```
                        UNITED STATES DISTRICT COURT        1
                        FOR THE DISTRICT OF NEW JERSEY
                        CIVIL ACTION NO. 13-1039(FLW-TJB)
                        CIVIL ACTION NO. 13-13


 _____    :
 IN RE PLAVIX PRODUCT            :
 LIABILITY AND MARKETING         :  TRANSCRIPT OF
 LITIGATION, etc., et al.,       :  MOTIONS
             Plaintiffs          :
          v.                     :
 BRISTOL-MYERS SQUIBB            :  AUGUST 21, 2013
 COMPANY, et al.,                :
             Defendants          :
 _____    :
 STATE OF WEST VIRGINIA, et      :
 al,                             :
             Plaintiffs          :
          v.
 BRISTOL-MYERS SQUIBB
 COMPANY, et al.,



 CLARKSON S. FISHER UNITED STATES COURTHOUSE
 402 EAST STATE STREET, TRENTON, NJ  08608


 B E F O R E :  THE HONORABLE FREDA L. WOLFSON, USDJ


 A P P E A R A N C E S :

   ROBERT L. SALIM, ESQUIRE  (LA)
        -and-
   FRANKOVITCH ANETAKIS COLANTONIO & SIMON, ESQUIRES
   BY:  CARL N. FRANKOVITCH, ESQUIRE  (WV)
        -and-
   BRACEWELL & GIULIANI, ESQUIRES
   BY: HEATH NOVOSAD, ESQUIRE  (TX)
        -and-
   ATTORNEY GENERAL OF WEST VIRGINIA
   BY: DANIEL GREEAR, DAG  (WV)
   On behalf of the Plaintiffs
                              (Continued)
```

* * * * *

**VINCENT RUSSONIELLO, C.C.R.**
**OFFICIAL U.S. COURT REPORTER**
**(609)588-9516**

2

A P P E A R A N C E S   (continued):


  ARNOLD & PORTER, ESQUIRES
  BY: ANAND AGNESHWAR, ESQUIRE  (NY)
      DREW HARKER, ESQUIRE  (DC)
      DAVID D. FAUVRE, ESQUIRE  (DC)
        -and-
  LOWENSTEIN SANDLER, ESQUIRES
  BY:  REBECCA VISVADER, ESQUIRE
  On behalf of the Defendants


A L S O   P R E S E N T:


  PARKER WAICHMAN, ESQUIRES
  BY:  DANIEL C. BURKE, ESQUIRE  (NY)

3

# C E R T I F I C A T E

PURSUANT TO SECTION 753, TITLE 28, USC, THE

FOLLOWING TRANSCRIPT IS CERTIFIED TO BE AN ACCURATE

TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE

ABOVE-ENTITLED MATTER.

S/Vincent Russoniello
VINCENT RUSSONIELLO, CCR
OFFICIAL U.S. COURT REPORTER

4

1              (In open court.)

2              THE CLERK:  All rise.

3              THE COURT:  Thank you.

4              I'll have the appearances.  Everyone else may

5     be seated.

6              MR. SALIM:  Robert L. Salim for the

7     plaintiffs, your Honor.

8              Mr. Carl Frankovitch for the plaintiffs West

9     Virginia.

10             MR. NOVOSAD:  Keith Novosad for the qui tam

11    plaintiffs.

12             MR. GREEAR:  Daniel Greear from the West

13    Virginia State Attorney General's Office, the state of

14    West Virginia.

15             THE COURT:  Thank you.

16             MR. AGNESHWAR:  Anand Agneshwar, Arnold &

17    Porter, for the defendants, your Honor.

18             MR. HARKER:  Drew Harker, Arnold & Porter, for

19    the defendants, your Honor.

20             MR. FAUVRE:  Your Honor, David Fauvre, on

21    behalf of the defendants, with Arnold & Porter.

22             MS. VISVADER:  Rebecca Visvader from

23    Lowenstein Sandler, also on behalf of the defendants.

24             THE COURT:  Thank you.

25             I'm going to first address the motions

1   regarding the Relator's case which includes the motion

2   for suggestion of remand and the motion for

3   reconsideration by the defendants of the transferor

4   court's opinion, and then, after that, I will turn to

5   the West Virginia motion.

6           Let me begin then as follows:

7           First, I think we need to kind of set some

8   background rules as follows, which are that with

9   regard to all of the issues that we'll be addressing

10  today:

11          Would the parties not agree that under the MDL

12  rules that if it is a procedural issue, it is

13  addressed by the law of this Circuit, the transferee

14  court; if it is a diversity case, I would be

15  addressing the substantiative law of the transferor

16  court; and, for a federal question issue, I'll be

17  using Third Circuit law?

18          Do you agree with that?

19          MR. AGNESHWAR:  Yes, your Honor.

20          MR. NOVOSAD:  Yes, your Honor.

21          THE COURT:  Then we have some parameters to go

22  with.  Thank you.

23          So let me begin with, first of all, the motion

24  for suggestion of remand, and that is the motion that

25  has been filed by the Relator in this matter.  I

1  really do not need argument on this point.  I think in

2  this regard the only argument really is that the

3  Relator indicates that essentially this being a false

4  claims case, qui tam, that it's unique and

5  procedurally complex.  That makes it somewhat

6  different than my products liability MDL cases.

7          Nobody disputes the theories of law; the

8  elements of cause of action are different.  Correct?

9  The only issue is -- and as the MLD panel looked at --

10 whether there is an overlap, at least, of a factual

11 issue in these cases.  Right?  That's what they found.

12 You can't deny that there is; can you?

13         Who is arguing this point?

14         Give me your name one more time, please.

15         MR. NOVOSAD:  Heath Novosad, your Honor.

16         THE COURT:  All right.  I have you,

17 Mr. Novosad.  Go ahead.

18         MR. NOVOSAD:  I do believe there is a factual

19 difference.

20         THE COURT:  Not if there are factual

21 differences.  I asked the question:  Is there an

22 overlap of at least some factual issues?  Can you deny

23 that?

24         MR. NOVOSAD:  Potentially, but the focus of

25 the qui tam and the marketing cases is on the efficacy

1   of Plavix as compared to aspirin, and the focus of the

2   PI -- the personal injury cases is whether there was

3   sufficient warnings about the bleeding risks of Plavix

4   such that there weren't sufficient warnings of the

5   bleeding risks.  And, so, the fundamental nature of

6   the two types of cases are different.

7            THE COURT:  You would disagree with that.

8            Who is arguing this one?

9            MR. FAUVRE:  Your Honor, David Fauvre.

10           We would disagree with Relator's point on

11   that.  And if you look at our opposition, we do note

12   citations from their complaint where they allege, as

13   do the product cases, that defendants understated

14   Plavix's bleeding risks relative to aspirin.  The

15   products cases do make allegations that defendants

16   promoted Plavix as superior to aspirin, which is the

17   central allegation in the qui tam case.

18           There are also similar allegations regarding

19   the FDA letters at issue in the case and about the

20   companies' representations about the clinical studies.

21   So those are all overlapping factual issues that the

22   panel considered in making its determination.

23           THE COURT:  I've reviewed the complaint and,

24   frankly, I find the same to be true.  There clearly is

25   an overlap in the kinds of factual allegations, and it

1   did reference the studies with regard to bleeding

2   risk.  It does talk about efficacy with regard to

3   aspirin versus Plavix; and, frankly, I think that's

4   what's going to come out probably as well in the

5   product cases as well.  There is going to be that

6   discussion of efficacy.  And certainly the marketing

7   practices are front and center in the products

8   liability cases.  There I know we've dealt with

9   already in some of the motions as to the learned

10  intermediary doctrine, but it's talking about how it's

11  being marketed and to whom, what the representations

12  were.  There is an overlap of factual issues and there

13  is no doubt about that.

14       As a result, and which is all that needs to be

15  done, the MLD panel so found, and that they found that

16  there were numerous allegations with regard to

17  marketing in both kinds of cases, and that it was

18  appropriate therefore to consolidate.  This Court

19  would agree.  All the cases I think are ultimately

20  going to also come down to an inquiry with regard to

21  efficacy of Plavix as well, all of them.

22       These commonalities are certainly sufficient

23  to find that centralization is appropriate.  I will

24  not disturb the removal to this Court.  I deny the

25  motion for suggestion of remand.

```
 1          Let's turn to the more substantive aspects now
 2   of the case.  Who is going to be dealing with the
 3   reconsideration motion?
 4          MR. NOVOSAD:  I will again, your Honor.
 5          MR. HARKER:  Your Honor, I will deal with that
 6   one for the defendants.
 7          THE COURT:  You are?
 8          MR. HARKER:  Drew Harker.
 9          THE COURT:  All right.
10          With regard to the reconsideration, as well
11   there is no dispute that this Court has the right
12   under certain constraints obviously to review that
13   ruling.  Correct?
14          You are not disputing that.  Correct?
15          MR. NOVOSAD:  No, your Honor, we are not
16   saying you don't have any jurisdiction.
17          THE COURT:  Thank you.
18          And essentially everyone as I think also
19   thought to look at this as does it fall within the,
20   what we would call our 7.1(i) rule, our
21   reconsideration contours.  Correct?
22          MR. HARKER:  Yes, your Honor.
23          THE COURT:  So let me start with that.  The
24   first question I think I want to ask is:  Looking at
25   the opinion from the judge, and I think that the
```

1    Relator has conceded this as well, that nowhere did

2    the judge specifically review or invoke Medicaid; did

3    he?

4           MR. NOVOSAD:  He does not mention Medicaid,

5    your Honor, no.

6           THE COURT:  Is that not alone a basis for this

7    Court to find that he overlooked the argument -- well,

8    let me start with this, by the way.  The brief you

9    filed below didn't highlight it either.  I looked back

10   at your brief.

11          MR. HARKER:  That's correct, your Honor.

12          THE COURT:  It didn't highlight Medicare D and

13   it didn't highlight Medicaid.  It spoke in general

14   terms.

15          MR. HARKER:  We were dealing with the

16   complaint which also spoke in very general terms, your

17   Honor.

18          THE COURT:  I understand.  But you didn't

19   highlight it for the judge, and I know there was no

20   reply, and I've seen the argument.  Bottom line --

21   there wasn't a reply, et cetera, but it didn't

22   highlight it.  And the bottom line is when the

23   opposition came, you made your arguments with regard

24   to the reasonable and necessity requirement and why

25   you followed that, and you did it under Medicare, et

11

1  cetera, generally, but the judge never mentions

2  Medicaid even though that's part of your complaint.

3          MR. NOVOSAD:  He doesn't mention Medicaid.

4  But it was in the complaint and it was an issue for

5  him to consider.

6          THE COURT:  Isn't it there to think by reading

7  this that it's at least unclear what he did or that he

8  overlooked Medicaid, because he clearly used the term

9  "Medicare" as a general word, and throughout the

10  opinion he refers to "Medicare" generally and never

11  invokes Medicaid.

12          MR. NOVOSAD:  Never invokes Medicaid, that's

13  correct.

14          THE COURT:  I think that's a basis at least

15  with regard to the Medicaid arguments for me to

16  consider the Medicaid arguments.  I do not believe

17  they were ever considered in the first instance; and,

18  as a result, it would be I think an error to not

19  reconsider that for which there is no opinion in my

20  mind.  So I will hear arguments with regard to

21  Medicaid today and whether the complaint is properly

22  pled.

23          Now, with regard to Medicare, and specifically

24  the focus of Medicare Part D.  This is a prescription

25  drug.  Medicare D is what controls it.  Correct?

1           MR. NOVOSAD:  Yes, your Honor.

2           THE COURT:  Really, Sections Medicare A, B,

3    et cetera, don't deal with prescription drugs.  Right?

4           So while the judge spoke generally about

5    Medicare and didn't focus on Medicaid D, also within

6    his opinion essentially the cases he cites deal with

7    Medicare A and B; don't they?  They don't deal with

8    prescription drugs and how Medicare is applied.

9           MR. NOVOSAD:  I believe the cases he cites to

10   specifically are Medicare's A and B.  There is plenty

11   of law out there that Medicare Part D also has

12   reasonable and necessary standards.

13          THE COURT:  I know that's the argument and

14   that's what we are going to talk about today.  But

15   what I'm suggesting is, the first question I have is,

16   I think that there needs to be at least clarification

17   of the judge's opinion because it's not clear if he

18   was focusing on the language of Medicare D, which I

19   know has some exclusionary language.

20          And I know what your argument is going to be,

21   why you think, nonetheless, reasonable and necessary

22   gets read into it.  But certainly the language of

23   Medicare D is different than A and B; and since his

24   general language was about Medicare, and he cites

25   cases as to Medicare A and B, I believe that

```
 1   reconsideration is appropriate at the very least for
 2   clarification purposes.  It doesn't mean the result
 3   may be different but it's necessary.
 4          So I am going to reconsider both aspects of
 5   the opinion:  Medicaid in my mind in the first
 6   instance because it was never decided, and then the
 7   Medicare D.
 8          So let's move from there now and talk about
 9   the substance of these motions.
10          Let's start with the Medicaid arguments
11   because, in my mind, to some extent, they are going to
12   be argued for the first time here today.
13          With regard to Medicaid, essentially the
14   position of the defendants is that once it's
15   essentially an on-label use and it's an FDA-approved
16   drug, that's the end of the inquiry.  You don't have
17   another layer.
18          Is that correct?
19          MR. HARKER:  The only other layer you would
20   have, your Honor, is whether one of the four
21   exclusions that are mandated in Medicaid have been
22   applied by the states, and our argument on that is
23   clearly that they haven't been.
24          But, yes, fundamentally, if it's on-label for
25   an FDA-approved drug, the cases say that the states
```

1    have to, must reimburse for the prescription.

2         THE COURT:  Now, with regard to Medicaid, what

3    is your argument with regard to the reasonable and

4    necessary -- and some of this may apply to Medicare D

5    as well -- when the state is not taking any specific

6    action with regard to excluding this from a formulary

7    or any of that?

8         MR. NOVOSAD:  Your Honor is very correct.  The

9    argument is going to apply I think to both Medicare

10   and Medicaid.  The defendants' position, as you've

11   stated, is once the drug is approved by the FDA, every

12   prescription for that drug for the indication the

13   FDA-approved it for is automatically reasonable and

14   necessary or medically necessary, and the plaintiffs'

15   position is that for both Medicare and Medicaid that's

16   simply not the case.

17        There is also a very important step, and

18   that's the physician, the treating physician,

19   prescribing physician, their decision whether the

20   prescription is reasonable and necessary for Medicare,

21   whether it's medically necessary for Medicaid, and

22   that is a second safeguard that goes to the

23   reasonableness and necessity.

24        THE COURT:  Let me stop you for a second.

25   Perhaps I'll turn to the defendant for just one

1    moment.

2         Is it essentially your position, because when

3    a drug is approved, at least since the 1962 amendments

4    by the FDA, it has to be approved for both safety and

5    effectiveness?

6         MR. HARKER:  That's correct, your Honor.

7         THE COURT:  So you say a finding has already

8    been made essentially.

9         MR. HARKER:  A federal finding has been made

10   as to that issue.  That's correct.

11        THE COURT:  So furthermore you don't need an

12   additional layer of reasonable and necessary then.

13        MR. HARKER:  That's correct.  And I think that

14   the federal cases that we cited, including Edmonds

15   from Florida, essentially say the same thing.  Yes,

16   your Honor.

17        THE COURT:  I'll turn to the plaintiffs at

18   this point as well.

19        Using the term, "reasonableness," do you think

20   that has some different meaning than safety and

21   effectiveness?  Because, clearly, at this point a

22   large part of the argument is cost.  Certainly, they

23   are going to say whether Plavix is as effective or

24   less effective than aspirin.

25        What they are really saying is nonetheless the

1  way you've touted this is it's so highly superior to

2  aspirin, and we're going to charge 100 times more than

3  we charge for aspirin, and if people understood that

4  it wasn't so superior or superior at all perhaps no

5  one would be paying this premium and government payors

6  would certainly not be allowing this.

7          So I don't know if the argument is that on the

8  reasonableness that's a different overlay when we get

9  to cost as opposed to effectiveness and safety.

10         MR. NOVOSAD:  It's an issue.  The

11  reasonableness of prescribing Plavix when the

12  defendants knew that it was no better than aspirin for

13  two of the three indications or may be worse than

14  aspirin.

15         We know that the FDA on at least two occasions

16  told them to stop marketing it that way.  So there is

17  not an issue, I don't believe it's going to be an

18  issue, that they were improperly marketing Plavix,

19  Plavix's efficacy, as compared to aspirin.

20         And so what they have basically done by these

21  fraudulent marketing practices is to deprive the

22  treating physicians of the ability to make their best

23  judgment about whether a prescription for Plavix was

24  reasonable or necessary.

25         This goes for many drugs for many of the

1    indications.  Epilepsy, for example; there is a dozen

2    anti-epileptics out there.  Some may be approved for

3    epilepsy, some may be reasonable for some types and

4    some may not be reasonable for other types.  It may be

5    reasonable to try something else first as opposed to

6    going to one or the other.

7           The same thing for Plavix.  A patient who had

8    a stroke before Plavix was on the market, if the

9    doctor wanted to prescribe an anti-coagulant to help

10   prevent another stroke or a heart attack or vascular

11   death, would most likely prescribe the baby aspirin

12   that costs four cents.

13          Plavix comes on the market.  The defendants

14   know that for stroke patients and for heart attack

15   patients, myocardial infarction patients, Plavix is no

16   better than aspirin.  But their sales reps are trained

17   to sell it as being superior.  They leave behind

18   pamphlets saying it's superior to aspirin.  And so a

19   doctor in many instance may think Plavix is this great

20   drug, and so they issue these prescriptions instead of

21   using the four-cent aspirin.

22          THE COURT:  Have a seat for a moment.

23          So the argument is that it really is not the

24   same inquiry or requirements as the FDA finding that

25   it's safe and effective, which your position would be,

18

1    and that's the end of it now.

2         So if you prescribe an on-label drug which has

3    already been determined as safe and effective, there

4    is no reason to have an additional criteria of

5    reasonable and necessary, though the statutes are

6    written in such a way that that is possible perhaps.

7         But the argument being made is, the reason for

8    having such an additional requirement -- I'm only

9    discussing now why there could be an additional

10   requirement as opposed to whether there actually is or

11   not -- is that it can mean something different than

12   what the FDA finding or determination was with regard

13   to safe and effective because something can be safe,

14   something can be effective in that it will treat the

15   problem for which it's being prescribed, but it

16   doesn't mean in a particular case perhaps that it is

17   the necessary drug or that it is the reasonable drug

18   to prescribe whether for cost reasons or otherwise.

19        I think there is probably some merit to the

20   argument that was just made that they could have some

21   different meanings.  You wouldn't dispute it could

22   have different meanings, reasonable and necessary,

23   than safe and effective; would you?

24        MR. HARKER:  I wouldn't dispute that, your

25   Honor.  They could have different meanings.

 1              THE COURT:  So we start with that.

 2              Now, we'll start talking about the statutes

 3    themselves.

 4              Have a seat for a moment.

 5              So that I can also decide what this is as a

 6    claim, let me go through a couple of things.

 7              The parties would agree that a False Claims

 8    Act cause of action imposes liability on a person or

 9    entity that both submits a false claim or causes a

10    false claim to be submitted.

11              Now, your argument is essentially that the

12    physicians are submitting the claim, they don't know

13    it to be false, but that essentially they are being

14    caused to submit it by the actions of the defendant.

15    Correct?

16              MR. NOVOSAD:  That's correct.

17              THE COURT:  And it's causing them to submit

18    this to the government.  That's your only argument, is

19    the causing.

20              Correct?

21              MR. NOVOSAD:  That's correct, your Honor.

22              THE COURT:  All right.

23              I think you would also agree, and certainly

24    the case law seems to indicate, there are two types of

25    false claims: those which are factually false and the

1   claims which are legally false.

2          Isn't it true that your theory of liability,

3   the Relator's theory of liability that was advanced

4   before the transferor court and this Court, is that

5   this is a legally false claim?

6          MR. NOVOSAD:  Yes, your Honor.

7          THE COURT:  Thank you.

8          And would the parties agree that to

9   demonstrate legally false claims in this case, that

10  the Relator would have to show that the defendants

11  caused the submission of the claims that did not

12  comply with the applicable statutes or regulations,

13  and that compliance with which was a precondition to

14  payment by Medicare Part D and the individual state

15  Medicaid programs?

16         Would you all agree with that statement?

17         MR. NOVOSAD:  Yes, your Honor.

18         MR. HARKER:  Yes, that's what Judge Greenberg

19  said in Wilkins, your Honor.

20         THE COURT:  It sure is.

21         So now we're in agreement on that, because

22  there was some disagreement in the briefs about legal,

23  factual, et cetera.  We have now set the parameters of

24  what the cause of action has to be.

25         Let's first turn then to Medicaid.

1              First of all, I know that the complaints do

2    not actually plead a reasonable and necessary

3    requirement.

4              Do you think that has to be pled?

5              MR. HARKER:  Yes, your Honor, I do, both under

6    Organon and Takeda.  Yes, those cases are False Claims

7    Act cases, and they make it clear that complaints are

8    deficient unless they specifically set out the program

9    that did set forth the condition for payment and the

10   way in which the claim was false versus that as

11   condition.

12             So, yes, your Honor, the complaint is

13   deficient in that regard.

14             THE COURT:  The "program" meaning Medicare or

15   Medicaid?

16             MR. HARKER:  That's correct.

17             THE COURT:  What do you say about that?

18             MR. NOVOSAD:  Paragraph 71 of our complaint,

19   which is specifically our first cause of action for

20   the federal false claim, does say:

21             "BMS/Sanofi's actions knowingly caused

22   physicians and pharmacists to either expressly or

23   impliedly make false certifications about Plavix's

24   efficacy or necessity for the patient's treatment.  As

25   a result, BMS/Sanofi knowingly caused a submission of

22

1   false claims by government payors."

2        I do not believe the remaining causes of

3   action mention medical necessity, but the pleadings

4   are there.  The claims, the reasonableness and

5   necessity are part of the complaint.

6        THE COURT:  All right.

7        That doesn't say "reasonableness."  We've

8   already discussed that efficacy is something different

9   than reasonable.  But I assume your argument would be:

10  Well, even if I didn't plead it properly, I could

11  amend.

12       MR. NOVOSAD:  If the Court is of that mind, we

13  would ask leave to amend.  We think the complaint is

14  sufficient on its face.  But for that matter we would

15  ask leave to amend.

16       THE COURT:  I think you would have to use the

17  buzz words, and they are not just buzz words because

18  as we've already indicated talking about efficacy I

19  think goes right as to perhaps just the statute.  The

20  reasonable and necessary requirements are a little bit

21  different, and I think you would have to, and you

22  would have to be able to do so in good faith.  That's

23  a pleading issue and certainly amendments could be

24  appropriate.

25       But let's talk about your position, which I

23

1    think you are saying that is not a part -- we are

2    going to start with Medicaid -- of the Medicaid

3    program.

4           MR. HARKER:  That's correct.

5           Well, certainly with respect to the

6    terminology in the complaint, efficacy or necessity,

7    you don't find that in the Medicaid statute.

8           THE COURT:  Put that apart.  We're at the

9    beginning.  Amendments are fine.

10          So assuming they would amend to include that

11   language, now let's talk about it.

12          MR. HARKER:  Okay.

13          Our view, again, would be that with respect to

14   the allegations in the complaint, which are all for

15   on-label use, stroke, or what have you, no off-label

16   being indicated, the condition for payment here set

17   out in the Medicaid statute made very clear by

18   Congress, a mandate -- and many, many cases say the

19   same thing, that the states have to reimburse for an

20   on-label accepted, medically accepted indication, in

21   the absence of one of the exceptions.  I understand

22   that they could amend their complaint.  But, as of

23   now, there is no allegation as to any of the

24   exceptions.

25          So what you have are allegations related to

1   on-label uses for a medically-approved drug without

2   any of the exclusions, Medicaid Congress mandates

3   reimbursement.

4       So going back to Judge Greenberg's opinion in

5   Wilkins, they have not alleged and cannot allege, in

6   my view, a condition for payment based on what their

7   basic factual allegation is, which is all on-label

8   uses.

9       THE COURT:  What would you say in response?

10      MR. NOVOSAD:  We don't disagree that we are

11  alleging on-label uses.  We are not making any

12  allegations about off-label in the qui tam.  I think

13  it still comes back to -- I don't believe there is any

14  case law that the defendants have cited that say

15  automatically every on-label prescription for a drug

16  is medically necessary or is reasonable and necessary.

17      Whether or not Medicaid and Medicare must

18  reimburse for on-label -- let's assume for the fact

19  that is true.  I don't think that's necessarily the

20  case.  But assuming that Medicare and Medicaid have no

21  choice but to reimburse for on-label prescriptions,

22  you still have the requirement that prescription must

23  be, for Medicaid, specifically, medically necessary.

24  That's a determination that's made by a treating

25  physician when they see their patient, whether it is

1   necessary for that patient to be prescribed Plavix or

2   whether something else would be more appropriate.

3          THE COURT:  So the argument basically is

4   because the doctor has to still certify for Medicaid

5   purposes that something is medically necessary.

6          Would you agree with that?

7          MR. HARKER:  No, your Honor, I wouldn't.

8          THE COURT:  You wouldn't.

9          MR. HARKER:  No.  It hasn't been pled and --

10         THE COURT:  Forget the "having been pled."

11         MR. HARKER:  No, I wouldn't agree with that.

12         THE COURT:  Why?

13         MR. HARKER:  Because with respect to this

14   particular -- these particular usages, they are

15   on-label.  They are on-label.  They are for an FDA-

16   approved drug.  You look at the statute which clearly

17   says that they must be reimbursed if that's the basis

18   without more.

19         Look at Edmonds, your Honor.  I would

20   encourage you to read Edmonds closely.  We have.

21   Edmonds was interesting because the state tried to

22   impose some extra requirements onto what medically

23   accepted indications were and exclude, exclude from

24   the reimbursement in Florida indications that the

25   statute mandated should be reimbursed.

1          And in Edmonds the Court found that those

2     extra conditions, if you will -- which is exactly what

3     we are talking about here with this concept of this

4     medical necessary overlay, if you will, on top of the

5     federal requirement -- that the medical necessary

6     overlay they are talking about is exactly the kind of

7     thing that the Edmonds court said Medicaid doesn't

8     permit unless the states follow one of the four, what

9     the Court called, carefully circumscribed exceptions

10    that are set out in the statute.  Unless the state

11    follows that, then the on-label indicated use must be

12    reimbursed, and without respect to any additional

13    requirements.

14          So what we are saying is that the states --

15    within the confines of those four exceptions that are

16    set out in the statute, the states could impose

17    additional requirements.  But there's got to be within

18    the context of those four exceptions, those four

19    exclusions from the basic guarantee of reimbursement,

20    and that hasn't been done and certainly hasn't been

21    pled.

22          MR. NOVOSAD:  Again, your Honor, I think we

23    are talking cross-wise.  For the purpose of today,

24    let's assume everything they said is right, that the

25    state does not have the ability, no discretion,

1   whether or not they have to reimburse for an on-label

2   usage.

3         What we have in the complaint are Relator,

4   former sales rep for the defendants, said that they

5   were instructed to target physicians in low-income

6   areas because those doctors have a higher percentage

7   of patients on government assistance like Medicare and

8   Medicaid; and, ironically enough, low income patients

9   are less price sensitive than higher income.

10        THE COURT:  I know your argument.  His

11  argument is:  But the state could not restrict that

12  unless it falls within the four criteria, and you

13  haven't pled nor suggested that you would plead that

14  it could fall within the four exclusions.

15        MR. NOVOSAD:  Because there are bases upon

16  which the state can refuse to pay; then there is the

17  medical necessity requirement that is certified by the

18  doctor.

19        If the government has no choice, that's what

20  the False Claims Act is for.  They promoted Plavix in

21  a way to vastly increase the amount of prescriptions

22  for people who it's not medically necessary for; and

23  if the government has no choice but to pay those, that

24  is causing a false claim to be submitted that the

25  government has to pay, and that's the purpose of this.

28

1     It comes back to their bad actions that the FDA at

2     least twice told them to stop doing.

3           THE COURT:  I asked the question:  Does a

4     doctor who submits a claim for the patient, the

5     patient submits a claim for reimbursement, is there a

6     medical necessity certification that is essentially

7     being attached by making that claim?

8           MR. HARKER:  Not in the case of Plavix

9     on-label indications; no, your Honor.

10          THE COURT:  Isn't it inherent that it has to

11     be; that anytime that a physician is prescribing, they

12     are determining or they have determined that there is

13     a medical necessity for that prescription?

14          MR. HARKER:  That's not contemplated within

15     the Medicaid statute.  You say is it inherent, as I

16     say --

17          THE COURT:  Isn't that part of the scheme for

18     Medicaid?  The whole idea for this kind of government

19     program was that you are going to make claims for

20     things that are medically necessary for patients.  You

21     are going to get government money repaying.  You

22     wouldn't do something that's not.

23          Look, you could have a drug that's

24     FDA-approved and on-label and a doctor says, Well,

25     maybe you could develop a little bit of high

1   cholesterol here.  I'm going to give you Crestor or

2   Lipitor for it.  You're not really there.  Maybe it's

3   not really medically necessary.

4          To get it repaid, they have to be saying it's

5   medically necessary to prescribe this drug.  Right?

6   Isn't that inherent?

7          MR. HARKER:  They are making a judgment, your

8   Honor.

9          THE COURT:  Exactly.  But you just conceded

10  that then.

11         So their argument is that the judgment has

12  been skewed by your marketing, and that they can make

13  a claim in that regard which is causing them to submit

14  claims.

15         MR. HARKER:  Well, your Honor, I'm glad that

16  you got back to the language of the False Claims Act

17  because that's where we start; and if you look at

18  Judge Greenberg's opinion, the certification --

19  assuming that there is a certification -- of

20  reasonableness, it must relate to a condition of

21  payment, and what we have searched for in the context

22  of Medicaid is that condition of payment.  That the

23  state had a basis under the statutory scheme set out

24  by Congress to deny the claim for payment, and because

25  Congress set up Medicaid the way they did, there is

1   no -- the state, if they wanted to impose such a

2   condition, they could do so, but it's got to be within

3   the context of those four exclusions which I think

4   it's just been conceded they couldn't plead to.

5         Wilkins also addressed the issue about:  Are

6   there other remedies here?  The False Claims Act deals

7   with false claims for payment, and the allegation in

8   the Wilkins case was with respect to Medicare

9   marketing regulations.  The Court there said, We've

10  heard a number of times about FDA.  The authority of

11  FDA has been invoked here.

12        Well, the FDA has authority to deal with the

13  kinds of allegations that are being made here -- false

14  marketing.  And what Wilkins said was the Court

15  shouldn't substitute as judgment for what has really

16  been set up to be an administrative remedy here.  Go

17  to the FDA and let the FDA deal with claims about

18  false marketing because the FDA is best suited to do

19  that.

20        With respect to what Wilkins was looking at

21  and what your Honor is looking at, I would submit to

22  you that you need to look for a condition of payment,

23  and the condition of payment needs to specifically say

24  that the doctor has to certify as to its reasonable

25  and necessary -- that this is a reasonable and

1  necessary prescription, and there is no requirement to

2  do that.  There is just no requirement to do that, nor

3  has one been pled.

4       THE COURT:  So under your theory, unless the

5  plan sponsor, provider, et cetera, adopts a system

6  that excludes unreasonable or unnecessary drugs, then

7  any prescription must be paid for, including anything

8  that's a more expensive drug than one that is equally

9  effective or is cheaper or equivalent.  That's your

10  position.  There's no choice.  Cost never comes into

11  it.

12       MR. HARKER:  And, indeed, your Honor with

13  respect to that question --

14       THE COURT:  Is that right, cost never comes

15  into it?

16       MR. HARKER:  Yes.  And I would say for support

17  for that, I would encourage your Honor to look at the

18  formulary provisions in the Medicaid statute because

19  the formulary provisions -- this is one of the four

20  exceptions that we are talking about.

21       THE COURT:  I have the requirements for

22  formularies.  What do you want me to look at?

23       MR. HARKER:  The one that says -- let's see.

24  I'll tell you.

25       It's Section 1396r-8(d)(B)(iv).  And you will

1   see there, your Honor, that there is a reference with

2   respect to formularies that "a covered outpatient

3   drug" -- this is Plavix now; Plavix is a covered

4   outpatient drug about which there is no dispute --

5   "may be excluded with respect to the treatment of a

6   specific disease or condition for an identified

7   population, only if, based on the drug's labeling, or

8   in the case of a drug the prescribed use which is not

9   approved" -- the pertinent part -- "the excluded drug

10   does not have a significant, clinically meaningful

11   therapeutic advantage in terms of safety,

12   effectiveness, or clinical outcome of such treatment

13   for such population over other drugs included

14   formulary," and there is a written explanation of the

15   basis for the exclusion."

16          What that is saying is that if in setting up

17   the formulary the state looks at two completing drugs,

18   and you look at the label and one drug is more

19   effective, has efficacy advantages over the other, you

20   can exclude from the formulary that drug.

21          THE COURT:  I have it.  I read it with you and

22   I have it in front of me.  Thank you.

23          MR. HARKER:  And without any reference to

24   cost.  I'll just make that point.  No discussion with

25   respect to the formulary about cost and cost

33

1    advantages and taking into account cost issues.

2           So in setting up a key exclusion from the

3    federal mandate of guaranteed reimbursement for

4    approved drugs, Congress itself did not focus on cost.

5    I think that's a terribly important consideration for

6    us to the extent that we are looking at this issue of

7    the difference between Plavix and aspirin in terms of

8    cost.

9           (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  But there is more than that.  It

2     does talk about, put aside the cost, "and does not

3     have a significant clinically meaningful therapeutic

4     advantage."  That would be the second part of their

5     argument.

6          Put aside the cost.  You can add that to it

7     and think about it.  But what they are saying is, and

8     that is their claim, that Plavix does not have a

9     significant clinically meaningful therapeutic

10    advantage over aspirin, and therefore it is something

11    that could be excluded by a formulary.

12         Now, I know your argument is that they haven't

13    presented anything that any state actually excluded

14    it.  But my assumption is, the next argument would be:

15    Well, one of the reasons they haven't is because you

16    have so skewed your marketing and test results that

17    not only are the physicians that you are targeting not

18    aware, but the states who are creating and those who

19    serve on these committees that create the formulary

20    are not fully aware either.

21         By the way, you haven't pled that because that

22    was my next question.  You've only pled as to

23    physicians being essentially marketed and hoodwinked.

24    You haven't said anything about this being aimed at

25    those at the state level or -- we'll get to Medicare

1    Part D -- the plan sponsors and providers.  It's not

2    pled.

3          Wouldn't that have to be for you to be able to

4    make a claim under these statutes?

5          MR. NOVOSAD:  I don't think that necessarily

6    does have to be pled to make a claim under these

7    statutes.

8          Your Honor hit the nail on the head.  Our

9    allegation, your Honor, is that there is no

10   significant clinical advantage of Plavix over aspirin

11   for two of the indications.  But I still think you do

12   have the cost issue as well.

13         Montana, for example, specifically in its

14   Medicaid regulations said that "prescription drugs

15   must be medically necessary and the most efficient and

16   cost effective."

17         So they are requiring this, and physicians,

18   because they have been told that Plavix is so much

19   better than aspirin, don't get to that cost

20   assessment.  If they were told the truth, that Plavix

21   is no better than aspirin, maybe worse than aspirin

22   for these groups of people that suffered stroke or --

23         THE COURT:  Could I just stop you one second.

24         Would Section E of the section you were

25   reading have any impact on cost?  You were in

1  subparagraph (4), (e) says as well:

2      "The formulary meets such other requirements

3  as the Secretary may impose in order to achieve

4  program savings consistent with protecting the health

5  of program beneficiaries."

6      Does that put an overlay of cost into the

7  equation?

8      MR. HARKER:  Yes, your Honor -- well, all of

9  those provisions that we are talking about have to be

10 met in setting up a formulary.

11     THE COURT:  So couldn't cost be an issue in

12 creating a formulary together with the others, is what

13 I'm saying, a consideration of cost by looking at

14 Subsection E?

15     MR. HARKER:  Assuming that it's met.

16     THE COURT:  So it's not that cost could never

17 come into the equation of creating a formulary

18 assuming the other criteria are met as well.  That's

19 all I wanted to point out.  You indicated cost never

20 comes into it, but apparently it does under the

21 statute.  So there can be the argument made, both cost

22 and comparison with other drugs and whether there is a

23 significant therapeutic advantage.

24     I go back to, however -- because I know you

25 have not pled that any state has created a formulary

1   that excludes it.  I've essentially made the argument

2   for you, I guess, that what you would argue is that

3   one of the reasons they haven't is because the

4   information hasn't been adequately given to them as

5   well with regard to this drug.

6        But it's not pled.  And I raise that to you

7   because while I understand your argument is that it is

8   the physicians who are submitting the claims and being

9   caused to submit what you would say to be false

10  claims, must you not be pleading as well if, indeed,

11  there is no exclusion from the formulary list by a

12  state, would you not have to be in good faith able to

13  plead that while there is not, the reason is, again,

14  because of this false marketing, which means it's not

15  adequately pled still.

16       MR. NOVOSAD:  What we come back to, your

17  Honor, is even if it's an on-formulary drug, the

18  medical necessity requirement is an independent check

19  on the Medicaid system that their fraudulent marketing

20  caused physicians to submit these claims.

21       So even, again, if the state had to reimburse,

22  if there was some rule that says if there weren't

23  these exceptions that states could limit their

24  formulary, let's say, any drug approved by the FDA you

25  have to have on the formulary, it's still a bad action

1   by the defendants causing excessive prescriptions to

2   be written and violating the medical necessity

3   requirement which is an independent issue that's dealt

4   with at a physician level.

5            So I think you can do it both ways.  You can

6   do it either way.  One is to say the defendants

7   hoodwinked the states into keeping Plavix on the

8   formulary for strokes and MI patients thereby having

9   the states reimburse these prescriptions.  But even if

10  that wasn't the case, I think you still get there with

11  the independent medical necessary requirement that

12  applies to the physicians and their decision whether

13  to prescribe Plavix.

14           THE COURT:  Well, except that the physician

15  isn't looking at cost.  It's not their concern except

16  when it has to be their concern when a patient can't

17  pay for it and they are looking for something else.

18  They are not worried about cost in this situation.

19           Where you talk about efficacy, the argument

20  would be, you haven't argued it's not as efficacious

21  as aspirin.  You are just saying it's not

22  significantly better.

23           MR. NOVOSAD:  It's not significantly better

24  and it may be worse.  The studies have -- it's

25  unclear.  That's why the FDA told them to stop.

1          THE COURT:  I don't really have anything that

2    would make that -- to be clear that you could plead

3    that.  But in that regard, when you talk about medical

4    necessity for the doctors themselves without a

5    consideration of cost or whether it's significantly

6    better, I'm not so sure at that point you could argue

7    that that becomes a false claim in saying that this is

8    a medically necessary drug because they don't have to

9    do at that point a comparison of saying:  Is there

10   something cheaper out there that would do the same

11   thing?

12          MR. NOVOSAD:  I think for some states, Montana

13   specifically, you do have to do a --

14          THE COURT:  I don't know about Montana.  You

15   haven't pled that.  You haven't pled anything else as

16   to the other states as to why, then, that overlay

17   would come in where that could be a consideration.  I

18   don't think it's been properly pled under Medicaid.

19   I'll give you a chance to plead it again.

20          So I'm going to at this point dismiss without

21   prejudice the Medicaid allegations with the right to

22   replead.

23          Let's turn to Medicare Part D.  Where are we

24   here?  What's your argument?  I've read it all, but

25   I'll let you summarize it now in light of everything

1    we've said.

2         MR. HARKER:  Well, it really is very

3    consistent, and you're probably not surprised, your

4    Honor, with our Medicaid argument in the sense that

5    when you look at Medicare Part D, what did Congress

6    say?  What Congress said was that covered Part D

7    drugs, which, again, are FDA-approved for an indicated

8    use, must be reimbursed under Part D unless there is

9    a -- unless one of the exceptions applies.

10        I know that there is an argument that has been

11   made that, no, there is a reasonable and necessary

12   standard that also applies to Medicare Part D,

13   although Congress knew when they wanted to condition

14   payment on a reasonable and necessary requirement,

15   they knew how to do it.

16        So if you look at the Medicaid A and B

17   statute, what does it say, your Honor?  It says, "no

18   payment may be made under Part A or B or Part B of

19   this subchapter for any expenses incurred for items or

20   services" -- I'll skip over a few words -- "that are

21   not reasonable and necessary for the diagnosis or

22   treatment."

23        So Congress spoke very clearly in A and B when

24   they wanted to impose a reasonable and necessary

25   requirement on payment.  They knew how to do it.  They

1    didn't use that same language with respect to Part D.

2        Instead, with respect to Part D, what they

3    said was that Part D covered Part D drugs, as I've

4    just defined them, have to be reimbursed and unless an

5    exclusion is met or a circumstance is met.  And one of

6    the circumstances is that a Part D plan may

7    proactively impose a reasonable and necessary

8    requirement as part of its reimbursement policy.

9        That's not been pled, your Honor.  So what we

10   have is, we have the condition of payment here is that

11   an FDA-approved indication must be reimbursed under

12   Part D unless certain circumstances are met.  Those

13   circumstances not being pled, our view is the

14   condition for payment is it's FDA-approved and it's

15   for an indicated use.  If there is any implied

16   certification here, your Honor, by the doctor, that's

17   what he's certifying to and that's it.

18       THE COURT:  Counsel.

19       MR. NOVOSAD:  What we have in 42 U.S.C.,

20   1395w-102(e) is that Congress specifically authorizes

21   prescription drug plans to exclude from qualified

22   prescription drug coverage any covered Part D drug

23   that is not reasonable and necessary.  It's a very

24   similar argument to the Medicaid.

25       THE COURT:  I understand.  So we go back to

42

1   the argument of there is no indication that any plan

2   sponsor has incorporated that language.  Isn't that

3   what the statute says:  To get the reasonable and

4   necessary requirement written into it, the plan

5   sponsor has to make it a part of theirs?

6        MR. NOVOSAD:  Again, we think that's one

7   avenue.  We also think there is the independent duty

8   of reasonableness and necessity on behalf of the

9   prescribing physician.

10        THE COURT:  Well, except in the statute itself

11   the way it's been written, for whatever reason,

12   Congress decided that in Section Y, that they created

13   this exclusion under D.  They say that unless the plan

14   sponsor includes it -- I'm sorry.  It's W.  And for

15   some reason they did that way with prescription drugs

16   different than regular services under A and B; and

17   whether it's because they saw the overlay of the FDA

18   having taken action and they thought that was

19   appropriate, but they left open for plan sponsors to

20   create this additional requirement which was already

21   discussed earlier in this argument could have some

22   additional meaning.

23        Do you not have to plead that in some way,

24   similar to the discussion I just had with you, either

25   that some of them did exclude, which I'm guessing none

1   of them did, or the argument that I just made for you

2   essentially a few moments ago, that your argument

3   might be one of the reasons such an exclusion doesn't

4   exist is because they are also not aware because of

5   the manner in which it has been marketed?

6          MR. NOVOSAD:  The same arguments would apply,

7   yes, your Honor.

8          THE COURT:  And I think you would have to

9   replead it then again.  So I'll allow you to replead

10  both of those claims, and we'll see where it goes from

11  there and if you could do it effectively.

12         So the motion has been reconsidered, and I'll

13  give an opportunity for plaintiff to replead within

14  30 days.

15         Now, let's turn to West Virginia.

16         MR. SALIM:  Your Honor, if I may, I would like

17  to introduce to the Court the Attorney General from

18  West Virginia who is in charge of this case who has

19  come today.  He was not here at our initial

20  conference, and I wanted to introduce Mr. Greear to

21  the Court, your Honor.

22         THE COURT:  Thank you.

23         Who is going to be arguing the West Virginia?

24         MR. FRANKOVITCH:  I will be, your Honor.  Carl

25  Frankovitch.

44

1          THE COURT:  Thank you very much.

2          So we are dealing with this in your motion for

3    remand, and let me begin.

4          First of all, we're going to be talking about

5    the real party in interest in this case during this

6    argument.  In that regard, is that a procedural as

7    opposed to substantive issue?

8          MR. FRANKOVITCH:  Not necessarily, your Honor.

9    I think the substantive issue is the Attorney

10   General's authority to act on behalf of the citizens

11   of the state and statutorily created authority to act

12   on behalf of the state.  And so I think it's

13   substantive, not just procedural.

14         THE COURT:  Is it a combination?

15         I understand that I may have to look at what

16   West Virginia does and actually, the whole system of

17   the PEIA, et cetera, and I'll be looking at all of

18   that.  But when I'm applying the legal principles to

19   it.

20         MR. FRANKOVITCH:  Well, I think in what I

21   guess we are relating as the standing issue, it's the

22   substantive law of the state which creates -- part of

23   it is statutory which gives the Attorney General the

24   authority to enforce certain provisions and to seek

25   statutory penalties which is created solely by

1    statute, and I don't think is procedural.

2         THE COURT:  By the way, this was not briefed.

3    I know it was brought up in the sur-reply that was

4    filed.  I did not want sur-replies, but there was one

5    filed.

6         MR. FRANKOVITCH:  I don't think it is even

7    predominantly procedural.

8         THE COURT:  Are you going to be arguing the

9    West Virginia one?

10        MR. AGNESHWAR:  I am, your Honor.  Anand

11   Agneshwar for the defendants.

12        I think there is both aspects to this.  In

13   terms of the standard that your Honor will apply to

14   determine what is a real party in interest, my

15   understanding is you will apply Third Circuit law.

16        In terms of applying that standard in

17   determining what PEIA is under West Virginia, you will

18   then look to West Virginia substantive law.

19        THE COURT:  That's basically how I saw it.

20   You disagree with that?

21        MR. FRANKOVITCH:  No, I don't disagree to that

22   aspect.  I don't think that PEIA is the critical issue

23   either.

24        THE COURT:  I understand.  We'll get to that

25   in a moment.

1        Let me try and get down to really the issues I

2   see in this motion.  I would hope, Mr. Agneshwar, that

3   you are really not going to be arguing CAFA

4   jurisdiction here.  You are just wrong on that one.

5        MR. AGNESHWAR:  I was not going to focus on

6   that part of the argument, your Honor.

7        THE COURT:  Good.  Because we are just going

8   to get rid of that argument that that was a basis for

9   jurisdiction here.

10       So what we really have instead is the question

11  of really who are the parties in this case and,

12  indeed, is the state a party?  And if they are a

13  proper party and an actual party, it ultimately

14  doesn't matter what PEIA is.  If they are not, then it

15  obviously does matter what PEIA is in this matter, if

16  it's an arm of the state or not.

17       And, of course, the last question is, this

18  question of federal jurisdiction as well, but let's

19  deal with the parties first.

20       In this regard, talking about West Virginia,

21  there is no question, correct, that the Attorney

22  General may bring lawsuits on behalf of the state of

23  West Virginia?  You would agree with that.  Correct?

24       MR. AGNESHWAR:  As a general proposition, yes,

25  your Honor.

1          THE COURT:  Then what is being argued is that

2     the plaintiff has a substantial pecuniary stake in the

3     outcome of the litigation because it seeks civil

4     penalties of up to $5,000 for each willful violation

5     that occurred during a four-year period.

6          The issue of the injunction, apparently from

7     what I understand factually, and I don't know that

8     it's being argued to the contrary, is essentially on a

9     going forward basis mooted because you have

10    represented -- and I don't know that you disagree with

11    these -- that the marketing efforts that were being

12    attacked had ended.  Is that correct?

13         MR. AGNESHWAR:  That's correct, your Honor.

14    Plavix is now generic.

15         THE COURT:  So, Mr. Frankovitch, I think you

16    would agree that a prospective injunctive relief is

17    not therefore still part of this case.

18         MR. FRANKOVITCH:  Well, it would be to

19    preclude the reintroduction of its same marketing

20    aspects.

21         THE COURT:  They would probably stipulate to

22    that -- right? -- at the outset that they are not

23    going to do that.  Correct?

24         MR. AGNESHWAR:  That we are not going to

25    promote it unlawfully, yes.

1          THE COURT:  Well, gee, you could do that for

2     all of your drugs.  Wouldn't you say that?  That's not

3     what you mean, that general statement.  He means more

4     specifically the manner in which you have marketed

5     Plavix in the past with regard to certain claims.

6          Is that correct?

7          MR. FRANKOVITCH:  Yes, the underlying aspect

8     of this case, what we have depicted as unfair trade

9     practices and deceptive marketing.

10          MR. AGNESHWAR:  No, your Honor, I would not

11     stipulate that there was anything wrong about the way

12     the companies promoted the product.

13          THE COURT:  I understand you are not going to

14     put labels on it or say it was improper.  The question

15     is -- and as I understand it now to know whether this

16     is really a moot point or not -- is:  If there is a

17     dispute between the parties as to the manner in which

18     Plavix is marketed, you are thinking, of course, that

19     everything that has been done to date has been fine,

20     that they are saying it has not been, and even if they

21     are not engaged in those marketing activities at the

22     moment, the position is if you might resurrect those

23     marketing activities that they claim to be

24     problematic, they have a right to go forward and make

25     sure that you don't and get a decision as to whether

1    it was improper so you would be enjoined from doing so

2    in the future.

3         So my question to you is:  Unless there was

4    some agreement, whatever those marketing things are

5    that could be agreed to, he's got a life claim on

6    injunctive relief.  You see the Catch-22 you are in?

7         MR. AGNESHWAR:  Yes.  Unless I'm willing to

8    say that the companies will never market the claim in

9    the future, I guess that theoretically has a claim for

10   injunctive relief.  But I would think that in order to

11   file a claim for an injunctive relief, he has to have

12   evidence that something is going on now that he needs

13   to enjoin.  So there is no ripe claim for injunctive

14   relief.

15        Now, theoretically, if six months from now the

16   companies decide, You know what, we want to get back

17   in promoting the drug against the generic, and they do

18   some marketing that he thinks is wrong, maybe there

19   will be a claim for injunctive relief that becomes

20   ripe then, but not now.

21        MR. FRANKOVITCH:  They still have marketing

22   material out there and having corrected what we

23   perceive as being the improper marketing.

24        THE COURT:  Mr. Frankovitch, are you telling

25   me that there is currently marketing material out

1   there that you feel falls within the allegations of

2   your complaint?

3           MR. FRANKOVITCH:  There could be because there

4   was paper marketing, there was advertising, there was

5   instructions to staff, and part of that injunctive

6   relief would be to desist from that activity, assuming

7   we prove our case.

8           THE COURT:  Right, or to seek return of it.

9           MR. FRANKOVITCH:  Right.

10          THE COURT:  Or to make curative instructions.

11          MR. FRANKOVITCH:  Exactly.

12          THE COURT:  I don't think the injunctive

13  relief claim is dead.

14          MR. AGNESHWAR:  I think we are back to

15  pleading a little bit.  There is nothing pled about

16  what's going on today.  The only evidence, the only

17  allegations in the complaint about marketing stem from

18  a decade ago where the FDA's untitled letters were

19  written.

20          So, again, I would think that if they really

21  want to keep a claim for injunctive relief, they have

22  to plead something going on now.

23          THE COURT:  Where do you think you have

24  allegations that deal with the marketing that would be

25  current at the time you filed the complaint?  Because

1   you filed this back in when?

2        MR. FRANKOVITCH:  I think it was February of

3   this year -- excuse me.  December of 2012.

4        THE COURT:  Well, they certainly pled it as a

5   present.  By the way, this is not a summary judgment

6   motion here.  But they have pled it as, "At all times

7   material herein BMS/Sanofi engaged in illegal

8   marketing practices in West Virginia to promote the

9   use of Plavix by affirmatively representing Plavix was

10  a superior drug to aspirin for certain indicated

11  usages" -- is paragraph 21 -- "when in fact Plavix is

12  no more effective than aspirin for certain indicated

13  usages."

14       Paragraph 23 deals with targeting the false

15  and deceptive marketing efforts of the state and PEIA.

16       There is nothing that indicates that this is a

17  backwards look, but that it was ongoing.  And I'll

18  take the allegations as pled at the time that you

19  removed the case, and that's when I look at it, at the

20  time of removal.

21       MR. AGNESHWAR:  I can understand that

22  position, your Honor.  I would just submit, since you

23  are asking me the question that under Twombly and

24  Iqbal, there would need to be a lot more specificity

25  than just saying that there were promotions that

52

1    happened over a long period without any evidence or

2    any allegations but there are specific things going on

3    today.

4         THE COURT:  By the way, the Third Circuit has

5    cut back a little bit on Twombly and Iqbal this

6    summer, if you have seen the more recent opinion.  I

7    think they thought that all of us got a little out of

8    control in trying to make Twombly and Iqbal have more

9    real teeth for all of us in evaluating pleading.  So I

10   wouldn't be as sanguine that it's not -- that's not

11   where we are, and this is not a motion to dismiss on

12   adequate pleading, et cetera.

13        You removed it based on the manner in which it

14   was pled in arguing they were not a proper party, and

15   one of your arguments, of course, is that they could

16   not go forward on injunctive relief.  Essentially, it

17   was a moot point.  And I'm saying, the manner in which

18   it was pled does not make it appear to be a moot

19   point.

20        MR. AGNESHWAR:  Yes, I understand that, your

21   Honor, and I don't need to debate the point.  Our real

22   argument about that is that the State AG aspect of

23   this case is really the tail wagging the dog; and if

24   you do a real party-in-interest analysis, it's really

25   not the gravamen of this complaint.

53

1          It's really about what the insurance fund was

2     paying out and about reimbursing the insurance fund.

3     And our real point about the injunctive relief

4     component is:  Look, come on; these companies are not

5     out there promoting the drug today.  You saw an

6     injunctive relief component out there.  It's really

7     not -- it's not a significant claim.

8          Might it have some legs under a pure pleading

9     analysis?  Yes, I'll concede that it might have some

10    legs because the complaint was drafted in the present

11    tense, but it is really not the thrust of the

12    complaint.

13         THE COURT:  Let's talk about the penalties.

14    The civil penalties are penalties apparently that are

15    going to be paid to the state.  This isn't the return

16    of monies to PEIA or the fund.  These are simply

17    penalties that I guess the argument would go into the

18    general treasury and not earmarked for the PEIA.

19         Is that correct?

20         MR. FRANKOVITCH:  That's correct, your Honor.

21         MR. AGNESHWAR:  Your Honor, we have an

22    argument, the civil monetary penalties aspect of the

23    claim that is not tied to the insurance recovery is

24    not viable under West Virginia law because of the

25    White case.

54

```
 1            THE COURT:  I know that's your argument under
 2    White.  Now, talk to me about White because -- first
 3    of all, White specifically is -- I know you talked
 4    about no private cause of action.  This is not a
 5    private cause of action.  So, instead, I know what you
 6    would like to argue is, though, the reasoning of that,
 7    when put together with the Bear Sterns case in the
 8    securities context in a regulated kind of industry
 9    context, you said it carries a lot of weight as to why
10    that analysis should apply as well to the state being
11    able to bring a cause of action with regard to this
12    kind of prescription drug.
13            Now, the J&J case, the West Virginia J&J case
14    which you cite for a different proposition to argue
15    why it's a federal question argument by looking at
16    their briefing, nonetheless, in the J&J case didn't
17    the judge there discuss the fact that these really are
18    complimentary causes of action that may be brought
19    together in a different part of the case?
20            MR. AGNESHWAR:  Yes, your Honor -- well, I
21    think more accurately the J&J case assumes for the
22    purposes of that case that the claim is a viable
23    claim; and because of the timing of when the J&J
24    opinion came out and when White came out, I think it
25    was all briefed separately.  And the issue about
```

55

1   whether the claims are viable at all just honestly

2   didn't come up in the J&J case.  So the Court never

3   really addresses the argument about whether these

4   types of claims are viable.

5            THE COURT:  Let's see.  Bear Sterns was

6   decided -- Johnson & Johnson I guess was in 2010.

7            MR. AGNESHWAR:  And Bear, Sterns, 2005.

8            THE COURT:  So they are well aware of the Bear

9   Sterns case when they decided this five years later.

10           MR. AGNESHWAR:  Well, I think, typically,

11   Appellate Courts don't reach out to decide issues that

12   are not squarely raised before it.  That's the only

13   explanation I can think of for why the J&J case didn't

14   address that.  It just wasn't briefed.

15           May I expand a little bit on the argument?

16           THE COURT:  Go ahead.

17           MR. AGNESHWAR:  If you look at what was going

18   on in the Bear Sterns case and in the White case, I

19   think the Supreme Court of West Virginia is trying to

20   take the West Virginia Consumer Protection Act and

21   give it back to its roots, and they are asking the

22   question of:  What is this Consumer Protection Act

23   statute really intended to protect?

24           And what they say in the Bear Sterns case is,

25   this is meant to protect gaps in other regulatory

 1    schemes.  When you have a situation where consumers

 2    have day-to-day expenditures, day-to-day interactions

 3    where there is no other broad regulatory scheme,

 4    that's where the Act comes in to protect consumers.

 5    But when you have detailed federal regulatory schemes

 6    that are being enforced by federal agencies, there is

 7    no gap there that needs to be filled.  The federal

 8    agencies are doing that.  So I think what the Supreme

 9    Court was doing was by putting a stop on that and

10    taking it back to its roots.

11        And when you look at the White case, in

12    particular, what's interesting about the case -- your

13    Honor was right, the actual holding of the case is

14    about private causes of action.  But they reached out

15    and in answering the specific question that was raised

16    that was certified to as to whether causation is an

17    element of a private cause of action, they answered

18    that question in the broadest possible way.

19        THE COURT:  They used the learned intermediary

20    doctrine there.  I think we're a little bit different

21    purposes in the private cause of action versus one

22    brought by the state.  Aren't there different

23    purposes?  The state is coming in essentially looking

24    for a penalty that's for the purpose of deterring a

25    certain kind of action.  Whereas, when the individual

1  brings the claim, it's really to benefit themselves

2  and to right a wrong that was done to them.  With

3  those different kinds of purposes, and when you are

4  talking about the marketing messages that are seeking

5  to be deterred by a state, and those different

6  purposes, if a state could not bring such an action

7  for the purpose of deterrence and sending a message to

8  others, wouldn't essentially that allow, then, the

9  actions to simply go forward and essentially escape

10  penalty for them?

11       MR. AGNESHWAR:  No, your Honor, because there

12  is the FDA there, and the premise behind the White

13  case was not just the learned intermediary.  The

14  learned intermediary was particularly relevant for the

15  prospect if there was a buffer between the alleged

16  fraud and the actual consumer, but there was also the

17  notion that this is a very heavily regulated industry.

18  So it's very questionable as to whether this is the

19  type of alleged fraud that the Act was intended to

20  protect against.

21       THE COURT:  I'm not convinced as you are that

22  in the area of pharmaceuticals that the same result

23  would obtain, that that was intended to be excluded.

24  It's certainly not specifically excluded from the West

25  Virginia Act, and we are at this point looking at this

58

1    state's law.  There is no dispute about that at the

2    moment.

3            MR. AGNESHWAR:  Correct, your Honor.

4            THE COURT:  I have some real questions about

5    your position here and applying Bear Sterns to it.

6            MR. AGNESHWAR:  Can I give it one more shot?

7            THE COURT:  Yes.

8            MR. AGNESHWAR:  Your Honor, to me I don't

9    think they are different purposes.  The AG component

10   of the Act and the consumer protection private cause

11   of action component of the Act, they were both enacted

12   together by the West Virginia legislature, and they

13   were both twin parts of protecting consumers from

14   fraud in the state.  It is the Consumer Credit and

15   Protection Act.  So it is designed to protect

16   consumers.

17           So now there are two ways in which consumers

18   can be protected in the Act.  On the one hand,

19   consumers themselves can file a private cause of

20   action; and, on the other hand, there might be

21   situations where consumers don't do that, especially

22   when you are talking about the day-to-day cash

23   transactions that the Act is intended to protect

24   against.  You are not going to see a lot of private

25   cause of actions there.  So the state can come in and

1    use its enforcement powers to enforce that same fraud.

2    But the reason the state is doing that is because

3    consumers are being defrauded under the Act.  So it is

4    fulfilling that mission of the Act to protect

5    consumers.

6            And so when you apply that to our situation,

7    and when you look at what the West Virginia Supreme

8    Court is saying is, Look, consumers don't need to be

9    protected here, and they don't need to be able to file

10   private causes of action because, No. 1, you've got

11   learned intermediaries, you've got doctors that have a

12   lot of information before them, not just how the drug

13   was promoted to make these decisions; and, No. 2,

14   you've got this 800-pound gorilla in Rockville,

15   Maryland, the Food and Drug Administration, that is

16   enacting very detailed regulations that controls the

17   companies.

18           So consumers don't need to be protected from

19   any fraud.  So if consumers don't need to be protected

20   from the fraud, how can it be that the state Attorney

21   General can nevertheless file an enforcement action to

22   vindicate this fraud that the very consumers don't

23   need to be protected against?

24           I don't think it makes any sense.  I don't

25   think that you can read White with the rationale --

60

1    now, they could have come at it a different way.  They

2    could have said, There needs to be reliance; and if

3    you don't have reliance, you can't make a claim.  But

4    that's not how they came at it.  They came at it as a

5    policy matter as to what was necessary to protect

6    consumers, and that policy applies equally here to the

7    AG's context, and I don't think the state has said

8    anything in their brief as to why those policies don't

9    apply here.

10            THE COURT:  Mr. Frankovitch.

11            MR. FRANKOVITCH:  Your Honor, I think that the

12   statute is clear in providing -- both the Insurance

13   Fraud Protection Act, which is another statute that

14   has been cited, and the Consumer Protection Act --

15   they clearly -- and there has been a host of cases

16   that have emanated from the Attorney General's office

17   that have gone through -- there is a recent case that

18   I want to bring to the Court's attention.

19            THE COURT:  What is that?

20            MR. FRANKOVITCH:  It is the Pfizer case, the

21   Attorney General v. Pfizer, that was decided after

22   these briefs were filed.  It was a remand case.

23            THE COURT:  What's the cite on that?

24            MR. FRANKOVITCH:  It is a Westlaw cite.  It is

25   213 Westlaw 3927833.

61

1          THE COURT:  Came out of which court?

2          MR. FRANKOVITCH:  It's out of the Southern

3    District of West Virginia remanding cases.  It's a

4    drug case, but it revolves around the application of

5    patent law, and it addresses the preemption type of

6    argument, but it also reaffirms the Consumer

7    Protection Act viability of the state's claim.

8          THE COURT:  In what context?

9          MR. FRANKOVITCH:  In the context of issuing

10   the remand based on the fact that even though there is

11   a large body of federal implication in patent

12   applications and antitrust -- it also involved

13   antitrust.

14         THE COURT:  It wasn't specifically then a

15   pharmaceutical type case that we are talking about?

16         MR. FRANKOVITCH:  It involved pharmaceutical

17   patents.

18         THE COURT:  Patents are different than dealing

19   with the drug itself.

20         MR. FRANKOVITCH:  Yes.

21         THE COURT:  It didn't involve an FDA.

22   Correct?

23         MR. FRANKOVITCH:  That's correct.

24         THE COURT:  We'll take a look at that case in

25   any event.

1          MR. FRANKOVITCH:  The Merrell Dow case from

2     the United States Supreme Court clearly says the Food,

3     Drug and Cosmetic Act doesn't create that cause of

4     action.  That's left for the states to enforce.  So it

5     is not where you have to rely on the FDA to give some

6     enforcement or some relief.  That's an element that

7     can be utilized by the state.

8          THE COURT:  Certainly, it's been argued a

9     moment ago by counsel that with regard to even though

10    recognizing White only dealt with the private cause of

11    action, but the policy reasons for regulating this --

12    and I do note White was decided basically a month

13    after the J&J case, so it did come later than the J&J

14    case.

15         MR. AGNESHWAR:  It did, your Honor.

16         MR. FRANKOVITCH:  They're two different

17    animals altogether.  The White case is, you've alluded

18    to, a learned intermediary that the fraud is

19    perpetrated on as a result of language comes into

20    play.  That doesn't come into play on the Attorney

21    General's.  It is giving him enforcement powers in the

22    unfair and deceptive trade practices, and it is not

23    contingent upon the elements set forth in White, and

24    they could easily have done that.

25         THE COURT:  There is a fair amount of

63

1   analysis, though, in the White opinion looking at,

2   indeed, New Jersey law as well, talking about

3   prescription drug cases and consumer acts and highly

4   regulated industries.  And so I'll turn to you and

5   say:  Why isn't at least some of that analysis

6   applicable here?

7           MR. FRANKOVITCH:  Well, I don't think it's

8   applicable at all.  I think all we have to show in the

9   remand context is that we have the possibility of

10  going forward and establishing a claim.  I don't think

11  the Court is necessarily called upon at this juncture

12  to determine essentially a summary judgment motion.

13          THE COURT:  No, it's not, and I do want to put

14  it in the right context.  I do understand.  Their

15  argument was there is really a cause of action trying

16  to determine whether you are a proper party.  So I

17  have to be looking at that.  That's the overlay here.

18          Let's move on.  I have your arguments in that

19  regard.

20          So essentially with regard to -- I can just

21  sum up -- with regard to the civil penalties aspect,

22  essentially the argument, Mr. Agneshwar, is if they

23  actually had a cause of action, civil penalties, at

24  least they are a real party.  But your position is you

25  don't think they can bring their cause of action.

1        MR. AGNESHWAR:  Yes, that's essentially it.

2   But I would go one step further than that.  There is

3   another argument.

4        Even if the Court is not willing to conclude

5   that White closes off the state AG component of it, at

6   the most it's hanging by a thread.  It's the next

7   thing.  And so I think that factors into the real

8   party-in-interest analysis.  I think under the Fourth

9   Circuit case that the state cites, the court looks at

10  the totality of the complaint and tries to figure out

11  and has to figure out who is the real party in

12  interest here.

13       And when you have a situation where they've

14  interposed the state AG action, but the West Virginia

15  Supreme Court has said those consumers don't need to

16  be protected in this context, therefore, How can there

17  be a division between consumers and the state?, and

18  you have a complaint that is all really about the

19  insurance part, the insurance companies that paid.

20  That is really a peripheral aspect of the case.

21       THE COURT:  Well, I don't know.  Their civil

22  penalty argument, if they think they can show every

23  single time there was a willful violation, there could

24  be a nice little pot for West Virginia on recovery.

25  What is it, $5,000?

65

1          MR. FRANKOVITCH:  $5,000.

2          THE COURT:  $5,000 a violation.

3          MR. AGNESHWAR:  My point is, at the end of the

4    day, if a claim like that survives, then you are

5    absolutely right.

6          But my point is that even if, notwithstanding

7    the discussion in White that consumers don't need to

8    be protected, even if the Court decides that there is

9    enough because of the standards on removal to let it

10   go, it's not going to survive.  And I think ultimately

11   whether it's a motion to dismiss or summary judgment

12   or something else, because --

13         THE COURT:  Well, at that point, if it didn't,

14   wouldn't you at that point then move to remove once

15   they were no longer a party in the case?

16         MR. AGNESHWAR:  Well, there is the voluntary/

17   involuntary rule that might factor in at that point.

18         My point is simply this:  At the most, what it

19   is, it's a peripheral aspect of the case that's a

20   tack-on to four out of five counts that are really

21   about PEIA.

22         THE COURT:  Let's turn to PEIA then and let's

23   take a look at what we've got there.

24         Now, let me look at some of the issues with

25   regard to this entity.

1          Essentially, West Virginia is arguing that it

2     really is just an arm of the state.  I guess the

3     director is appointed by the governor.  Their funding

4     comes from the state.  But I have some issues here.  I

5     think you haven't been clear about this.  If I look

6     back at the statute, not only is the funding

7     segregated, but the funding, as I understand it, is

8     really coming from the state as the employer as for

9     their employees.

10          Now, is there additional funding that the

11     state provides that's separate from what they are

12     giving for their own employees that are part of the

13     pay of the PEIA system?

14          MR. FRANKOVITCH:  My understanding of the way

15     the system works is it's for public employees within

16     the state which include state employees, but it also

17     includes municipal employees, county employees, other

18     state-related employees.

19          THE COURT:  Exactly.  So when you are arguing,

20     though, it's an arm of the state, what I'm saying is,

21     certainly, the manner in which you've briefed it,

22     because you have taken a look at the funding issue, I

23     note that while the state holds the funds, it says

24     that "all monies received by the public employees

25     insurance agency shall be deposited in a special fund

1  or funds as necessary in the state Treasury,"

2  et cetera, who is going to administer the funds.  It

3  goes on in that way.  But it also indicates very

4  clearly that, for instance, it appears that it's

5  segregated funding for this agency for just their

6  purposes.  It is not coming out of general funds of

7  the state.

8      MR. FRANKOVITCH:  Well, it depends how you

9  determine "general funds."  The state gives them the

10  money to put in the particular account.

11      THE COURT:  But for the benefit of the

12  employees.  That's very different.

13      MR. FRANKOVITCH:  For the benefit of the

14  employees that are employed there, and controls the

15  funds and dictates the operation of the funds, and

16  it's -- I don't know how much closer you can get to

17  being an arm of the state without being the state.

18      THE COURT:  Actually, I'm looking at who makes

19  the investment decisions.

20      MR. FRANKOVITCH:  The investment decisions are

21  through the Treasury, the State Treasurer.

22      THE COURT:  All right.  Have a seat for a

23  moment.

24      Let me turn to you, Mr. Agneshwar.  I'm sure

25  you are going to tell me the fact that the director is

68

1    appointed by the governor, certainly it's not

2    weighty, and serves at the pleasure of the governor.

3         MR. AGNESHWAR:  Correct, your Honor.  There is

4    no question there is a state aspect to it.  The

5    governor appoints the director.  The board members are

6    appointed by the governor.  But that is obviously not

7    the issue or else there wouldn't be all this case law

8    about whether an entity is really an alterego of the

9    state.

10        The real issue is this with PEIA, and I think

11   this is the fundamental inquiry under Third Circuit

12   law:  How are the funds set up?  If it sues or if it

13   gets sued, does it pay itself or does it come out of

14   state funds?  And PEIA is an autonomous entity for

15   those purposes.  The state actually only pays

16   25 percent of the money that PEIA gets.  It's

17   self-funded through premiums from both employers and

18   employees; and what's interesting is it even goes

19   beyond West Virginia.

20        THE COURT:  Let me ask you this question:

21        When you said the state only pays 25 percent

22   of the money, is the 25 percent it's paying as

23   premiums for its own employees or is it other funding

24   that's giving it?

25        MR. AGNESHWAR:  It's only premiums.

1          THE COURT:  That's what I was trying to ask

2    your adversary as well.  So whatever they are paying

3    in, it's just for their employees' benefit, the same

4    as the county, municipality, or other employers that

5    are paying for their government employees.

6          MR. AGNESHWAR:  Exactly, and it even covers

7    non-residents of West Virginia who happen to work for

8    the state of West Virginia.  It can sue on its own

9    behalf.  Any money it recovers has to be used for the

10   purposes of PEIA.  It's just clearly a classic

11   insurance entity that is set up for the benefit of

12   state and county and other employees, but, other than

13   that, acts autonomously.

14          So even when you look at the director, if you

15   look at the statutory provision about how the director

16   is supposed to operate, they are supposed to operate

17   independently, and they are supposed to stay clear of

18   politics, and all their decisions have to be as

19   fiduciaries for the employees who are benefitting from

20   the insurance.

21          THE COURT:  I have issues with your arguments

22   with regard to the funding of PEIA.

23          What other arguments do you have that PEIA is

24   essentially an arm of the state?  They are acting

25   really as an insurance company.

1          MR. FRANKOVITCH:  It is acting as an insurance

2     vehicle to insure those people.  I don't know that

3     there is any additional arguments.  But it is not

4     critical to the Attorney General's viability in this

5     case.

6          THE COURT:  I hear you.  There was the

7     independent argument that if this Court were to

8     find -- their argument is that PEIA is the real party

9     in interest.

10          MR. FRANKOVITCH:  Right.

11          THE COURT:  So I know your argument is, Please

12     look at the Attorney General, and that's enough to

13     find that there is not diversity and send it back.

14          What I'm hearing at this point, you are really

15     not going to be hinging your argument on PEIA.

16          MR. FRANKOVITCH:  That's true.

17          THE COURT:  Perfect.  That's what I wanted to

18     know.

19          The last argument is with regard to the

20     question of federal question jurisdiction, and

21     essentially the argument by the defendants that this

22     is really involving federal questions.  Right?

23          MR. AGNESHWAR:  Correct, your Honor.

24          THE COURT:  And in that regard, I know you've

25     recently submitted to me the underlying brief that was

71

1  filed by the state in the J&J case where they

2  essentially argued, Take a look at what the FDCA has

3  done and you are controlled by that.

4      MR. AGNESHWAR:  Yes, no more, no less.

5      THE COURT:  What do you want to say about

6  that?  They've just submitted that recently.

7      MR. FRANKOVITCH:  Yes, and I was familiar with

8  it.  I don't think that is relevant at all.  There are

9  many, many times in all kinds of litigation where you

10  submit federal regulations.  In accident cases you may

11  have an allegation in the complaint that the defendant

12  violated safety standards, and you look to OSHA to see

13  whether the safety standard is there or not.  It

14  doesn't change the underlying case which here is the

15  deceptive trade practices.  You still have that.

16      In fact, that's what the J&J court said.  You

17  are not governed by this.  You have to go back as the

18  fact finder and let the fact finder determine whether

19  in the J&J case there was improper conduct, the same

20  thing you would do here.  It's not contingent on the

21  FDA determination.

22      MR. AGNESHWAR:  That is inaccurate, your

23  Honor.  If we look at just the last sentence or the

24  last page of the J&J case, this is the way the Supreme

25  Court of West Virginia --

1          THE COURT:  Just give me one moment because I

2   have put things in different places and I would like

3   to get it out before you read it.

4          (Pause.)

5          I have it.

6          MR. AGNESHWAR:  This is under "Conclusion."

7   It's the last page.

8          "Whether Janssen's statements and omissions in

9   the Risperdal DACP letter and the Duragesic file card

10  are actually false and misleading under the FDCA, the

11  Food, Drug and Cosmetic Act, and thus constitute

12  unfair or deceptive acts or practices under the

13  Consumer Protection Act is a question of fact to be

14  decided by a finder of fact."

15         That is their holding.  The question that the

16  finder of fact must answer in the first instance is

17  not whether it violated some state law; it's whether

18  the actions violated the Food, Drug and Cosmetic Act,

19  which is a federal statute.

20         THE COURT:  The argument there being made was

21  because I guess there were some findings made by the

22  FDCA that the plaintiff wanted to rely upon and would

23  hope was dispositive, because they felt they were

24  false and misleading findings, and was encouraging the

25  court to find that was enough for such a finding.

1          MR. AGNESHWAR:  And they were successful.

2    And, in fact, the way the decision is written by the

3    West Virginia Supreme Court is -- and the whole

4    decision is all about what the particular provisions

5    of the FDCA are and how they regulate advertising for

6    prescription drugs.

7          THE COURT:  But they didn't win the argument

8    because what the court held was that -- they agreed

9    that what was happening is the state wanted to argue,

10   Please find it as a matter of law, and we're done with

11   our case.  And the court said:  No, we are not going

12   to find it as a matter of law.

13         They said that the findings of the FDA, or,

14   their belief, it says, that they violated the FDCA is

15   not sufficient to establish as a matter of law that

16   the appellant's communications to healthcare providers

17   were actually false and misleading in violation of the

18   Consumer Protection Act, and that's why they say

19   whether Janssen's statements and omissions -- the

20   sentence you just read in the Risperdal letter and the

21   file card are actually false and misleading under the

22   FDCA and thus unfair is a question of fact to be

23   decided by a finder of fact, and thus the state must

24   present evidence that Janssen's specific statement and

25   omissions do in fact violate the relevant laws.

1          MR. AGNESHWAR:  I totally get that, your

2     Honor.  But the relevant law is the FDCA.

3          THE COURT:  No, I don't think that's just the

4     relevant law.  It's clearly whether it would fall

5     under the prescription of the Consumer Protection Act.

6     You have to make a factual finding as to, one, whether

7     they're misleading under the FDCA, and, then, further,

8     would it then be a violation of the Act.

9          MR. AGNESHWAR:  No, I don't believe that's

10    right, your Honor.  The issue the state of West

11    Virginia lost is the collateral estoppel argument.

12    They were arguing that because there were warning

13    letters that the FDA issued to Janssen that disposed

14    of the issue as a matter of law, because that was

15    final agency action, and what the West Virginia

16    Supreme Court said -- and this is important.

17          It looked only at federal law.  It looked at

18    FDA's handbooks.  It looked at FDA's regulations.  It

19    looked at federal case law interpreting what warning

20    letters are.  And they concluded that a warning letter

21    by the FDA is not a final agency action such that it

22    would give collateral estoppel.

23          Therefore, the jury or the finder of fact

24    still has to determine for itself whether the FDCA was

25    violated.  And once the FDCA is violated -- this is

1  how I read the sentence -- as a matter of course, the

2  West Virginia Consumer Protection Act is violated

3  because the FDCA provides the sum and substance of

4  what is and is not false advertising in the

5  prescription drug arena.

6       THE COURT:  Let me ask the question, and I

7  don't know that I need to get to this at the moment.

8       Certainly that's what that case was about,

9  which was, the state wanted to play the role up,

10  great, our case is going to be over.  Please buy my

11  argument that's enough to show that we have proven our

12  case.  The Court disagreed.

13       The question is:  Is it simply -- and I don't

14  know what Mr. Frankovitch is going to say about this.

15  Looking at all of the practices and the marketing

16  practices that went on that they are going to claim

17  that BMS/Sanofi were involved in marketing Plavix, do

18  you, one, agree that in the first instance what you

19  have to show is that those marketing efforts would

20  have been considered false and misleading under the

21  FDCA?

22       Do you agree or disagree?

23  MR. FRANKOVITCH:  No, I disagree with that,

24  your Honor.  I think clearly the court -- and that was

25  the Merrell Dow case -- said the FDCA doesn't create a

1   cause of action for anybody.  You have to establish it

2   under whatever law you are going under.  And in this

3   instance, under the State of West Virginia Consumer

4   Protection Act.  Footnote 5 of that case clearly sets

5   out that the Consumer Protection Act looks to the

6   federal decisions on issues, but it's complimentary to

7   the independent determination by the state, or, state

8   court.

9            MR. AGNESHWAR:  First of all, your Honor, in

10  their brief -- and I'm reading from page 20 of their

11  brief.

12           THE COURT:  Which brief?

13           MR. AGNESHWAR:  The state's brief that we

14  cited as supplemental authority in the J&J case.

15           Here is what they say:

16           "As discussed above, state law cannot impose

17  different standards either higher or lower than are

18  provided by federal law on drug advertising."

19           Now, they may have been strategically

20  motivated in that case because they wanted the

21  collateral estoppel effect of warning letters, but

22  that is the argument the West Virginia Supreme Court

23  adopted.

24           I think we need to look at Merrell Dow because

25  I think the real question here is on the slope between

1   Merrell Dow and Grable; where does this case fall?

2   And I have to just quote this because, as I was

3   preparing for argument, I read the Supreme Court's

4   most recent decision in this area, the Gunn case.

5   It's not so relevant here, but Chief Justice Roberts

6   wrote:

7   "In outlining the contours of this slim

8   category of federal jurisdiction, we do not paint on a

9   blank canvas.  Unfortunately, the canvas looks like

10   one that Jackson Pollack got to first."

11   So the law has not been a total model of

12   clarity.  But I think if you look at Merrell Dow and

13   Grable, and some of the other cases that have come

14   down recently, there are some clear guidelines that

15   are now finally developing as to when you find federal

16   subject matter jurisdiction.

17   And I think, as I look at it, there are really

18   kind of three issues:

19   1.  Is the federal law really sort of

20   dispositive of the issue, of some issue in the case?

21   No. 2.  Are there institutional issues here

22   that impact the federal agency and the regulatory

23   scheme that go beyond the facts and the particular

24   private dispute that's going on in the case?

25   And 3.  What are the practical consequences of

1    saying that there is federal jurisdiction in a

2    particular situation?

3        And Merrell Dow and Grable I think are great

4    examples because what you had in Merrell Dow, it was

5    your standard failure-to-warn argument, and the

6    argument was that this label was inadequate for a host

7    of reasons; and one of those reasons was a negligence

8    per se count, which is that under federal law, this

9    label was misbranded because the FDA had found it

10   inadequate, and, therefore, that's one of the reasons

11   why there was state law negligence.  But that was not

12   at all dispositive to the claim.

13       As your Honor knows well, negligence per say,

14   what it really operates as is an evidentiary

15   presumption.  So, yes, you can bring that standard in

16   as evidence that the defendant was negligent as

17   evidence that the warning was inadequate, but it

18   doesn't control the issue.

19       THE COURT:  But isn't a labelling case even

20   more convincing than a marketing case?

21       MR. AGNESHWAR:  No, your Honor, because under

22   Wyeth v. Levine, state juries are entitled to decide

23   whether under state law a label is adequate or not.

24   It's not really tied to the FDA regulations.  But the

25   courts recognized that the reality of a prescription

1    drug case is the FDA is an 800-pound gorilla.  What it

2    says and doesn't say is going to come into evidence.

3    But if a defendant rebuts the negligence per se

4    presumption, then all bets are off.  It's off to the

5    races.  What the FDA has said it doesn't really matter

6    anymore.  So it wasn't dispositive of the issue in

7    Merrell Dow.

8         Now, contrast that with Grable, where in

9    Grable, which was an acquired title action, the sole

10   issue in the case was whether the IRS needed to give

11   personal service in order to foreclose on a claim.

12   And so that issue, how that question of federal law

13   was answered, really ended up deciding the case.

14        And I think this is the big difference between

15   Merrell Dow and Grable.  What the trier of fact would

16   do in Grable was it would look at federal law and look

17   at what federal law meant; and depending on how

18   federal law came out, that is how the state law action

19   came out, exactly parallel, co-extensive with.  That

20   is how the lawsuit came out.

21        So, now, look at our case, and we look at it

22   in the context of Johnson & Johnson, and what the

23   state asked the Supreme Court to do, which they did.

24   The issue here is that there are detailed marketing

25   schemes that the FDA has set out.  The FDA has lots of

1    guidelines and warning letters and regulations as to

2    what is and is not a false marketing claim.

3         The superiority argument is a case in point

4    because superiority -- like the argument that Plavix

5    is superior to aspirin, and we shouldn't have been

6    paying that -- superiority has a very technical

7    meaning under FDA regulations.

8         So if a jury was asked, say, just colloquially

9    to answer the question:  Did they accurately say that

10   Plavix was superior to aspirin?  That would be an

11   incorrect instruction under West Virginia Consumer

12   Protection Act standards because the real question is:

13   What does the FDA mean by "superiority?"  And that's a

14   very different technical argument.  But that is the

15   argument that has to be made and that is what the

16   trier of fact has to do in West Virginia.

17        So that puts this case on all fours with

18   Grable in answering the question.  There is no

19   rebuttable presumption.  It's not just evidence.

20   There is no case but for the violation of FDA

21   regulations.

22        What the jury or the judge will be doing in

23   this case is it will be opening up the federal

24   regulations looking at FDA guidance, looking at how

25   FDA has defined "superiority," and answering the

1   question as to whether the fraud alleged in this case

2   is a violation of federal law.

3        That makes this case 180 degrees opposite of

4   Merrell Dow and the progeny of cases that came after

5   including Judge Debevoise's decision in the Novartis

6   case.  Just like Merrell Dow, that case was a

7   failure-to-warn case claim; and the 800-pound gorilla,

8   the FDA, and what it did or didn't do came into

9   evidence because the plaintiff obviously wanted to

10  say:  See, the FDA has done this; the FDA has done

11  that.  That's relevant to my failure-to-warn claim.

12  But it doesn't dispose of the issue.  It was still a

13  state law claim that survived even if you found that

14  FDA regulations were not violated.

15       That is not the case here under Johnson &

16  Johnson, as that sentence I read from the last

17  paragraph shows.  You have to find a violation of the

18  FDCA in order to prevail on your case.

19       THE COURT:  All right.  I have your argument.

20       You disagree.

21       MR. FRANKOVITCH:  I totally disagree, your

22  Honor.  To do what's been suggested by the defense,

23  every case would end up being subject to removal, and

24  you can't use the defense of the federal statute as

25  grounds for removal.  It's not part of the removal

1    process.

2            THE COURT:  I understand.

3            Let me just ask you the question:

4            Do you disagree with the argument

5    Mr. Agneshwar just made that the Court will have to

6    find that to proceed to whether there was a violation

7    of the West Virginia Act, you would have to first find

8    there was a violation of the FDA?

9            MR. FRANKOVITCH:  No, absolutely not.

10           THE COURT:  Why not?

11           MR. FRANKOVITCH:  Because there can be other

12   instances that are set out, other marketing practices

13   that aren't dictated by the --

14           THE COURT:  Example, in your complaint.

15           MR. FRANKOVITCH:  They put people out on the

16   sales calls that promoted the product improperly.

17           THE COURT:  In which way do you get back to

18   promoting improperly because they were promoting in

19   violation of what the FDA would permit them to say, or

20   something else?

21           MR. FRANKOVITCH:  West Virginia law -- as the

22   Supreme Court noted in the Johnson & Johnson case,

23   it's complimentary.  The federal statute is

24   complimentary to the West Virginia statute.

25           THE COURT:  That's not the question I asked.

1  I said:  To be able to make this claim under the West

2  Virginia Consumer Act to show that the marketing

3  practices were improper, will you be relying on

4  showing that the marketing practices were in violation

5  of FDA approvals?

6          MR. FRANKOVITCH:  They may.

7          THE COURT:  Will you show anything beyond

8  that?

9          MR. FRANKOVITCH:  I would hope so.

10          THE COURT:  What is it?  What have you pled?

11          MR. FRANKOVITCH:  I think that we would have

12  testimony that sales representatives called on them

13  and made representations as to the efficacy of the

14  drug and the pricing was appropriate because of the

15  efficacy, and this is really a pricing issue.  All of

16  that marketing aspect would come in and compliment the

17  potential violations of the FDCA, or, FDA.

18          THE COURT:  But you are going to be relying on

19  essentially arguing efficacy claims that you say are

20  contrary to what was shown to the FDA.

21          MR. FRANKOVITCH:  Well, we would have to prove

22  that they had false and misleading statements, and

23  that they knew that when they went out and marketed

24  the drug that it was not efficacious and it was

25  inappropriate in many cases for prescription.

1          THE COURT:  And you would be arguing that they

2    said things different than what they presented to the

3    FDA and that the FDA approved.

4          MR. FRANKOVITCH:  I don't know that the FDA

5    approved.

6          THE COURT:  Not approved.  Marketing.  But

7    the claims.

8          MR. FRANKOVITCH:  I'm not sure I --

9          THE COURT:  What the effect of the drug is or

10   how efficacious it is.

11         MR. FRANKOVITCH:  Yes.  We would establish

12   that they did not provide adequate information and

13   didn't provide the full picture and efficacy that they

14   knew existed.

15         THE COURT:  Anything else, Mr. Agneshwar?

16         MR. AGNESHWAR:  Yes.

17         I think if you just look at the way -- just

18   the last thing on this particular aspect of it -- if

19   you just look at the way the J&J case analyzed what

20   they have to prove, they have to prove violations of

21   the FDCA; and if they don't, they don't have a claim.

22         If you just look at superiority, the question

23   will be:  What does that mean under the handbook of

24   jury instructions in West Virginia?  The question will

25   be:  What does that mean under the FDCA?  That's the

85

1   sum and substance of their claim.

2          In terms of his argument that every case would

3   become a federal case, that is simply not true.  No.

4   1, this whole following the FDCA and that the

5   violation of the FDCA, in fact, becomes then a

6   violation of the Consumer Protection Act, that is an

7   aspect that's unique to West Virginia.  There may be

8   other states.

9          But if you contrast that, they cited a

10  Louisiana case that I argued and lost, that I made a

11  federal question argument there.  And what the court

12  said is, no, look, when you look at the Consumer

13  Protection statute in Louisiana, they can just show

14  that stuff is false and misleading generally just as a

15  matter of Louisiana common law.  So violations of the

16  FDA regulations are not essential.

17         THE COURT:  What is unique about the West

18  Virginia law?  Let's take a look at that, please.

19         MR. AGNESHWAR:  What's unique about it --

20  well, there are two aspects that are unique about it

21  and I think that are very relevant to the sort of

22  second and third questions, which is whether there is

23  an institutional issue here, and the third question is

24  whether the floodgates are going to open up and every

25  case becomes a federal case.

1          The two overriding unique issues about West

2     Virginia are:

3          No. 1, as the Johnson & Johnson case said, in

4     order to determine in a prescription drug case whether

5     something is false and misleading under state law, you

6     look at the FDCA; and that is the beginning, the

7     middle, and the end of the inquiry.

8          The issue No. 2, which makes West Virginia

9     unique is, because of White, there is no private cause

10    of action.  There is not a compensatory damages

11    scheme.  You are not talking about a situation where a

12    violation of FDA regs just becomes part of a

13    compensatory damages scheme.  It is only an

14    enforcement state now, if it is that.  But I argued

15    before even that aspect is gone.  But assuming it is,

16    this is the state of West Virginia enforcing the Food,

17    Drug and Cosmetic Act.

18         That is what's happening here when you take

19    out private causes of action: one, you have to find a

20    violation of the FDCA; two, the state can only be

21    permitted to do enforcement, which is to get civil

22    monetary penalties.  That is why there has to be

23    federal jurisdiction here, because that raises huge

24    institutional issues.

25         THE COURT:  Let me ask you this:

 1          The statute doesn't say that they are bound by

 2    the FDCA.  The way the statute is written, it says:

 3          "Courts are to be guided by the interpretation

 4    given by the federal courts to the various federal

 5    statutes dealing with the same or similar matters."

 6          And, therefore, then, the Court looked for

 7    guidance to the FDCA.  It says "for guidance."  It

 8    doesn't say, "you're bound by."

 9          MR. AGNESHWAR:  Here is the way I read it.

10          THE COURT:  Does that make a difference?

11          MR. AGNESHWAR:  I think it potentially makes a

12    difference.  But then you have to look at how the case

13    law has evolved and how the West Virginia Supreme

14    Court interpreted that.  It could have gone in a very

15    different way.

16          The way the West Virginia statute could have

17    developed is that, yes, federal law is looked at as

18    just a guideline.  But at the end of the day, the

19    standards are what is false and misleading under West

20    Virginia law.  And if it had gone that way, and the

21    FDCA was not the beginning, middle, and end, my

22    argument would be a lot weaker.  But after J&J, that

23    is not the way West Virginia law has developed.

24          The way West Virginia law has developed in the

25    prescription drug area is that you look only at the

1    FDCA to determine whether the promotional and

2    advertising practices of the pharmaceutical company

3    were unlawful under West Virginia law.  You look only

4    at the FDCA.  If you don't show that, there is no

5    wiggle room.  You don't have a cause of action.

6             THE COURT:  You think it says that?

7             MR. AGNESHWAR:  I think it couldn't be

8    clearer, whether Janssen's statements and omissions

9    are actually false and misleading under the FDCA and

10   thus constitute unfair trade practices under the

11   Consumer Protection Act.

12            THE COURT:  Was it written that way?  Because

13   that's the manner in which it was being argued to

14   them.  If you look at the entire opinion, it's making

15   clear that it could not do that because otherwise we

16   would have a preemption argument, and it notes that by

17   citing to the Bayer case earlier on and why they are

18   complimentary causes of action.

19            I know what your arguments are.  I've got

20   them.  I'm reserving on this question today.  I'm not

21   ruling on this.

22            MR. SALIM:  Your Honor, may I add something?

23            THE COURT:  Go ahead.

24            MR. SALIM:  Your Honor, we literally argued

25   this issue with the defendants in California and

1   Louisiana and with other defendants in Arkansas, New

2   Mexico, all across this country, with the same

3   statutes at issue, and with numerous federal judges,

4   and the rulings have all been consistent, that that's

5   just one way that you look at the issue, and state law

6   still applies, and it's been almost uniform across the

7   board in this country.

8             THE COURT:  I have your cases that have gone

9   the other way, and I think that's right, because I

10  think when you look at the entire case law, it says

11  that in the conclusion, I understand why you are

12  reading it that way.  I think it's doing so because in

13  the manner in which it was argued to them and the fact

14  that at that point it looked as if they were relying

15  on those FDCA findings for their conclusion.

16            But if you look at the entire case, I think it

17  makes very clear that it cannot be that it is the same

18  as a finding under the FDCA because otherwise there

19  would be a preemption argument because what you are

20  doing is trying to preempt that federal law by making

21  your own determination.

22            MR. AGNESHWAR:  I respectfully disagree, your

23  Honor.

24            THE COURT:  You say you would disagree?

25            MR. AGNESHWAR:  I completely disagree.  If you

1    look at the device context where there is expressed

2    preemption that is being upheld by the Supreme Court

3    in <u>Regal</u>, you can still have state law that parallels

4    the FDA law.

5          THE COURT:  I understand.  But I'm just

6    telling you, I think if you look at this entire case,

7    I think you cannot take that conclusion out of

8    context.

9          I don't want to debate you anymore, Mr.

10    Agneshwar.  I'm going to decide this.

11          MR. AGNESHWAR:  I understand.

12          There is one last point, not on this issue but

13    his argument; that the floodgates will open up, I

14    don't think is the case here because --

15          THE COURT:  Because other courts have decided

16    the other way.

17          MR. AGNESHWAR:  Well, other courts have

18    decided other statutes the other way, but this is an

19    enforcement scheme.  West Virginia does not every day

20    bring these kinds of enforcement actions.

21          THE COURT:  I don't know.  They seem to bring

22    an awful lot of them.  I was surprised how many times

23    West Virginia brings all these kinds of cases and how

24    active they are in these areas.

25          MR. AGNESHWAR:  But if you uphold federal

1   jurisdiction, the holding will be very narrow.  It

2   would be that in a situation where the Consumer

3   Protection Act completely tracks the FDA, the FDCA,

4   and the action is a claim for enforcement which

5   parallels what the FDA --

6          THE COURT:  It doesn't completely track it.

7   But that's okay.  Please, I have your arguments.  I

8   don't need more.

9          Yes, Mr. Salim.

10          MR. SALIM:  I was just going to ask your Honor

11   while we are all here about our next regular

12   scheduling conference.  We would request that the

13   Court not set it until October because we are trying

14   to resolve a lot of issues, and I don't know when the

15   Court had in mind setting it.

16          THE COURT:  I think your next one is going to

17   be the status.  It will be before Judge Bongiovanni.

18          You're just talking about discovery issues.

19          MR. SALIM:  Right.  Would that be in October?

20   Did the Court set it yet?

21          THE COURT:  Was it in the last order?

22          MR. SALIM:  No, your Honor.  You said to let

23   you know where we were the next time we got together

24   and then we would set it.

25          THE COURT:  You can talk to Judge

92

1   Bongiovanni's chambers about setting that up, and you

2   can assume that you'll get a decision on this sometime

3   in September on the West Virginia matter.

4           MR. SALIM:   Thank you, your Honor.

5           THE COURT:   Thank you for all your arguments

6   and your briefing.

7           THE CLERK:   All rise.

8           (Proceedings concluded.)

9   ///

1                          **I N D E X**

2

3    <u>**Proceedings**</u>                              <u>**Page**</u>

4
     General discussion                            4
5
     Motion for suggestion of remand               5
6        By MR. NOVOSAD                             6
         By Mr. Fauvre                             7
7        Ruling by the Court                       9

8    Motion for reconsideration of transferor Court's
     opinion                                       9
9        By MR. NOVOSAD                        10, 11
         By Mr. Harker                             10
10       Ruling by the Court                  11, 13

11   Medicaid argument                            13
         By Mr. Harker                 13, 15, 18
12       By MR. NOVOSAD                     14, 16
         Further discussion by the Court          20
13          By Mr. Harker        21, 22, 25, 28, 36
            By MR. NOVOSAD       21, 24, 26, 35, 37
14       Ruling by the Court                       39

15   Medicare D argument                          39
         By Mr. Harker                            39
16       By MR. NOVOSAD                           41
         Ruling by the Court                      43
17
     Motion for remand                            43
18       By Mr. Frankovitch         44, 47, 49, 60
         By Mr. Agneshwar               45, 49, 50
19
     Civil penalties discussion                   63
20       By Mr. Agneshwar                     64, 68
         By Mr. Frankovitch                   66, 69
21
     Federal question jurisdiction argument       70
22       By Mr. Frankovitch              71, 75, 81
         By Mr. Agneschwar           71, 76, 84, 89
23       By Mr. Salim                             88

24

25

94

# C E R T I F I C A T E

I, **Vincent Russoniello,** Official United States Court Reporter and Certified Court Reporter of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I do further certify that I am neither a relative, nor employee, nor attorney, nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel and that I am not financially interested in this action.

S/Vincent Russoniello
Vincent Russoniello, CCR
Certificate No. 675
Date: August 27, 2013

**$**

**$5,000** [4] - 47:4, 64:25, 65:1, 65:2

**0**

**08608** [1] - 1:13

**1**

**1** [4] - 59:10, 77:19, 85:4, 86:3
**10** [2] - 93:9, 93:9
**100** [1] - 16:2
**11** [2] - 93:9, 93:10
**13** [3] - 93:10, 93:11, 93:11
**13-1039(FLW-TJB** [1] - 1:2
**13-13** [1] - 1:2
**1395w-102(e** [1] - 41:20
**1396r-8(d)(B)(iv)** [1] - 31:25
**14** [1] - 93:12
**15** [1] - 93:11
**16** [1] - 93:12
**18** [1] - 93:11
**180** [1] - 81:3
**1962** [1] - 15:3

**2**

**2** [3] - 59:13, 77:21, 86:8
**20** [2] - 76:10, 93:12
**2005** [1] - 55:7
**2010** [1] - 55:6
**2012** [1] - 51:3
**2013** [1] - 1:6
**21** [4] - 1:6, 51:11, 93:13, 93:13
**213** [1] - 60:25
**22** [1] - 93:13
**23** [1] - 51:14
**24** [1] - 93:13
**25** [4] - 68:16, 68:21, 68:22, 93:13
**26** [1] - 93:13
**28** [2] - 3:6, 93:13

**3**

**3** [1] - 77:25
**30** [1] - 43:14
**35** [1] - 93:13
**36** [1] - 93:13

**37** [1] - 93:13
**39** [3] - 93:14, 93:15, 93:15
**3927833** [1] - 60:25

**4**

**4** [2] - 36:1, 93:4
**402** [1] - 1:13
**41** [1] - 93:16
**42** [1] - 41:19
**43** [2] - 93:16, 93:17
**44** [1] - 93:18
**45** [1] - 93:18
**47** [1] - 93:18
**49** [2] - 93:18, 93:18

**5**

**5** [2] - 76:4, 93:5
**50** [1] - 93:18

**6**

**6** [1] - 93:6
**60** [1] - 93:18
**609)588-9516** [1] - 1:25
**63** [1] - 93:19
**64** [1] - 93:20
**66** [1] - 93:20
**675** [1] - 94:21
**68** [1] - 93:20
**69** [1] - 93:20

**7**

**7** [1] - 93:6
**7.1(i** [1] - 9:20
**70** [1] - 93:21
**71** [3] - 21:18, 93:22, 93:22
**75** [1] - 93:22
**753** [1] - 3:6
**76** [1] - 93:22

**8**

**800-pound** [3] - 59:14, 79:1, 81:7
**81** [1] - 93:22
**84** [1] - 93:22
**88** [1] - 93:23
**89** [1] - 93:22

**9**

**9** [2] - 93:7, 93:8

**A**

**ability** [2] - 16:22, 26:25
**able** [6] - 22:22, 35:3, 37:12, 54:11, 59:9, 83:1
**ABOVE** [1] - 3:9
**ABOVE-ENTITLED** [1] - 3:9
**absence** [1] - 23:21
**absolutely** [2] - 65:5, 82:9
**accepted** [3] - 23:20, 25:23
**accident** [1] - 71:10
**account** [2] - 33:1, 67:10
**accurate** [1] - 94:7
**ACCURATE** [1] - 3:7
**accurately** [2] - 54:21, 80:9
**achieve** [1] - 36:3
**acquired** [1] - 79:9
**Act** [37] - 19:8, 21:7, 27:20, 29:16, 30:6, 55:20, 55:22, 56:4, 57:19, 57:25, 58:10, 58:11, 58:15, 58:18, 58:23, 59:3, 59:4, 60:13, 60:14, 61:7, 62:3, 72:11, 72:13, 72:18, 73:18, 74:5, 74:8, 75:2, 76:4, 76:5, 80:12, 82:7, 83:2, 85:6, 86:17, 88:11, 91:3
**act** [2] - 44:10, 44:11
**acting** [2] - 69:24, 70:1
**action** [39] - 6:8, 14:6, 19:8, 20:24, 21:19, 22:3, 37:25, 42:18, 54:4, 54:5, 54:11, 54:18, 56:14, 56:17, 56:21, 56:25, 57:6, 58:11, 58:20, 59:10, 59:21, 62:4, 62:11, 63:15, 63:23, 63:25, 64:14, 74:15, 74:21, 76:1, 79:9, 79:18, 86:10, 86:19, 88:5, 88:18, 91:4, 94:13, 94:15
**ACTION** [2] - 1:2, 1:2
**actions** [7] - 19:14, 21:21, 28:1, 57:9, 58:25, 72:18, 90:20
**active** [1] - 90:24
**activities** [2] - 48:21,

48:23
**activity** [1] - 50:6
**acts** [3] - 63:3, 69:13, 72:12
**actual** [3] - 46:13, 56:13, 57:16
**add** [2] - 34:6, 88:22
**additional** [10] - 15:12, 18:4, 18:8, 18:9, 26:12, 26:17, 42:20, 42:22, 66:10, 70:3
**address** [2] - 4:25, 55:14
**addressed** [2] - 5:13, 30:5
**addresses** [2] - 55:3, 61:5
**addressing** [2] - 5:9, 5:15
**adequate** [3] - 52:12, 78:23, 84:12
**adequately** [2] - 37:4, 37:15
**administer** [1] - 67:2
**Administration** [1] - 59:15
**administrative** [1] - 30:16
**adopted** [1] - 76:23
**adopts** [1] - 31:5
**advanced** [1] - 20:3
**advantage** [5] - 32:11, 34:4, 34:10, 35:10, 36:23
**advantages** [2] - 32:19, 33:1
**adversary** [1] - 69:2
**advertising** [5] - 50:4, 73:5, 75:4, 76:18, 88:2
**affirmatively** [1] - 51:9
**AG** [4] - 52:22, 58:9, 64:5, 64:14
**AG's** [1] - 60:7
**agencies** [2] - 56:6, 56:8
**agency** [5] - 66:25, 67:5, 74:15, 74:21, 77:22
**agneschwar** [1] - 93:22
**AGNESHWAR** [49] - 2:7, 4:16, 5:19, 45:10, 46:5, 46:24, 47:13, 47:24, 48:10, 49:7, 50:14, 51:21, 52:20, 53:21, 54:20, 55:7, 55:10, 55:17, 57:11, 58:3, 58:6,

58:8, 62:15, 64:1, 65:3, 65:16, 68:3, 68:25, 69:6, 70:23, 71:4, 71:22, 72:6, 73:1, 74:1, 74:9, 76:9, 76:13, 78:21, 84:16, 85:19, 87:9, 87:11, 88:7, 89:22, 89:25, 90:11, 90:17, 90:25

**Agneshwar** [10] - 4:16, 45:11, 46:2, 63:22, 67:24, 82:5, 84:15, 90:10, 93:18, 93:20

**ago** [3] - 43:2, 50:18, 62:9

**agree** [13] - 5:11, 5:18, 8:19, 19:7, 19:23, 20:8, 20:16, 25:6, 25:11, 46:23, 47:16, 75:18, 75:22

**agreed** [2] - 49:5, 73:8

**agreement** [2] - 20:21, 49:4

**ahead** [3] - 6:17, 55:16, 88:23

**aimed** [1] - 34:24

**al** [4] - 1:5, 1:7, 1:9, 1:11

**allegation** [6] - 7:17, 23:23, 24:7, 30:7, 35:9, 71:11

**allegations** [14] - 7:15, 7:18, 7:25, 8:16, 23:14, 23:25, 24:12, 30:13, 39:21, 50:1, 50:17, 50:24, 51:18, 52:2

**allege** [2] - 7:12, 24:5

**alleged** [4] - 24:5, 57:15, 57:19, 81:1

**alleging** [1] - 24:11

**allow** [2] - 43:9, 57:8

**allowing** [1] - 16:6

**alluded** [1] - 62:17

**almost** [1] - 89:6

**alone** [1] - 10:6

**alterego** [1] - 68:8

**altogether** [1] - 62:17

**amend** [5] - 22:11, 22:13, 22:15, 23:10, 23:22

**amendments** [3] - 15:3, 22:23, 23:9

**amount** [2] - 27:21, 62:25

**AN** [1] - 3:7

**analysis** [6] - 52:24,

53:9, 54:10, 63:1, 63:5, 64:8

**analyzed** [1] - 84:19

**Anand** [2] - 4:16, 45:10

**ANAND** [1] - 2:7

**AND** [1] - 1:4

**ANETAKIS** [1] - 1:18

**animals** [1] - 62:17

**answer** [2] - 72:16, 80:9

**answered** [2] - 56:17, 79:13

**answering** [3] - 56:15, 80:18, 80:25

**anti** [2] - 17:2, 17:9

**anti-coagulant** [1] - 17:9

**anti-epileptics** [1] - 17:2

**antitrust** [2] - 61:12, 61:13

**anytime** [1] - 28:11

**apart** [1] - 23:8

**appear** [1] - 52:18

**appearances** [1] - 4:4

**appellant's** [1] - 73:16

**Appellate** [1] - 55:11

**applicable** [3] - 20:12, 63:6, 63:8

**application** [1] - 61:4

**applications** [1] - 61:12

**applied** [2] - 12:8, 13:22

**applies** [5] - 38:12, 40:9, 40:12, 60:6, 89:6

**apply** [8] - 14:4, 14:9, 43:6, 45:13, 45:15, 54:10, 59:6, 60:9

**applying** [3] - 44:18, 45:16, 58:5

**appointed** [3] - 66:3, 68:1, 68:6

**appoints** [1] - 68:5

**appropriate** [7] - 8:18, 8:23, 13:1, 22:24, 25:2, 42:19, 83:14

**approvals** [1] - 83:5

**approved** [19] - 13:15, 13:25, 14:11, 14:13, 15:3, 15:4, 17:2, 24:1, 25:16, 28:24, 32:9, 33:4, 37:24, 40:7, 41:11, 41:14, 84:3, 84:5, 84:6

**area** [3] - 57:22, 77:4, 87:25

**areas** [2] - 27:6, 90:24

**arena** [1] - 75:5

**argue** [5] - 37:2, 39:6, 54:6, 54:14, 73:9

**argued** [11] - 13:12, 38:20, 47:1, 47:8, 62:8, 71:2, 85:10, 86:14, 88:13, 88:24, 89:13

**arguing** [11] - 6:13, 7:8, 43:23, 45:8, 46:3, 52:14, 66:1, 66:19, 74:12, 83:19, 84:1

**argument** [80] - 6:1, 6:2, 10:7, 10:20, 12:13, 12:20, 13:22, 14:3, 14:9, 15:22, 16:7, 17:23, 18:7, 18:20, 19:11, 19:18, 22:9, 25:3, 27:10, 27:11, 29:11, 34:5, 34:12, 34:14, 36:21, 37:1, 37:7, 38:19, 39:24, 40:4, 40:10, 41:24, 42:1, 42:21, 43:1, 43:2, 44:6, 46:6, 46:8, 52:22, 53:17, 53:22, 54:1, 54:15, 55:3, 55:15, 61:6, 63:15, 63:22, 64:3, 64:22, 70:7, 70:8, 70:11, 70:15, 70:19, 70:21, 72:20, 73:7, 74:11, 75:11, 76:22, 77:3, 78:5, 78:6, 80:3, 80:4, 80:14, 80:15, 81:19, 82:4, 85:2, 85:11, 87:22, 88:16, 89:19, 90:13, 93:11, 93:15, 93:21

**arguments** [14] - 10:23, 11:15, 11:16, 11:20, 13:10, 43:6, 52:15, 63:18, 69:21, 69:23, 70:3, 88:19, 91:7, 92:5

**Arkansas** [1] - 89:1

**arm** [5] - 46:16, 66:2, 66:20, 67:17, 69:24

**ARNOLD** [1] - 2:6

**Arnold** [3] - 4:16, 4:18, 4:21

**aside** [2] - 34:2, 34:6

**aspect** [12] - 45:22, 48:7, 52:22, 53:22, 63:21, 64:20, 65:19, 68:4, 83:16, 84:18, 85:7, 86:15

**aspects** [5] - 9:1, 13:4, 45:12, 47:20, 85:20

**aspirin** [25] - 7:1, 7:14, 7:16, 8:3, 15:24, 16:2, 16:3, 16:12, 16:14, 16:19, 17:11, 17:16, 17:18, 17:21, 33:7, 34:10, 35:10, 35:19, 35:21, 38:21, 51:10, 51:12, 80:5, 80:10

**assessment** [1] - 35:20

**assistance** [1] - 27:7

**assume** [4] - 22:9, 24:18, 26:24, 92:2

**assumes** [1] - 54:21

**assuming** [7] - 23:10, 24:20, 29:19, 36:15, 36:18, 50:6, 86:15

**assumption** [1] - 34:14

**attached** [1] - 28:7

**attack** [2] - 17:10, 17:14

**attacked** [1] - 47:12

**attention** [1] - 60:18

**attorney** [2] - 94:12, 94:14

**Attorney** [11] - 4:13, 43:17, 44:9, 44:23, 46:21, 59:20, 60:16, 60:21, 62:20, 70:4, 70:12

**ATTORNEY** [1] - 1:21

**AUGUST** [1] - 1:6

**authority** [6] - 30:10, 30:12, 44:10, 44:11, 44:24, 76:14

**authorizes** [1] - 41:20

**automatically** [2] - 14:13, 24:15

**autonomous** [1] - 68:14

**autonomously** [1] - 69:13

**avenue** [1] - 42:7

**aware** [4] - 34:18, 34:20, 43:4, 55:8

**awful** [1] - 90:22

---

**B**

**baby** [1] - 17:11

**background** [1] - 5:8

**backwards** [1] - 51:17

**bad** [2] - 28:1, 37:25

**based** [4] - 24:6, 32:7, 52:13, 61:10

**bases** [1] - 27:15

**basic** [2] - 24:7, 26:19

**basis** [7] - 10:6, 11:14, 25:17, 29:23, 32:15, 46:8, 47:9
**Bayer** [1] - 88:17
**BE** [1] - 3:7
**Bear** [7] - 54:7, 55:5, 55:7, 55:8, 55:18, 55:24, 58:5
**become** [1] - 85:3
**becomes** [5] - 39:7, 49:19, 85:5, 85:25, 86:12
**begin** [3] - 5:6, 5:23, 44:3
**beginning** [3] - 23:9, 86:6, 87:21
**behalf** [9] - 1:22, 2:10, 4:21, 4:23, 42:8, 44:10, 44:12, 46:22, 69:9
**behind** [2] - 17:17, 57:12
**belief** [1] - 73:14
**below** [1] - 10:9
**beneficiaries** [1] - 36:5
**benefit** [5] - 57:1, 67:11, 67:13, 69:3, 69:11
**benefitting** [1] - 69:19
**best** [2] - 16:22, 30:18
**bets** [1] - 79:4
**better** [7] - 16:12, 17:16, 35:19, 35:21, 38:22, 38:23, 39:6
**between** [6] - 33:7, 48:17, 57:15, 64:17, 76:25, 79:14
**beyond** [3] - 68:19, 77:23, 83:7
**big** [1] - 79:14
**bit** [6] - 22:20, 28:25, 50:15, 52:5, 55:15, 56:20
**blank** [1] - 77:9
**bleeding** [4] - 7:3, 7:5, 7:14, 8:1
**BMS/Sanofi** [3] - 21:25, 51:7, 75:17
**BMS/Sanofi's** [1] - 21:21
**board** [2] - 68:5, 89:7
**body** [1] - 61:11
**Bongiovanni** [1] - 91:17
**Bongiovanni's** [1] - 92:1
**bottom** [2] - 10:20, 10:22
**bound** [2] - 87:1, 87:8
**BRACEWELL** [1] - 1:20
**brief** [8] - 10:8, 10:10,

60:8, 70:25, 76:10, 76:11, 76:12, 76:13
**briefed** [4] - 45:2, 54:25, 55:14, 66:21
**briefing** [2] - 54:16, 92:6
**briefs** [2] - 20:22, 60:22
**bring** [8] - 46:22, 54:11, 57:6, 60:18, 63:25, 78:15, 90:20, 90:21
**brings** [2] - 57:1, 90:23
**BRISTOL** [2] - 1:6, 1:10
**BRISTOL-MYERS** [2] - 1:6, 1:10
**broad** [1] - 56:3
**broadest** [1] - 56:18
**brought** [3] - 45:3, 54:18, 56:22
**buffer** [1] - 57:15
**BURKE** [1] - 2:14
**buy** [1] - 75:10
**buzz** [2] - 22:17
**BY** [6] - 1:19, 1:20, 1:22, 2:7, 2:9, 2:14

**C**

**C.C.R** [1] - 1:24
**CAFA** [1] - 46:3
**California** [1] - 88:25
**cannot** [4] - 24:5, 76:16, 89:17, 90:7
**canvas** [2] - 77:9
**card** [2] - 72:9, 73:21
**carefully** [1] - 26:9
**CARL** [1] - 1:19
**Carl** [4] - 4:8, 43:24
**carries** [1] - 54:9
**case** [108] - 5:1, 5:14, 6:4, 7:17, 7:19, 9:2, 14:16, 18:16, 19:24, 20:9, 24:14, 24:20, 28:8, 30:8, 32:8, 38:10, 43:18, 44:5, 46:11, 47:17, 48:8, 50:7, 51:19, 52:23, 53:25, 54:7, 54:13, 54:16, 54:19, 54:21, 54:22, 55:2, 55:9, 55:13, 55:18, 55:24, 56:11, 56:12, 56:13, 57:13, 60:17, 60:20, 60:22, 61:4, 61:15, 61:24, 62:1, 62:13, 62:14, 62:17, 64:9, 64:20, 65:15, 65:19, 68:7, 70:5, 71:1,

71:14, 71:19, 71:24, 73:11, 74:19, 75:8, 75:10, 75:12, 75:25, 76:4, 76:14, 76:20, 77:1, 77:4, 77:20, 77:24, 78:19, 78:20, 79:1, 79:10, 79:13, 79:21, 80:3, 80:17, 80:20, 80:23, 81:1, 81:3, 81:6, 81:7, 81:15, 81:18, 81:23, 82:22, 84:19, 85:2, 85:3, 85:10, 85:25, 86:3, 86:4, 87:12, 88:17, 89:10, 89:16, 90:6, 90:14
**cases** [28] - 6:6, 6:11, 6:25, 7:2, 7:6, 7:13, 7:15, 8:5, 8:8, 8:17, 8:19, 12:6, 12:9, 12:25, 13:25, 15:14, 21:6, 21:7, 23:18, 60:15, 61:3, 63:3, 71:10, 77:13, 81:4, 83:25, 89:8, 90:23
**cash** [1] - 58:22
**Catch-22** [1] - 49:6
**category** [1] - 77:8
**causation** [1] - 56:16
**caused** [6] - 19:14, 20:11, 21:21, 21:25, 37:9, 37:20
**causes** [7] - 19:9, 22:2, 54:18, 56:14, 59:10, 86:19, 88:18
**causing** [5] - 19:17, 19:19, 27:24, 29:13, 38:1
**CCR** [2] - 3:13, 94:20
**cent** [1] - 17:21
**center** [1] - 8:7
**central** [1] - 7:17
**centralization** [1] - 8:23
**cents** [1] - 17:12
**certain** [7] - 9:12, 41:12, 44:24, 48:5, 51:10, 51:12, 56:25
**certainly** [15] - 8:6, 8:22, 12:22, 15:22, 16:6, 19:23, 22:23, 23:5, 26:20, 51:4, 57:24, 62:8, 66:21, 68:1, 75:8
**Certificate** [1] - 94:21
**certification** [4] - 28:6, 29:18, 29:19, 41:16

**certifications** [1] - 21:23
**Certified** [1] - 94:5
**certified** [2] - 27:17, 56:16
**CERTIFIED** [1] - 3:7
**certify** [4] - 25:4, 30:24, 94:6, 94:11
**certifying** [1] - 41:17
**cetera** [8] - 10:21, 11:1, 12:3, 20:23, 31:5, 44:17, 52:12, 67:2
**chambers** [1] - 92:1
**chance** [1] - 39:19
**change** [1] - 71:14
**charge** [3] - 16:2, 16:3, 43:18
**cheaper** [2] - 31:9, 39:10
**check** [1] - 37:18
**Chief** [1] - 77:5
**choice** [4] - 24:21, 27:19, 27:23, 31:10
**cholesterol** [1] - 29:1
**Circuit** [6] - 5:13, 5:17, 45:15, 52:4, 64:9, 68:11
**circumscribed** [1] - 26:9
**circumstance** [1] - 41:5
**circumstances** [3] - 41:6, 41:12, 41:13
**citations** [1] - 7:12
**cite** [3] - 54:14, 60:23, 60:24
**cited** [5] - 15:14, 24:14, 60:14, 76:14, 85:9
**cites** [4] - 12:6, 12:9, 12:24, 64:9
**citing** [1] - 88:17
**citizens** [1] - 44:10
**Civil** [1] - 93:19
**civil** [7] - 47:3, 53:14, 53:22, 63:21, 63:23, 64:21, 86:21
**CIVIL** [2] - 1:2, 1:2
**claim** [46] - 19:6, 19:9, 19:10, 19:12, 20:5, 21:10, 21:20, 27:24, 28:4, 28:5, 28:7, 29:13, 29:24, 34:8, 35:4, 35:6, 39:7, 48:23, 49:5, 49:8, 49:9, 49:11, 49:13, 49:19, 50:13, 50:21, 53:7, 53:23, 54:22, 54:23, 57:1, 60:3, 61:7, 63:10, 65:4, 75:16,

78:12, 79:11, 80:2, 81:7, 81:11, 81:13, 83:1, 84:21, 85:1, 91:4
**claims** [20] - 6:4, 19:25, 20:1, 20:9, 20:11, 22:1, 22:4, 28:19, 29:14, 30:7, 30:17, 37:8, 37:10, 37:20, 43:10, 48:5, 55:1, 55:4, 83:19, 84:7
**Claims** [5] - 19:7, 21:6, 27:20, 29:16, 30:6
**clarification** [2] - 12:16, 13:2
**clarity** [1] - 77:12
**CLARKSON** [1] - 1:13
**classic** [1] - 69:10
**clear** [10] - 12:17, 21:7, 23:17, 39:2, 60:12, 66:5, 69:17, 77:14, 88:15, 89:17
**clearer** [1] - 88:8
**clearly** [13] - 7:24, 11:8, 13:23, 15:21, 25:16, 40:23, 60:15, 62:2, 67:4, 69:10, 74:4, 75:24, 76:4
**CLERK** [2] - 4:2, 92:7
**clinical** [3] - 7:20, 32:12, 35:10
**clinically** [3] - 32:10, 34:3, 34:9
**closely** [1] - 25:20
**closer** [1] - 67:16
**closes** [1] - 64:5
**co** [1] - 79:19
**co-extensive** [1] - 79:19
**coagulant** [1] - 17:9
**COLANTONIO** [1] - 1:18
**collateral** [3] - 74:11, 74:22, 76:21
**colloquially** [1] - 80:8
**combination** [1] - 44:14
**coming** [3] - 56:23, 66:8, 67:6
**committees** [1] - 34:19
**common** [1] - 85:15
**commonalities** [1] - 8:22
**communications** [1] - 73:16
**companies** [6] - 48:12, 49:8, 49:16, 53:4, 59:17, 64:19
**companies'** [1] - 7:20
**company** [2] - 69:25,

88:2
**COMPANY** [2] - 1:7, 1:11
**compared** [2] - 7:1, 16:19
**comparison** [2] - 36:22, 39:9
**compensatory** [2] - 86:10, 86:13
**complaint** [24] - 7:12, 7:23, 10:16, 11:2, 11:4, 11:21, 21:12, 21:18, 22:5, 22:13, 23:6, 23:14, 23:22, 27:3, 50:2, 50:17, 50:25, 52:25, 53:10, 53:12, 64:10, 64:18, 71:11, 82:14
**complaints** [2] - 21:1, 21:7
**completely** [3] - 89:25, 91:3, 91:6
**completing** [1] - 32:17
**complex** [1] - 6:5
**compliance** [1] - 20:13
**compliment** [1] - 83:16
**complimentary** [5] - 54:18, 76:6, 82:23, 82:24, 88:18
**comply** [1] - 20:12
**component** [5] - 53:4, 53:6, 58:9, 58:11, 64:5
**concede** [1] - 53:9
**conceded** [3] - 10:1, 29:9, 30:4
**concept** [1] - 26:3
**concern** [2] - 38:15, 38:16
**conclude** [1] - 64:4
**concluded** [2] - 74:20, 92:8
**conclusion** [3] - 89:11, 89:15, 90:7
**Conclusion** [1] - 72:6
**condition** [13] - 21:9, 21:11, 23:16, 24:6, 29:20, 29:22, 30:2, 30:22, 30:23, 32:6, 40:13, 41:10, 41:14
**conditions** [1] - 26:2
**conduct** [1] - 71:19
**conference** [2] - 43:20, 91:12
**confines** [1] - 26:15
**Congress** [11] - 23:18,

24:2, 29:24, 29:25, 33:4, 40:5, 40:6, 40:13, 40:23, 41:20, 42:12
**consequences** [1] - 77:25
**consider** [2] - 11:5, 11:16
**consideration** [4] - 33:5, 36:13, 39:5, 39:17
**considered** [3] - 7:22, 11:17, 75:20
**consistent** [3] - 36:4, 40:3, 89:4
**consolidate** [1] - 8:18
**constitute** [2] - 72:11, 88:10
**constraints** [1] - 9:12
**consumer** [3] - 57:16, 58:10, 63:3
**Consumer** [17] - 55:20, 55:22, 58:14, 60:14, 61:6, 72:13, 73:18, 74:5, 75:2, 76:3, 76:5, 80:11, 83:2, 85:6, 85:12, 88:11, 91:2
**consumers** [17] - 56:1, 56:4, 58:13, 58:16, 58:17, 58:19, 58:21, 59:3, 59:5, 59:8, 59:18, 59:19, 59:22, 60:6, 64:15, 64:17, 65:7
**contemplated** [1] - 28:14
**context** [14] - 26:18, 29:21, 30:3, 54:8, 54:9, 60:7, 61:8, 61:9, 63:9, 63:14, 64:16, 79:22, 90:1, 90:8
**contingent** [2] - 62:23, 71:20
**continued** [3] - 1:23, 2:4, 33:9
**contours** [2] - 9:21, 77:7
**contrary** [2] - 47:8, 83:20
**contrast** [2] - 79:8, 85:9
**control** [2] - 52:8, 78:18
**controlled** [1] - 71:3
**controls** [3] - 11:25, 59:16, 67:14
**convinced** [1] - 57:21
**convincing** [1] - 78:20
**correct** [31] - 6:8, 9:13, 9:14, 9:21, 10:11, 11:13, 11:25, 13:18, 14:8, 15:6,

15:10, 15:13, 19:15, 19:16, 19:20, 19:21, 21:16, 23:4, 46:21, 46:23, 47:12, 47:13, 47:23, 48:6, 53:19, 53:20, 58:3, 61:22, 61:23, 68:3, 70:23
**corrected** [1] - 49:22
**Cosmetic** [4] - 62:3, 72:11, 72:18, 86:17
**cost** [26] - 15:22, 16:9, 18:18, 31:10, 31:14, 32:24, 32:25, 33:1, 33:4, 33:8, 34:2, 34:6, 35:12, 35:16, 35:19, 35:25, 36:6, 36:11, 36:13, 36:16, 36:19, 36:21, 38:15, 38:18, 39:5
**costs** [1] - 17:12
**counsel** [4] - 41:18, 62:9, 94:12, 94:14
**count** [1] - 78:8
**country** [2] - 89:2, 89:7
**counts** [1] - 65:20
**county** [3] - 66:17, 69:4, 69:12
**couple** [1] - 19:6
**course** [4] - 46:17, 48:18, 52:15, 75:1
**COURT** [156] - 1:1, 1:25, 3:14, 4:3, 4:15, 4:24, 5:21, 6:16, 6:20, 7:7, 7:23, 9:7, 9:9, 9:17, 9:23, 10:6, 10:12, 10:18, 11:6, 11:14, 12:2, 12:13, 14:2, 14:24, 15:7, 15:11, 15:17, 17:22, 19:1, 19:17, 19:22, 20:7, 20:20, 21:14, 21:17, 22:6, 22:16, 23:8, 24:9, 25:3, 25:8, 25:10, 25:12, 27:10, 28:3, 28:10, 28:17, 29:9, 31:4, 31:14, 31:21, 32:21, 34:1, 35:23, 36:11, 36:16, 38:14, 39:1, 39:14, 41:18, 41:25, 42:10, 43:8, 43:22, 44:1, 44:14, 45:2, 45:8, 45:19, 45:24, 46:7, 47:1, 47:15, 47:21, 48:1, 48:13, 49:24, 50:8, 50:10, 50:12, 50:23, 51:4, 52:4, 53:13, 54:1,

55:5, 55:8, 55:16, 56:19, 57:21, 58:4, 58:7, 60:10, 60:19, 60:23, 61:1, 61:8, 61:14, 61:18, 61:21, 61:24, 62:8, 62:25, 63:13, 64:21, 65:2, 65:13, 65:22, 66:19, 67:11, 67:18, 67:22, 68:20, 69:1, 69:21, 70:6, 70:11, 70:17, 70:24, 71:5, 72:1, 72:20, 73:7, 74:3, 75:6, 76:12, 78:19, 81:19, 82:2, 82:10, 82:14, 82:17, 82:25, 83:7, 83:10, 83:18, 84:1, 84:6, 84:9, 84:15, 85:17, 86:25, 87:10, 88:6, 88:12, 88:23, 89:8, 89:24, 90:5, 90:15, 90:21, 91:6, 91:16, 91:21, 91:25, 92:5
**Court** [43] - 8:18, 8:24, 9:11, 10:7, 20:4, 22:12, 26:1, 26:9, 30:9, 30:14, 43:17, 43:21, 55:2, 55:19, 56:9, 59:8, 62:2, 63:11, 64:4, 64:15, 65:8, 70:7, 71:25, 73:3, 74:16, 75:12, 76:22, 79:23, 82:5, 82:22, 87:6, 87:14, 90:2, 91:13, 91:15, 91:20, 93:7, 93:10, 93:12, 93:14, 93:16, 94:5
**court** [14] - 4:1, 5:14, 5:16, 20:4, 26:7, 61:1, 64:9, 71:16, 72:25, 73:8, 73:11, 75:24, 76:8, 85:11
**court's** [1] - 5:4
**Court's** [3] - 60:18, 77:3, 93:8
**COURTHOUSE** [1] - 1:13
**courts** [5] - 78:25, 87:3, 87:4, 90:15, 90:17
**Courts** [1] - 55:11
**coverage** [1] - 41:22
**covered** [5] - 32:2, 32:3, 40:6, 41:3, 41:22
**covers** [1] - 69:6
**create** [4] - 34:19, 42:20, 62:3, 75:25
**created** [4] - 36:25,

42:12, 44:11, 44:25
**creates** [1] - 44:22
**creating** [3] - 34:18, 36:12, 36:17
**Credit** [1] - 58:14
**Crestor** [1] - 29:1
**criteria** [3] - 18:4, 27:12, 36:18
**critical** [2] - 45:22, 70:4
**cross** [1] - 26:23
**cross-wise** [1] - 26:23
**curative** [1] - 50:10
**current** [1] - 50:25
**cut** [1] - 52:5

**D**

**DACP** [1] - 72:9
**DAG** [1] - 1:22
**damages** [2] - 86:10, 86:13
**Daniel** [1] - 4:12
**DANIEL** [2] - 1:22, 2:14
**date** [2] - 48:19, 94:9
**Date** [1] - 94:21
**DAVID** [1] - 2:8
**David** [2] - 4:20, 7:9
**day-to-day** [3] - 56:2, 58:22
**days** [1] - 43:14
**dead** [1] - 50:13
**deal** [8] - 9:5, 12:3, 12:6, 12:7, 30:12, 30:17, 46:19, 50:24
**dealing** [5] - 9:2, 10:15, 44:2, 61:18, 87:5
**deals** [2] - 30:6, 51:14
**dealt** [3] - 8:8, 38:3, 62:10
**death** [1] - 17:11
**debate** [2] - 52:21, 90:9
**Debevoise's** [1] - 81:5
**decade** [1] - 50:18
**December** [1] - 51:3
**deceptive** [5] - 48:9, 51:15, 62:22, 71:15, 72:12
**decide** [5] - 19:5, 49:16, 55:11, 78:22, 90:10
**decided** [10] - 13:6, 42:12, 55:6, 55:9, 60:21, 62:12, 72:14, 73:23, 90:15, 90:18

**decides** [1] - 65:8
**deciding** [1] - 79:13
**decision** [8] - 14:19, 38:12, 48:25, 73:2, 73:4, 77:4, 81:5, 92:2
**decisions** [5] - 59:13, 67:19, 67:20, 69:18, 76:6
**defendant** [5] - 14:25, 19:14, 71:11, 78:16, 79:3
**defendants** [20] - 4:17, 4:19, 4:21, 4:23, 5:3, 7:13, 7:15, 9:6, 13:14, 16:12, 17:13, 20:10, 24:14, 27:4, 38:1, 38:6, 45:11, 70:21, 88:25, 89:1
**Defendants** [2] - 1:7, 2:10
**defendants'** [1] - 14:10
**defense** [2] - 81:22, 81:24
**deficient** [2] - 21:8, 21:13
**defined** [2] - 41:4, 80:25
**defrauded** [1] - 59:3
**degrees** [1] - 81:3
**demonstrate** [1] - 20:9
**deny** [4] - 6:12, 6:22, 8:24, 29:24
**depicted** [1] - 48:8
**deposited** [1] - 66:25
**deprive** [1] - 16:21
**designed** [1] - 58:15
**desist** [1] - 50:6
**detailed** [3] - 56:5, 59:16, 79:24
**determination** [6] - 7:22, 18:12, 24:24, 71:21, 76:7, 89:21
**determine** [8] - 45:14, 63:12, 63:16, 67:9, 71:18, 74:24, 86:4, 88:1
**determined** [2] - 18:3, 28:12
**determining** [2] - 28:12, 45:17
**deterred** [1] - 57:5
**deterrence** [1] - 57:7
**deterring** [1] - 56:24
**develop** [1] - 28:25
**developed** [3] - 87:17, 87:23, 87:24

**developing** [1] - 77:15
**device** [1] - 90:1
**diagnosis** [1] - 40:21
**dictated** [1] - 82:13
**dictates** [1] - 67:15
**difference** [5] - 6:19, 33:7, 79:14, 87:10, 87:12
**differences** [1] - 6:21
**different** [30] - 6:6, 6:8, 7:6, 12:23, 13:3, 15:20, 16:8, 18:11, 18:21, 18:22, 18:25, 22:8, 22:21, 42:16, 54:14, 54:19, 56:20, 56:22, 57:3, 57:5, 58:9, 60:1, 61:18, 62:16, 67:12, 72:2, 76:17, 80:14, 84:2, 87:15
**director** [5] - 66:3, 67:25, 68:5, 69:14, 69:15
**disagree** [14] - 7:7, 7:10, 24:10, 45:20, 45:21, 47:10, 75:22, 75:23, 81:20, 81:21, 82:4, 89:22, 89:24, 89:25
**disagreed** [1] - 75:12
**disagreement** [1] - 20:22
**discovery** [1] - 91:18
**discretion** [1] - 26:25
**discuss** [1] - 54:17
**discussed** [3] - 22:8, 42:21, 76:16
**discussing** [1] - 18:9
**discussion** [7] - 8:6, 32:24, 42:24, 65:7, 93:4, 93:12, 93:19
**disease** [1] - 32:6
**dismiss** [3] - 39:20, 52:11, 65:11
**dispose** [1] - 81:12
**disposed** [1] - 74:13
**dispositive** [4] - 72:23, 77:20, 78:12, 79:6
**dispute** [7] - 9:11, 18:21, 18:24, 32:4, 48:17, 58:1, 77:24
**disputes** [1] - 6:7
**disputing** [1] - 9:14
**District** [1] - 61:3
**DISTRICT** [2] - 1:1, 1:1
**disturb** [1] - 8:24
**diversity** [2] - 5:14, 70:13

division [1] - 64:17
doctor [8] - 17:9, 17:19, 25:4, 27:18, 28:4, 28:24, 30:24, 41:16
doctors [3] - 27:6, 39:4, 59:11
doctrine [2] - 8:10, 56:20
dog [1] - 52:23
done [10] - 8:15, 16:20, 26:20, 48:19, 57:2, 62:24, 71:3, 73:10, 81:10
doubt [1] - 8:13
Dow [11] - 62:1, 75:25, 76:24, 77:1, 77:12, 78:3, 78:4, 79:7, 79:15, 81:4, 81:6
down [3] - 8:20, 46:1, 77:14
dozen [1] - 17:1
drafted [1] - 53:10
drew [1] - 9:8
DREW [1] - 2:7
Drew [1] - 4:18
Drug [5] - 59:15, 62:3, 72:11, 72:18, 86:17
drug [45] - 11:25, 13:16, 13:25, 14:11, 14:12, 15:3, 17:20, 18:2, 18:17, 24:1, 24:15, 25:16, 28:23, 29:5, 31:8, 32:3, 32:4, 32:8, 32:9, 32:18, 32:20, 37:5, 37:17, 37:24, 39:8, 41:21, 41:22, 49:17, 51:10, 53:5, 54:12, 59:12, 61:4, 61:19, 63:3, 75:5, 76:18, 79:1, 83:14, 83:24, 84:9, 86:4, 87:25
drug's [1] - 32:7
drugs [14] - 12:3, 12:8, 16:25, 31:6, 32:13, 32:17, 33:4, 35:14, 36:22, 40:7, 41:3, 42:15, 48:2, 73:6
Duragesic [1] - 72:9
during [2] - 44:5, 47:5
duty [1] - 42:7

**E**

earmarked [1] - 53:18
easily [1] - 62:24
EAST [1] - 1:13

Edmonds [6] - 15:14, 25:19, 25:20, 25:21, 26:1, 26:7
effect [2] - 76:21, 84:9
effective [11] - 15:23, 15:24, 17:25, 18:3, 18:13, 18:14, 18:23, 31:9, 32:19, 35:16, 51:12
effectively [1] - 43:11
effectiveness [4] - 15:5, 15:21, 16:9, 32:12
efficacious [3] - 38:20, 83:24, 84:10
efficacy [15] - 6:25, 8:2, 8:6, 8:21, 16:19, 21:24, 22:8, 22:18, 23:6, 32:19, 38:19, 83:13, 83:15, 83:19, 84:13
efficient [1] - 35:15
efforts [3] - 47:11, 51:15, 75:19
either [7] - 10:9, 21:22, 34:20, 38:6, 42:24, 45:23, 76:17
element [2] - 56:17, 62:6
elements [2] - 6:8, 62:23
emanated [1] - 60:16
employed [1] - 67:14
employee [2] - 94:12, 94:14
employees [15] - 66:9, 66:12, 66:15, 66:16, 66:17, 66:18, 66:24, 67:12, 67:14, 68:18, 68:23, 69:5, 69:12, 69:19
employees' [1] - 69:3
employer [1] - 66:8
employers [2] - 68:17, 69:4
enacted [1] - 58:11
enacting [1] - 59:16
encourage [2] - 25:20, 31:17
encouraging [1] - 72:24
end [7] - 13:16, 18:1, 65:3, 81:23, 86:7, 87:18, 87:21
ended [2] - 47:12, 79:13
enforce [3] - 44:24, 59:1, 62:4
enforced [1] - 56:6

enforcement [9] - 59:1, 59:21, 62:6, 62:21, 86:14, 86:21, 90:19, 90:20, 91:4
enforcing [1] - 86:16
engaged [2] - 48:21, 51:7
enjoin [1] - 49:13
enjoined [1] - 49:1
entire [4] - 88:14, 89:10, 89:16, 90:6
entitled [1] - 78:22
ENTITLED [1] - 3:9
entity [5] - 19:9, 65:25, 68:8, 68:14, 69:11
epilepsy [2] - 17:1, 17:3
epileptics [1] - 17:2
equally [2] - 31:8, 60:6
equation [2] - 36:7, 36:17
equivalent [1] - 31:9
error [1] - 11:18
escape [1] - 57:9
especially [1] - 58:21
ESQUIRE [8] - 1:17, 1:19, 1:20, 2:7, 2:7, 2:8, 2:9, 2:14
ESQUIRES [5] - 1:18, 1:20, 2:6, 2:9, 2:13
essential [1] - 85:16
essentially [28] - 6:3, 9:18, 12:6, 13:13, 13:15, 15:2, 15:8, 15:15, 19:11, 19:13, 28:6, 34:23, 37:1, 43:2, 47:8, 52:16, 56:23, 57:8, 57:9, 63:12, 63:20, 63:22, 64:1, 66:1, 69:24, 70:21, 71:2, 83:19
establish [3] - 73:15, 76:1, 84:11
establishing [1] - 63:10
estoppel [3] - 74:11, 74:22, 76:21
et [12] - 1:5, 1:7, 1:8, 1:11, 10:21, 10:25, 12:3, 20:23, 31:5, 44:17, 52:12, 67:2
etc [1] - 1:5
evaluating [1] - 52:9
event [1] - 61:25
evidence [9] - 49:12, 50:16, 52:1, 73:24, 78:16, 78:17, 79:2, 80:19, 81:9

evidentiary [1] - 78:14
evolved [1] - 87:13
exactly [7] - 26:2, 26:6, 29:9, 50:11, 66:19, 69:6, 79:19
example [3] - 17:1, 35:13, 82:14
examples [1] - 78:4
except [3] - 38:14, 38:15, 42:10
exceptions [8] - 23:21, 23:24, 26:9, 26:15, 26:18, 31:20, 37:23, 40:9
excessive [1] - 38:1
exclude [5] - 25:23, 32:20, 41:21, 42:25
excluded [6] - 32:5, 32:9, 34:11, 34:13, 57:23, 57:24
excludes [2] - 31:6, 37:1
excluding [1] - 14:6
exclusion [6] - 32:15, 33:2, 37:11, 41:5, 42:13, 43:3
exclusionary [1] - 12:19
exclusions [5] - 13:21, 24:2, 26:19, 27:14, 30:3
excuse [1] - 51:3
exist [1] - 43:4
existed [1] - 84:14
expand [1] - 55:15
expenditures [1] - 56:2
expenses [1] - 40:19
expensive [1] - 31:8
explanation [2] - 32:14, 55:13
expressed [1] - 90:1
expressly [1] - 21:22
extensive [1] - 79:19
extent [2] - 13:11, 33:6
extra [2] - 25:22, 26:2

**F**

face [1] - 22:14
fact [20] - 24:18, 51:11, 54:17, 61:10, 67:25, 71:16, 71:18, 72:13, 72:14, 72:16, 73:2, 73:22, 73:23, 73:25, 74:23, 79:15, 80:16, 85:5, 89:13
factor [1] - 65:17

**factors** [1] - 64:7
**facts** [1] - 77:23
**factual** [10] - 6:10, 6:18, 6:20, 6:22, 7:21, 7:25, 8:12, 20:23, 24:7, 74:6
**factually** [2] - 19:25, 47:7
**failure** [3] - 78:5, 81:7, 81:11
**failure-to-warn** [3] - 78:5, 81:7, 81:11
**fair** [1] - 62:25
**faith** [2] - 22:22, 37:12
**fall** [4] - 9:19, 27:14, 74:4, 77:1
**falls** [2] - 27:12, 50:1
**false** [33] - 6:3, 19:9, 19:10, 19:13, 19:25, 20:1, 20:5, 20:9, 21:10, 21:20, 21:23, 22:1, 27:24, 30:7, 30:13, 30:18, 37:9, 37:14, 39:7, 51:14, 72:10, 72:24, 73:17, 73:21, 75:4, 75:20, 80:2, 83:22, 85:14, 86:5, 87:19, 88:9
**False** [5] - 19:7, 21:6, 27:20, 29:16, 30:6
**familiar** [1] - 71:7
**Fauvre** [3] - 4:20, 7:9, 93:6
**FAUVRE** [3] - 2:8, 4:20, 7:9
**FDA** [59] - 7:19, 13:15, 13:25, 14:11, 14:13, 15:4, 16:15, 17:24, 18:12, 25:15, 28:1, 28:24, 30:10, 30:11, 30:12, 30:17, 30:18, 37:24, 38:25, 40:7, 41:11, 41:14, 42:17, 57:12, 61:21, 62:5, 71:21, 73:13, 74:13, 74:21, 78:9, 78:24, 79:1, 79:5, 79:25, 80:7, 80:13, 80:20, 80:24, 80:25, 81:8, 81:10, 81:14, 82:8, 82:19, 83:5, 83:17, 83:20, 84:3, 84:4, 85:16, 86:12, 90:4, 91:3, 91:5
**FDA's** [3] - 50:18, 74:18
**FDA-approved** [7] - 13:15, 13:25, 14:13, 28:24, 40:7, 41:11,

41:14
**FDCA** [30] - 71:2, 72:10, 72:22, 73:5, 73:14, 73:22, 74:2, 74:7, 74:24, 74:25, 75:3, 75:21, 75:25, 81:18, 83:17, 84:21, 84:25, 85:4, 85:5, 86:6, 86:20, 87:2, 87:7, 87:21, 88:1, 88:4, 88:9, 89:15, 89:18, 91:3
**February** [1] - 51:2
**federal** [45] - 5:16, 15:9, 15:14, 21:20, 26:5, 33:3, 46:18, 54:15, 56:5, 56:6, 56:7, 61:11, 70:20, 70:22, 71:10, 72:19, 74:17, 74:19, 76:6, 76:18, 77:8, 77:15, 77:19, 77:22, 78:1, 78:8, 79:12, 79:16, 79:17, 79:18, 80:23, 81:2, 81:24, 82:23, 85:3, 85:11, 85:25, 86:23, 87:4, 87:17, 89:3, 89:20, 90:25, 93:21
**felt** [1] - 72:23
**few** [2] - 40:20, 43:2
**fiduciaries** [1] - 69:19
**figure** [2] - 64:10, 64:11
**file** [6] - 49:11, 58:19, 59:9, 59:21, 72:9, 73:21
**filed** [8] - 5:25, 10:9, 45:4, 45:5, 50:25, 51:1, 60:22, 71:1
**filled** [1] - 56:7
**final** [2] - 74:15, 74:21
**finally** [1] - 77:15
**financially** [1] - 94:15
**finder** [6] - 71:18, 72:14, 72:16, 73:23, 74:23
**findings** [4] - 72:21, 72:24, 73:13, 89:15
**fine** [2] - 23:9, 48:19
**first** [20] - 4:25, 5:7, 5:23, 9:24, 11:17, 12:15, 13:5, 13:12, 17:5, 20:25, 21:1, 21:19, 44:4, 46:19, 54:2, 72:16, 75:18, 76:9, 77:10, 82:7
**FISHER** [1] - 1:13
**five** [2] - 55:9, 65:20
**floodgates** [2] - 85:24, 90:13

**Florida** [2] - 15:15, 25:24
**focus** [6] - 6:24, 7:1, 11:24, 12:5, 33:4, 46:5
**focusing** [1] - 12:18
**follow** [1] - 26:8
**followed** [1] - 10:25
**FOLLOWING** [1] - 3:7
**following** [1] - 85:4
**follows** [3] - 5:6, 5:8, 26:11
**Food** [5] - 59:15, 62:2, 72:11, 72:18, 86:16
**Footnote** [1] - 76:4
**FOR** [1] - 1:1
**foreclose** [1] - 79:11
**foregoing** [1] - 94:7
**forget** [1] - 25:10
**former** [1] - 27:4
**formularies** [2] - 31:22, 32:2
**formulary** [19] - 14:6, 31:18, 31:19, 32:14, 32:17, 32:20, 32:25, 34:11, 34:19, 36:2, 36:10, 36:12, 36:17, 36:25, 37:11, 37:17, 37:24, 37:25, 38:8
**forth** [3] - 21:9, 62:23, 94:10
**forward** [5] - 47:9, 48:24, 52:16, 57:9, 63:10
**four** [13] - 13:20, 17:12, 17:21, 26:8, 26:15, 26:18, 27:12, 27:14, 30:3, 31:19, 47:5, 65:20
**four-cent** [1] - 17:21
**four-year** [1] - 47:5
**fours** [1] - 80:17
**Fourth** [1] - 64:8
**frankly** [2] - 7:24, 8:3
**FRANKOVITCH** [48] - 1:18, 1:19, 43:24, 44:8, 44:20, 45:6, 45:21, 47:18, 48:7, 49:21, 50:3, 50:9, 50:11, 51:2, 53:20, 60:11, 60:20, 60:24, 61:2, 61:9, 61:16, 61:20, 61:23, 62:1, 62:16, 63:7, 65:1, 66:14, 67:8, 67:13, 67:20, 70:1, 70:10, 70:16, 71:7, 75:23, 81:21, 82:9, 82:11, 82:15, 82:21, 83:6, 83:9,

83:11, 83:21, 84:4, 84:8, 84:11
**Frankovitch** [9] - 4:8, 43:25, 47:15, 49:24, 60:10, 75:14, 93:18, 93:20, 93:22
**fraud** [9] - 57:16, 57:19, 58:14, 59:1, 59:19, 59:20, 59:22, 62:18, 81:1
**Fraud** [1] - 60:13
**fraudulent** [2] - 16:21, 37:19
**FREDA** [1] - 1:15
**front** [2] - 8:7, 32:22
**fulfilling** [1] - 59:4
**full** [1] - 84:13
**fully** [1] - 34:20
**fund** [4] - 53:1, 53:2, 53:16, 66:25
**fundamental** [2] - 7:5, 68:11
**fundamentally** [1] - 13:24
**funded** [1] - 68:17
**funding** [8] - 66:3, 66:6, 66:7, 66:10, 66:22, 67:5, 68:23, 69:22
**funds** [9] - 66:23, 67:1, 67:2, 67:6, 67:9, 67:15, 68:12, 68:14
**furthermore** [1] - 15:11
**future** [2] - 49:2, 49:9

---

**G**

**gap** [1] - 56:7
**gaps** [1] - 55:25
**gee** [1] - 48:1
**general** [9] - 10:13, 10:16, 11:9, 12:24, 46:24, 48:3, 53:18, 67:6, 67:9
**General** [7] - 43:17, 44:23, 46:22, 59:21, 60:21, 70:12, 93:4
**GENERAL** [1] - 1:21
**General's** [5] - 4:13, 44:10, 60:16, 62:21, 70:4
**generally** [4] - 11:1, 11:10, 12:4, 85:14
**generic** [2] - 47:14, 49:17
**GIULIANI** [1] - 1:20

**given** [2] - 37:4, 87:4
**glad** [1] - 29:15
**gorilla** [3] - 59:14, 79:1, 81:7
**governed** [1] - 71:17
**government** [10] - 16:5, 19:18, 22:1, 27:7, 27:19, 27:23, 27:25, 28:18, 28:21, 69:5
**governor** [5] - 66:3, 68:1, 68:2, 68:5, 68:6
**Grable** [8] - 77:1, 77:13, 78:3, 79:8, 79:9, 79:15, 79:16, 80:18
**gravamen** [1] - 52:25
**great** [3] - 17:19, 75:10, 78:3
**GREEAR** [2] - 1:22, 4:12
**Greear** [2] - 4:12, 43:20
**Greenberg** [1] - 20:18
**Greenberg's** [2] - 24:4, 29:18
**grounds** [1] - 81:25
**groups** [1] - 35:22
**guarantee** [1] - 26:19
**guaranteed** [1] - 33:3
**guess** [7] - 37:2, 44:21, 49:9, 53:17, 55:6, 66:2, 72:21
**guessing** [1] - 42:25
**guidance** [3] - 80:24, 87:7
**guided** [1] - 87:3
**guideline** [1] - 87:18
**guidelines** [2] - 77:14, 80:1
**Gunn** [1] - 77:4

---

**H**

**hand** [2] - 58:18, 58:20
**handbook** [1] - 84:23
**handbooks** [1] - 74:18
**hanging** [1] - 64:6
**Harker** [6] - 4:18, 9:8, 93:9, 93:11, 93:13, 93:15
**HARKER** [32] - 2:7, 4:18, 9:5, 9:8, 9:22, 10:11, 10:15, 13:19, 15:6, 15:9, 15:13, 18:24, 20:18, 21:5, 21:16, 23:4, 23:12, 25:7, 25:9, 25:11, 25:13, 28:8, 28:14, 29:7, 29:15,

---

31:12, 31:16, 31:23, 32:23, 36:8, 36:15, 40:2
**head** [1] - 35:8
**health** [1] - 36:4
**healthcare** [1] - 73:16
**hear** [2] - 11:20, 70:6
**heard** [1] - 30:10
**hearing** [1] - 70:14
**heart** [2] - 17:10, 17:14
**HEATH** [1] - 1:20
**heath** [1] - 6:15
**heavily** [1] - 57:17
**held** [1] - 73:8
**help** [1] - 17:9
**hereby** [1] - 94:6
**herein** [1] - 51:7
**hereinbefore** [1] - 94:9
**high** [1] - 28:25
**higher** [3] - 27:6, 27:9, 76:17
**highlight** [5] - 10:9, 10:12, 10:13, 10:19, 10:22
**highly** [2] - 16:1, 63:3
**hinging** [1] - 70:15
**hit** [1] - 35:8
**holding** [3] - 56:13, 72:15, 91:1
**holds** [1] - 66:23
**honestly** [1] - 55:1
**Honor** [83] - 4:7, 4:17, 4:19, 4:20, 5:19, 5:20, 6:15, 7:9, 9:4, 9:5, 9:15, 9:22, 10:5, 10:11, 10:17, 12:1, 13:20, 14:8, 15:6, 15:16, 18:25, 19:21, 20:6, 20:17, 20:19, 21:5, 21:12, 25:7, 25:19, 26:22, 28:9, 29:8, 29:15, 30:21, 31:12, 31:17, 32:1, 35:8, 35:9, 36:8, 37:17, 40:4, 40:17, 41:9, 41:16, 43:7, 43:16, 43:21, 43:24, 44:8, 45:10, 45:13, 46:6, 46:25, 47:13, 48:10, 51:22, 52:21, 53:20, 53:21, 54:20, 56:13, 57:11, 58:3, 58:8, 60:11, 62:15, 68:3, 70:23, 71:23, 74:2, 74:10, 75:24, 76:9, 78:13, 78:21, 81:22, 88:22,

---

88:24, 89:23, 91:10, 91:22, 92:4
**HONORABLE** [1] - 1:15
**hoodwinked** [2] - 34:23, 38:7
**hope** [3] - 46:2, 72:23, 83:9
**host** [2] - 60:15, 78:6
**huge** [1] - 86:23

---

**I**

**idea** [1] - 28:18
**identified** [1] - 32:6
**illegal** [1] - 51:7
**impact** [2] - 35:25, 77:22
**implication** [1] - 61:11
**implied** [1] - 41:15
**impliedly** [1] - 21:23
**important** [3] - 14:17, 33:5, 74:16
**impose** [7] - 25:22, 26:16, 30:1, 36:3, 40:24, 41:7, 76:16
**imposes** [1] - 19:8
**improper** [5] - 48:14, 49:1, 49:23, 71:19, 83:3
**improperly** [3] - 16:18, 82:16, 82:18
**IN** [2] - 1:4, 3:8
**inaccurate** [1] - 71:22
**inadequate** [3] - 78:6, 78:10, 78:17
**inappropriate** [1] - 83:25
**include** [2] - 23:10, 66:16
**included** [1] - 32:13
**includes** [3] - 5:1, 42:14, 66:17
**including** [3] - 15:14, 31:7, 81:5
**income** [3] - 27:5, 27:8, 27:9
**incorporated** [1] - 42:2
**incorrect** [1] - 80:11
**increase** [1] - 27:21
**incurred** [1] - 40:19
**indeed** [4] - 31:12, 37:10, 46:12, 63:2
**independent** [6] - 37:18, 38:3, 38:11, 42:7, 70:7, 76:7
**independently** [1] - 69:17

---

**indicate** [1] - 19:24
**indicated** [8] - 22:18, 23:16, 26:11, 36:19, 40:7, 41:15, 51:10, 51:12
**indicates** [3] - 6:3, 51:16, 67:3
**indication** [4] - 14:12, 23:20, 41:11, 42:1
**indications** [6] - 16:13, 17:1, 25:23, 25:24, 28:9, 35:11
**individual** [2] - 20:14, 56:25
**industries** [1] - 63:4
**industry** [2] - 54:8, 57:17
**infarction** [1] - 17:15
**information** [3] - 37:4, 59:12, 84:12
**inherent** [3] - 28:10, 28:15, 29:6
**initial** [1] - 43:19
**injunction** [1] - 47:6
**injunctive** [12] - 47:16, 49:6, 49:10, 49:11, 49:13, 49:19, 50:5, 50:12, 50:21, 52:16, 53:3, 53:6
**injury** [1] - 7:2
**inquiry** [5] - 8:20, 13:16, 17:24, 68:11, 86:7
**instance** [7] - 11:17, 13:6, 17:19, 67:4, 72:16, 75:18, 76:3
**instances** [1] - 82:12
**instead** [4] - 17:20, 41:2, 46:10, 54:5
**institutional** [3] - 77:21, 85:23, 86:24
**instructed** [1] - 27:5
**instruction** [1] - 80:11
**instructions** [3] - 50:5, 50:10, 84:24
**Insurance** [1] - 60:12
**insurance** [10] - 53:1, 53:2, 53:23, 64:19, 66:25, 69:11, 69:20, 69:25, 70:1
**insure** [1] - 70:2
**intended** [4] - 55:23, 57:19, 57:23, 58:23
**interactions** [1] - 56:2
**interest** [6] - 44:5, 45:14,

52:24, 64:8, 64:12, 70:9
**interested** [1] - 94:15
**interesting** [3] - 25:21, 56:12, 68:18
**intermediaries** [1] - 59:11
**intermediary** [5] - 8:10, 56:19, 57:13, 57:14, 62:18
**interposed** [1] - 64:14
**interpretation** [1] - 87:3
**interpreted** [1] - 87:14
**interpreting** [1] - 74:19
**introduce** [2] - 43:17, 43:20
**investment** [2] - 67:19, 67:20
**invoke** [1] - 10:2
**invoked** [1] - 30:11
**invokes** [2] - 11:11, 11:12
**involuntary** [1] - 65:17
**involve** [1] - 61:21
**involved** [3] - 61:12, 61:16, 75:17
**involving** [1] - 70:22
**Iqbal** [3] - 51:24, 52:5, 52:8
**ironically** [1] - 27:8
**IRS** [1] - 79:10
**IS** [1] - 3:7
**issue** [43] - 5:12, 5:16, 6:9, 6:11, 7:19, 11:4, 15:10, 16:10, 16:17, 16:18, 17:20, 22:23, 30:5, 33:6, 35:12, 36:11, 38:3, 44:7, 44:9, 44:21, 45:22, 47:6, 54:25, 66:22, 68:7, 68:10, 74:10, 74:14, 77:20, 78:18, 79:6, 79:10, 79:12, 79:24, 81:12, 83:15, 85:23, 86:8, 88:25, 89:3, 89:5, 90:12
**issued** [1] - 74:13
**issues** [17] - 5:9, 6:22, 7:21, 8:12, 33:1, 46:1, 55:11, 65:24, 66:4, 69:21, 76:6, 77:18, 77:21, 86:1, 86:24, 91:14, 91:18
**issuing** [1] - 61:9
**items** [1] - 40:19

**itself** [5] - 33:4, 42:10, 61:19, 68:13, 74:24

**J**

**J&J** [16] - 54:13, 54:16, 54:21, 54:23, 55:2, 55:13, 62:13, 71:1, 71:16, 71:19, 71:24, 76:14, 84:19, 87:22
**Jackson** [1] - 77:10
**Janssen** [1] - 74:13
**Janssen's** [4] - 72:8, 73:19, 73:24, 88:8
**Jersey** [2] - 63:2, 94:6
**JERSEY** [1] - 1:1
**Johnson** [10] - 55:6, 79:22, 81:15, 81:16, 82:22, 86:3
**judge** [7] - 9:25, 10:2, 10:19, 11:1, 12:4, 54:17, 80:22
**Judge** [6] - 20:18, 24:4, 29:18, 81:5, 91:17, 91:25
**judge's** [1] - 12:17
**judges** [1] - 89:3
**judgment** [7] - 16:23, 29:7, 29:11, 30:15, 51:5, 63:12, 65:11
**juncture** [1] - 63:11
**juries** [1] - 78:22
**jurisdiction** [11] - 9:16, 46:4, 46:9, 46:18, 70:20, 77:8, 77:16, 78:1, 86:23, 91:1, 93:21
**jury** [4] - 74:23, 80:8, 80:22, 84:24
**Justice** [1] - 77:5

**K**

**keep** [1] - 50:21
**keeping** [1] - 38:7
**Keith** [1] - 4:10
**key** [1] - 33:2
**kind** [7] - 5:7, 26:6, 28:18, 54:8, 54:12, 56:25, 77:18
**kinds** [7] - 7:25, 8:17, 30:13, 57:3, 71:9, 90:20, 90:23
**knowingly** [2] - 21:21, 21:25

**knows** [1] - 78:13

**L**

**LA** [1] - 1:17
**label** [23] - 13:15, 13:24, 18:2, 23:15, 23:20, 24:1, 24:7, 24:11, 24:12, 24:15, 24:18, 24:21, 25:15, 26:11, 27:1, 28:9, 28:24, 32:18, 78:6, 78:9, 78:23
**labeling** [1] - 32:7
**labelling** [1] - 78:19
**labels** [1] - 48:14
**language** [9] - 12:18, 12:19, 12:22, 12:24, 23:11, 29:16, 41:1, 42:2, 62:19
**large** [2] - 15:22, 61:11
**last** [9] - 46:17, 70:19, 71:23, 71:24, 72:7, 81:16, 84:18, 90:12, 91:21
**law** [55] - 5:13, 5:15, 5:17, 6:7, 12:11, 19:24, 24:14, 44:22, 45:15, 45:18, 53:24, 58:1, 61:5, 63:2, 68:7, 68:12, 72:17, 73:10, 73:12, 73:15, 74:2, 74:4, 74:14, 74:17, 74:19, 76:2, 76:16, 76:18, 77:11, 77:19, 78:8, 78:11, 78:23, 79:12, 79:16, 79:17, 79:18, 81:2, 81:13, 82:21, 85:15, 85:18, 86:5, 87:13, 87:17, 87:20, 87:23, 87:24, 88:3, 89:5, 89:10, 89:20, 90:3, 90:4
**laws** [1] - 73:25
**lawsuit** [1] - 79:20
**lawsuits** [1] - 46:22
**layer** [3] - 13:17, 13:19, 15:12
**learned** [6] - 8:9, 56:19, 57:13, 57:14, 59:11, 62:18
**least** [11] - 6:10, 6:22, 11:7, 11:14, 12:16, 13:1, 15:3, 16:15, 28:2, 63:5, 63:24
**leave** [3] - 17:17, 22:13,

22:15
**left** [2] - 42:19, 62:4
**legal** [2] - 20:22, 44:18
**legally** [3] - 20:1, 20:5, 20:9
**legislature** [1] - 58:12
**legs** [2] - 53:8, 53:10
**less** [3] - 15:24, 27:9, 71:4
**letter** [3] - 72:9, 73:20, 74:20
**letters** [6] - 7:19, 50:18, 74:13, 74:20, 76:21, 80:1
**level** [2] - 34:25, 38:4
**Levine** [1] - 78:22
**LIABILITY** [1] - 1:4
**liability** [5] - 6:6, 8:8, 19:8, 20:2, 20:3
**life** [1] - 49:5
**light** [1] - 39:25
**likely** [1] - 17:11
**limit** [1] - 37:23
**line** [2] - 10:20, 10:22
**Lipitor** [1] - 29:2
**list** [1] - 37:11
**literally** [1] - 88:24
**litigation** [2] - 47:3, 71:9
**LITIGATION** [1] - 1:5
**Look** [1] - 59:8
**look** [54] - 7:11, 9:19, 25:16, 25:19, 28:23, 29:17, 30:22, 31:17, 31:22, 32:18, 40:5, 40:16, 44:15, 45:18, 51:17, 51:19, 53:4, 55:17, 56:11, 59:7, 61:24, 65:23, 65:24, 66:5, 66:22, 69:14, 69:15, 70:12, 71:2, 71:12, 71:23, 76:24, 77:12, 77:17, 79:16, 79:21, 84:17, 84:19, 84:22, 85:12, 85:18, 86:6, 87:12, 87:25, 88:3, 88:14, 89:5, 89:10, 89:16, 90:1, 90:6
**looked** [9] - 6:9, 10:9, 74:17, 74:18, 74:19, 87:6, 87:17, 89:14
**looking** [17] - 9:24, 30:20, 30:21, 33:6, 36:13, 38:15, 38:17,

44:17, 54:15, 56:23, 57:25, 63:1, 63:17, 67:18, 75:15, 80:24
**looks** [4] - 32:17, 64:9, 76:5, 77:9
**lost** [2] - 74:11, 85:10
**Louisiana** [4] - 85:10, 85:13, 85:15, 89:1
**low** [2] - 27:5, 27:8
**low-income** [1] - 27:5
**Lowenstein** [1] - 4:23
**LOWENSTEIN** [1] - 2:9
**lower** [1] - 76:17

**M**

**mandate** [2] - 23:18, 33:3
**mandated** [2] - 13:21, 25:25
**mandates** [1] - 24:2
**manner** [8] - 43:5, 48:4, 48:17, 52:13, 52:17, 66:21, 88:13, 89:13
**market** [3] - 17:8, 17:13, 49:8
**marketed** [6] - 8:11, 34:23, 43:5, 48:4, 48:18, 83:23
**MARKETING** [1] - 1:4
**marketing** [40] - 6:25, 8:6, 8:17, 16:16, 16:18, 16:21, 29:12, 30:9, 30:14, 30:18, 34:16, 37:14, 37:19, 47:11, 47:19, 48:9, 48:21, 48:23, 49:4, 49:18, 49:21, 49:23, 49:25, 50:4, 50:17, 50:24, 51:8, 51:15, 57:4, 75:15, 75:17, 75:19, 78:20, 79:24, 80:2, 82:12, 83:2, 83:4, 83:16, 84:6
**Maryland** [1] - 59:15
**material** [3] - 49:22, 49:25, 51:7
**MATTER** [1] - 3:9
**matter** [15] - 5:25, 22:14, 46:14, 46:15, 60:5, 73:10, 73:12, 73:15, 74:14, 75:1, 77:16, 79:5, 85:15, 92:3
**matters** [1] - 87:5
**MDL** [2] - 5:11, 6:6
**mean** [7] - 13:2, 18:11,

18:16, 48:3, 80:13, 84:23, 84:25
**meaning** [4] - 15:20, 21:14, 42:22, 80:7
**meaningful** [3] - 32:10, 34:3, 34:9
**meanings** [3] - 18:21, 18:22, 18:25
**means** [2] - 37:14, 48:3
**meant** [2] - 55:25, 79:17
**Medicaid** [47] - 10:2, 10:4, 10:13, 11:2, 11:3, 11:8, 11:11, 11:12, 11:15, 11:16, 11:21, 12:5, 13:5, 13:10, 13:13, 13:21, 14:2, 14:10, 14:15, 14:21, 20:15, 20:25, 21:15, 23:2, 23:7, 23:17, 24:2, 24:17, 24:20, 24:23, 25:4, 26:7, 27:8, 28:15, 28:18, 29:22, 29:25, 31:18, 35:14, 37:19, 39:18, 39:21, 40:4, 40:16, 41:24, 93:11
**medical** [10] - 22:3, 26:4, 26:5, 27:17, 28:6, 28:13, 37:18, 38:2, 38:11, 39:3
**medically** [14] - 14:14, 14:21, 23:20, 24:1, 24:16, 24:23, 25:5, 25:22, 27:22, 28:20, 29:3, 29:5, 35:15, 39:8
**medically-approved** [1] - 24:1
**Medicare** [32] - 10:12, 10:25, 11:9, 11:10, 11:23, 11:24, 11:25, 12:2, 12:5, 12:7, 12:8, 12:11, 12:18, 12:23, 12:24, 12:25, 13:7, 14:4, 14:9, 14:15, 14:20, 20:14, 21:14, 24:17, 24:20, 27:7, 30:8, 34:25, 39:23, 40:5, 40:12, 93:15
**Medicare's** [1] - 12:10
**meets** [1] - 36:2
**members** [1] - 68:5
**mention** [3] - 10:4, 11:3, 22:3
**mentions** [1] - 11:1
**merit** [1] - 18:19

**Merrell** [11] - 62:1, 75:25, 76:24, 77:1, 77:12, 78:3, 78:4, 79:7, 79:15, 81:4, 81:6
**message** [1] - 57:7
**messages** [1] - 57:4
**met** [6] - 36:10, 36:15, 36:18, 41:5, 41:12
**Mexico** [1] - 89:2
**MI** [1] - 38:8
**middle** [2] - 86:7, 87:21
**might** [6] - 43:3, 48:22, 53:8, 53:9, 58:20, 65:17
**mind** [5] - 11:20, 13:5, 13:11, 22:12, 91:15
**misbranded** [1] - 78:9
**misleading** [11] - 72:10, 72:24, 73:17, 73:21, 74:7, 75:20, 83:22, 85:14, 86:5, 87:19, 88:9
**mission** [1] - 59:4
**MLD** [2] - 6:9, 8:15
**model** [1] - 77:11
**moment** [10] - 15:1, 17:22, 19:4, 45:25, 48:22, 58:2, 62:9, 67:23, 72:1, 75:7
**moments** [1] - 43:2
**monetary** [2] - 53:22, 86:22
**money** [5] - 28:21, 67:10, 68:16, 68:22, 69:9
**monies** [2] - 53:16, 66:24
**Montana** [3] - 35:13, 39:12, 39:14
**month** [1] - 62:12
**months** [1] - 49:15
**moot** [3] - 48:16, 52:17, 52:18
**mooted** [1] - 47:9
**most** [5] - 17:11, 35:15, 64:6, 65:18, 77:4
**Motion** [1] - 93:17
**motion** [16] - 5:1, 5:2, 5:5, 5:23, 5:24, 8:25, 9:3, 43:12, 44:2, 46:2, 51:6, 52:11, 63:12, 65:11, 93:5, 93:8
**MOTIONS** [1] - 1:5
**motions** [3] - 4:25, 8:9, 13:9
**motivated** [1] - 76:20
**move** [3] - 13:8, 63:18,

65:14
**MR** [171] - 4:6, 4:10, 4:12, 4:16, 4:18, 4:20, 5:19, 5:20, 6:15, 6:18, 6:24, 7:9, 9:4, 9:5, 9:8, 9:15, 9:22, 10:4, 10:11, 10:15, 11:3, 11:12, 12:1, 12:9, 13:19, 14:8, 15:6, 15:9, 15:13, 16:10, 18:24, 19:16, 19:21, 20:6, 20:17, 20:18, 21:5, 21:16, 21:18, 22:12, 23:4, 23:12, 24:10, 25:7, 25:9, 25:11, 25:13, 26:22, 27:15, 28:8, 28:14, 29:7, 29:15, 31:12, 31:16, 31:23, 32:23, 35:5, 36:8, 36:15, 37:16, 38:23, 39:12, 40:2, 41:19, 42:6, 43:6, 43:16, 43:24, 44:8, 44:20, 45:6, 45:10, 45:21, 46:5, 46:24, 47:13, 47:18, 47:24, 48:7, 48:10, 49:7, 49:21, 50:3, 50:9, 50:11, 50:14, 51:2, 51:21, 52:20, 53:20, 53:21, 54:20, 55:7, 55:10, 55:17, 57:11, 58:3, 58:6, 58:8, 60:11, 60:20, 60:24, 61:2, 61:9, 61:16, 61:20, 61:23, 62:1, 62:15, 62:16, 63:7, 64:1, 65:1, 65:3, 65:16, 66:14, 67:8, 67:13, 67:20, 68:3, 68:25, 69:6, 70:1, 70:10, 70:16, 70:23, 71:4, 71:7, 71:22, 72:6, 73:1, 74:1, 74:9, 75:23, 76:9, 76:13, 78:21, 81:21, 82:9, 82:11, 82:15, 82:21, 83:6, 83:9, 83:11, 83:21, 84:4, 84:8, 84:11, 84:16, 85:19, 87:9, 87:11, 88:7, 88:22, 88:24, 89:22, 89:25, 90:11, 90:17, 90:25, 91:10, 91:19, 91:22, 92:4, 93:6, 93:9, 93:12, 93:13, 93:16
**MS** [1] - 4:22
**municipal** [1] - 66:17
**municipality** [1] - 69:4

**must** [13] - 14:1, 24:17, 24:22, 25:17, 26:11, 29:20, 31:7, 35:15, 37:10, 40:8, 41:11, 72:16, 73:23
**MY** [1] - 3:8
**MYERS** [2] - 1:6, 1:10
**myocardial** [1] - 17:15

**N**

**nail** [1] - 35:8
**name** [1] - 6:14
**narrow** [1] - 91:1
**nature** [1] - 7:5
**necessarily** [4] - 24:19, 35:5, 44:8, 63:11
**necessary** [40] - 12:12, 12:21, 13:3, 14:4, 14:14, 14:20, 14:21, 15:12, 16:24, 18:5, 18:17, 18:22, 21:2, 22:20, 24:16, 24:23, 25:1, 25:5, 26:4, 26:5, 27:22, 28:20, 29:3, 29:5, 30:25, 31:1, 35:15, 38:11, 39:8, 40:11, 40:14, 40:21, 40:24, 41:7, 41:23, 42:4, 60:5, 67:1
**necessity** [13] - 10:24, 14:23, 21:24, 22:3, 22:5, 23:6, 27:17, 28:6, 28:13, 37:18, 38:2, 39:4, 42:8
**need** [16] - 5:7, 6:1, 15:11, 30:22, 51:24, 52:21, 59:8, 59:9, 59:18, 59:19, 59:23, 64:15, 65:7, 75:7, 76:24, 91:8
**needed** [1] - 79:10
**needs** [6] - 8:14, 12:16, 30:23, 49:12, 56:7, 60:2
**negligence** [4] - 78:7, 78:11, 78:13, 79:3
**negligent** [1] - 78:16
**never** [10] - 11:1, 11:10, 11:12, 13:6, 31:10, 31:14, 36:16, 36:19, 49:8, 55:2
**nevertheless** [1] - 59:21
**NEW** [1] - 1:1
**New** [3] - 63:2, 89:1, 94:6
**next** [7] - 33:9, 34:14, 34:22, 64:6, 91:11, 91:16, 91:23

**nice** [1] - 64:24
**NJ** [1] - 1:13
**NO** [2] - 1:2, 1:2
**nobody** [1] - 6:7
**non** [1] - 69:7
**non-residents** [1] - 69:7
**none** [1] - 42:25
**nonetheless** [3] - 12:21, 15:25, 54:16
**note** [3] - 7:11, 62:12, 66:23
**noted** [1] - 82:22
**notes** [1] - 88:16
**NOTES** [1] - 3:8
**nothing** [2] - 50:15, 51:16
**notion** [1] - 57:17
**notwithstanding** [1] - 65:6
**Novartis** [1] - 81:5
**Novosad** [3] - 4:10, 6:15, 6:17
**NOVOSAD** [36] - 1:20, 4:10, 5:20, 6:15, 6:18, 6:24, 9:4, 9:15, 10:4, 11:3, 11:12, 12:1, 12:9, 14:8, 16:10, 19:16, 19:21, 20:6, 20:17, 21:18, 22:12, 24:10, 26:22, 27:15, 35:5, 37:16, 38:23, 39:12, 41:19, 42:6, 43:6, 93:6, 93:9, 93:12, 93:13, 93:16
**nowhere** [1] - 10:1
**number** [1] - 30:10
**numerous** [2] - 8:16, 89:3
**NY** [1] - 2:14

**O**

**obtain** [1] - 57:23
**obviously** [4] - 9:12, 46:15, 68:6, 81:9
**occasions** [1] - 16:15
**occurred** [1] - 47:5
**October** [2] - 91:13, 91:19
**OF** [5] - 1:1, 1:8, 1:4, 1:21, 3:8
**off-label** [2] - 23:15, 24:12
**Office** [1] - 4:13

**office** [1] - 60:16
**OFFICIAL** [2] - 1:25, 3:14
**Official** [1] - 94:4
**omissions** [4] - 72:8, 73:19, 73:25, 88:8
**on-formulary** [1] - 37:17
**on-label** [17] - 13:15, 13:24, 18:2, 23:15, 23:20, 24:1, 24:7, 24:11, 24:15, 24:18, 24:21, 25:15, 26:11, 27:1, 28:9, 28:24
**once** [4] - 13:14, 14:11, 65:14, 74:25
**one** [40] - 6:14, 7:8, 9:6, 13:20, 14:25, 16:5, 17:6, 23:21, 26:8, 31:3, 31:8, 31:19, 31:23, 32:18, 34:15, 35:23, 37:3, 38:6, 40:9, 41:5, 42:6, 43:3, 45:4, 45:9, 46:4, 52:15, 56:21, 58:6, 58:18, 64:2, 72:1, 74:6, 75:18, 77:10, 78:7, 78:10, 86:19, 89:5, 90:12, 91:16
**ongoing** [1] - 51:17
**open** [4] - 4:1, 42:19, 85:24, 90:13
**opening** [1] - 80:23
**operate** [2] - 69:16
**operates** [1] - 78:14
**operation** [1] - 67:15
**opinion** [14] - 5:4, 9:25, 11:10, 11:19, 12:6, 12:17, 13:5, 24:4, 29:18, 52:6, 54:24, 63:1, 88:14, 93:8
**opportunity** [1] - 43:13
**opposed** [4] - 16:9, 17:5, 18:10, 44:7
**opposite** [1] - 81:3
**opposition** [2] - 7:11, 10:23
**order** [6] - 36:3, 49:10, 79:11, 81:18, 86:4, 91:21
**Organon** [1] - 21:6
**OSHA** [1] - 71:12
**otherwise** [3] - 18:18, 88:15, 89:18
**outcome** [2] - 32:12, 47:3
**outlining** [1] - 77:7

**outpatient** [2] - 32:2, 32:4
**outset** [1] - 47:22
**overlap** [4] - 6:10, 6:22, 7:25, 8:12
**overlapping** [1] - 7:21
**overlay** [7] - 16:8, 26:4, 26:6, 36:6, 39:16, 42:17, 63:17
**overlooked** [2] - 10:7, 11:8
**overriding** [1] - 86:1
**own** [4] - 66:12, 68:23, 69:8, 89:21

**P**

**page** [4] - 33:9, 71:24, 72:7, 76:10
**Page** [1] - 93:3
**paid** [3] - 31:7, 53:15, 64:19
**paint** [1] - 77:8
**pamphlets** [1] - 17:18
**panel** [3] - 6:9, 7:22, 8:15
**paper** [1] - 50:4
**paragraph** [4] - 21:18, 51:11, 51:14, 81:17
**parallel** [1] - 79:19
**parallels** [2] - 90:3, 91:5
**parameters** [2] - 5:21, 20:23
**PARKER** [1] - 2:13
**part** [18] - 11:2, 15:22, 22:5, 23:1, 28:17, 32:9, 34:4, 41:8, 42:5, 44:22, 46:6, 47:17, 50:5, 54:19, 64:19, 66:12, 81:25, 86:12
**Part** [18] - 11:24, 12:11, 20:14, 35:1, 39:23, 40:5, 40:6, 40:8, 40:12, 40:18, 41:1, 41:2, 41:3, 41:6, 41:12, 41:22
**particular** [9] - 18:16, 25:14, 56:12, 67:10, 73:4, 77:23, 78:2, 84:18
**particularly** [1] - 57:14
**parties** [7] - 5:11, 19:7, 20:8, 46:11, 46:19, 48:17, 94:13
**parts** [1] - 58:13
**party** [13] - 44:5, 45:14, 46:12, 46:13, 52:14,

52:24, 63:16, 63:24, 64:8, 64:11, 65:15, 70:8
**party-in-interest** [2] - 52:24, 64:8
**past** [1] - 48:5
**patent** [2] - 61:5, 61:11
**patents** [2] - 61:17, 61:18
**patient** [6] - 17:7, 24:25, 25:1, 28:4, 28:5, 38:16
**patient's** [1] - 21:24
**patients** [7] - 17:14, 17:15, 27:7, 27:8, 28:20, 38:8
**pause** [1] - 72:4
**pay** [6] - 27:16, 27:23, 27:25, 38:17, 66:13, 68:13
**paying** [6] - 16:5, 53:2, 68:22, 69:2, 69:5, 80:6
**payment** [15] - 20:14, 21:9, 23:16, 24:6, 29:21, 29:22, 29:24, 30:7, 30:22, 30:23, 40:14, 40:18, 40:25, 41:10, 41:14
**payors** [2] - 16:5, 22:1
**pays** [2] - 68:15, 68:21
**pecuniary** [1] - 47:2
**PEIA** [19] - 44:17, 45:17, 45:22, 46:14, 46:15, 51:15, 53:16, 53:18, 65:21, 65:22, 66:13, 68:10, 68:14, 68:16, 69:10, 69:22, 69:23, 70:8, 70:15
**penalties** [11] - 44:25, 47:4, 53:13, 53:14, 53:17, 53:22, 63:21, 63:23, 86:22, 93:19
**penalty** [3] - 56:24, 57:10, 64:22
**people** [5] - 16:3, 27:22, 35:22, 70:2, 82:15
**per** [3] - 78:8, 78:13, 79:3
**perceive** [1] - 49:23
**percent** [3] - 68:16, 68:21, 68:22
**percentage** [1] - 27:6
**perfect** [1] - 70:17
**perhaps** [5] - 14:25, 16:4, 18:6, 18:16, 22:19
**period** [2] - 47:5, 52:1
**peripheral** [2] - 64:20,

65:19
**permit** [2] - 26:8, 82:19
**permitted** [1] - 86:21
**perpetrated** [1] - 62:19
**person** [1] - 19:8
**personal** [2] - 7:2, 79:11
**pertinent** [1] - 32:9
**Pfizer** [2] - 60:20, 60:21
**pharmaceutical** [3] - 61:15, 61:16, 88:2
**pharmaceuticals** [1] - 57:22
**pharmacists** [1] - 21:22
**physician** [8] - 14:18, 14:19, 24:25, 28:11, 38:4, 38:14, 42:9
**physicians** [10] - 16:22, 19:12, 21:22, 27:5, 34:17, 34:23, 35:17, 37:8, 37:20, 38:12
**PI** [1] - 7:2
**picture** [1] - 84:13
**place** [1] - 94:9
**places** [1] - 72:2
**plaintiff** [4] - 43:13, 47:2, 72:22, 81:9
**plaintiffs** [4] - 4:7, 4:8, 4:11, 15:17
**Plaintiffs** [3] - 1:5, 1:9, 1:22
**plaintiffs'** [1] - 14:14
**plan** [7] - 31:5, 35:1, 41:6, 42:1, 42:4, 42:13, 42:19
**plans** [1] - 41:21
**Plavix** [35] - 7:1, 7:3, 7:16, 8:3, 8:21, 15:23, 16:11, 16:18, 16:23, 17:7, 17:8, 17:13, 17:15, 17:19, 25:1, 27:20, 28:8, 32:3, 33:7, 34:8, 35:10, 35:18, 35:20, 38:7, 38:13, 47:14, 48:5, 48:18, 51:9, 51:11, 75:17, 80:4, 80:10
**PLAVIX** [1] - 1:4
**Plavix's** [3] - 7:14, 16:19, 21:23
**play** [3] - 62:20, 75:9
**plead** [9] - 21:2, 22:10, 27:13, 30:4, 37:13, 39:2, 39:19, 42:23, 50:22
**pleading** [6] - 22:23,

37:10, 50:15, 52:9, 52:12, 53:8
**pleadings** [1] - 22:3
**pleasure** [1] - 68:2
**pled** [26] - 11:22, 21:4, 25:9, 25:10, 26:21, 27:13, 31:3, 34:21, 34:22, 35:2, 35:6, 36:25, 37:6, 37:15, 39:15, 39:18, 41:9, 41:13, 50:15, 51:4, 51:6, 51:18, 52:14, 52:18, 83:10
**plenty** [1] - 12:10
**point** [26] - 6:1, 6:13, 7:10, 15:18, 15:21, 32:24, 36:19, 39:6, 39:9, 39:20, 48:16, 52:17, 52:19, 52:21, 53:3, 57:25, 65:3, 65:6, 65:13, 65:14, 65:17, 65:18, 70:14, 80:3, 89:14, 90:12
**policies** [1] - 60:8
**policy** [4] - 41:8, 60:5, 60:6, 62:11
**politics** [1] - 69:18
**Pollack** [1] - 77:10
**population** [2] - 32:7, 32:13
**PORTER** [1] - 2:6
**Porter** [3] - 4:17, 4:18, 4:21
**position** [11] - 13:14, 14:10, 14:15, 15:2, 17:25, 22:25, 31:10, 48:22, 51:22, 58:5, 63:24
**possibility** [1] - 63:9
**possible** [2] - 18:6, 56:18
**pot** [1] - 64:24
**potential** [1] - 83:17
**potentially** [2] - 6:24, 87:11
**powers** [2] - 59:1, 62:21
**practical** [1] - 77:25
**practices** [14] - 8:7, 16:21, 48:9, 51:8, 62:22, 71:15, 72:12, 75:15, 75:16, 82:12, 83:3, 83:4, 88:2, 88:10
**preclude** [1] - 47:19
**precondition** [1] - 20:13
**predominantly** [1] - 45:7

**preempt** [1] - 89:20
**preemption** [4] - 61:5, 88:16, 89:19, 90:2
**prejudice** [1] - 39:21
**premise** [1] - 57:12
**premium** [1] - 16:5
**premiums** [3] - 68:17, 68:23, 68:25
**preparing** [1] - 77:3
**prescribe** [6] - 17:9, 17:11, 18:2, 18:18, 29:5, 38:13
**prescribed** [3] - 18:15, 25:1, 32:8
**prescribing** [4] - 14:19, 16:11, 28:11, 42:9
**prescription** [25] - 11:24, 12:3, 12:8, 14:1, 14:12, 14:20, 16:23, 24:15, 24:22, 28:13, 31:1, 31:7, 35:14, 41:21, 41:22, 42:15, 54:12, 63:3, 73:6, 74:5, 75:5, 78:25, 83:25, 86:4, 87:25
**prescriptions** [5] - 17:20, 24:21, 27:21, 38:1, 38:9
**present** [3] - 51:5, 53:10, 73:24
**presented** [2] - 34:13, 84:2
**presumption** [3] - 78:15, 79:4, 80:19
**prevail** [1] - 81:18
**prevent** [1] - 17:10
**price** [1] - 27:9
**pricing** [2] - 83:14, 83:15
**principles** [1] - 44:18
**private** [13] - 54:4, 54:5, 56:14, 56:17, 56:21, 58:10, 58:19, 58:24, 59:10, 62:10, 77:24, 86:9, 86:19
**proactively** [1] - 41:7
**problem** [1] - 18:15
**problematic** [1] - 48:24
**procedural** [5] - 5:12, 44:6, 44:13, 45:1, 45:7
**procedurally** [1] - 6:5
**proceed** [1] - 82:6
**proceedings** [2] - 92:8, 94:8
**Proceedings** [1] - 93:3
**process** [1] - 82:1

**product** [4] - 7:13, 8:5, 48:12, 82:16
**PRODUCT** [1] - 1:4
**products** [3] - 6:6, 7:15, 8:7
**progeny** [1] - 81:4
**program** [6] - 21:8, 21:14, 23:3, 28:19, 36:4, 36:5
**programs** [1] - 20:15
**promote** [2] - 47:25, 51:8
**promoted** [5] - 7:16, 27:20, 48:12, 59:13, 82:16
**promoting** [4] - 49:17, 53:5, 82:18
**promotional** [1] - 88:1
**promotions** [1] - 51:25
**proper** [3] - 46:13, 52:14, 63:16
**properly** [3] - 11:21, 22:10, 39:18
**proposition** [2] - 46:24, 54:14
**prospect** [1] - 57:15
**prospective** [1] - 47:16
**protect** [8] - 55:23, 55:25, 56:4, 57:20, 58:15, 58:23, 59:4, 60:5
**protected** [7] - 58:18, 59:9, 59:18, 59:19, 59:23, 64:16, 65:8
**protecting** [2] - 36:4, 58:13
**protection** [1] - 58:10
**Protection** [17] - 55:20, 55:22, 58:15, 60:13, 60:14, 61:7, 72:13, 73:18, 74:5, 75:2, 76:4, 76:5, 80:12, 85:6, 85:13, 88:11, 91:3
**prove** [4] - 50:7, 83:21, 84:20
**proven** [1] - 75:11
**provide** [2] - 84:12, 84:13
**provided** [1] - 76:18
**provider** [1] - 31:5
**providers** [2] - 35:1, 73:16
**provides** [2] - 66:11, 75:3
**providing** [1] - 60:12

**provision** [1] - 69:15
**provisions** [5] - 31:18, 31:19, 36:9, 44:24, 73:4
**public** [2] - 66:15, 66:24
**pure** [1] - 53:8
**purpose** [4] - 26:23, 27:25, 56:24, 57:7
**purposes** [11] - 13:2, 25:5, 54:22, 56:21, 56:23, 57:3, 57:6, 58:9, 67:6, 68:15, 69:10
**PURSUANT** [1] - 3:6
**put** [10] - 23:8, 34:2, 34:6, 36:6, 48:14, 54:7, 63:13, 67:10, 72:2, 82:15
**puts** [1] - 80:17
**putting** [1] - 56:9

### Q

**qualified** [1] - 41:21
**questionable** [1] - 57:18
**questions** [3] - 58:4, 70:22, 85:22
**qui** [5] - 4:10, 6:4, 6:25, 7:17, 24:12
**quote** [1] - 77:2

### R

**races** [1] - 79:5
**raise** [1] - 37:6
**raised** [2] - 55:12, 56:15
**raises** [1] - 86:23
**rationale** [1] - 59:25
**RE** [1] - 1:4
**reach** [1] - 55:11
**reached** [1] - 56:14
**read** [11] - 12:22, 25:20, 32:21, 39:24, 59:25, 72:3, 73:20, 75:1, 77:3, 81:16, 87:9
**reading** [4] - 11:6, 35:25, 76:10, 89:12
**reaffirms** [1] - 61:6
**real** [14] - 44:5, 45:14, 52:9, 52:21, 52:24, 53:3, 58:4, 63:24, 64:7, 64:11, 68:10, 70:8, 76:25, 80:12
**reality** [1] - 78:25
**really** [42] - 6:1, 6:2, 12:2, 15:25, 17:23, 29:2,

29:3, 30:15, 39:1, 40:2, 46:1, 46:3, 46:10, 46:11, 48:16, 50:20, 52:23, 52:24, 53:1, 53:6, 53:11, 54:17, 55:3, 55:23, 57:1, 63:15, 64:18, 64:20, 65:20, 66:2, 66:8, 68:8, 69:25, 70:14, 70:22, 77:17, 77:19, 78:14, 78:24, 79:5, 79:13, 83:15
**reason** [6] - 18:4, 18:7, 37:13, 42:11, 42:15, 59:2
**reasonable** [27] - 10:24, 12:12, 12:21, 14:3, 14:13, 14:20, 15:12, 16:24, 17:3, 17:4, 17:5, 18:5, 18:17, 18:22, 21:2, 22:9, 22:20, 24:16, 30:24, 30:25, 40:11, 40:14, 40:21, 40:24, 41:7, 41:23, 42:3
**reasonableness** [8] - 14:23, 15:19, 16:8, 16:11, 22:4, 22:7, 29:20, 42:8
**reasoning** [1] - 54:6
**reasons** [8] - 18:18, 34:15, 37:3, 43:3, 62:11, 78:7, 78:10
**Rebecca** [1] - 4:22
**REBECCA** [1] - 2:9
**rebuts** [1] - 79:3
**rebuttable** [1] - 80:19
**received** [1] - 66:24
**recent** [3] - 52:6, 60:17, 77:4
**recently** [3] - 70:25, 71:6, 77:14
**recognized** [1] - 78:25
**recognizing** [1] - 62:10
**reconsider** [2] - 11:19, 13:4
**reconsideration** [6] - 5:3, 9:3, 9:10, 9:21, 13:1, 93:8
**reconsidered** [1] - 43:12
**recovers** [1] - 69:9
**recovery** [2] - 53:23, 64:24
**reference** [3] - 8:1, 32:1, 32:23

**refers** [1] - 11:10
**refuse** [1] - 27:16
**Regal** [1] - 90:3
**regard** [32] - 5:9, 6:2, 8:1, 8:2, 8:16, 8:20, 9:10, 10:23, 11:15, 11:20, 11:23, 13:13, 14:2, 14:3, 14:6, 18:12, 21:13, 29:13, 37:5, 39:3, 44:6, 46:20, 48:5, 54:11, 62:9, 63:19, 63:20, 63:21, 65:25, 69:22, 70:19, 70:24
**regarding** [2] - 5:1, 7:18
**regs** [1] - 86:12
**regular** [2] - 42:16, 91:11
**regulate** [1] - 73:5
**regulated** [3] - 54:8, 57:17, 63:4
**regulating** [1] - 62:11
**regulations** [13] - 20:12, 30:9, 35:14, 59:16, 71:10, 74:18, 78:24, 80:1, 80:7, 80:21, 80:24, 81:14, 85:16
**regulatory** [4] - 55:25, 56:3, 56:5, 77:22
**reimburse** [7] - 14:1, 23:19, 24:18, 24:21, 27:1, 37:21, 38:9
**reimbursed** [6] - 25:17, 25:25, 26:12, 40:8, 41:4, 41:11
**reimbursement** [6] - 24:3, 25:24, 26:19, 28:5, 33:3, 41:8
**reimbursing** [1] - 53:2
**reintroduction** [1] - 47:19
**relate** [1] - 29:20
**related** [2] - 23:25, 66:18
**relating** [1] - 44:21
**relative** [3] - 7:14, 94:11, 94:14
**Relator** [5] - 5:25, 6:3, 10:1, 20:10, 27:3
**Relator's** [3] - 5:1, 7:10, 20:3
**relevant** [8] - 57:14, 71:8, 73:25, 74:2, 74:4, 77:5, 81:11, 85:21
**reliance** [2] - 60:2, 60:3
**relief** [13] - 47:16, 49:6,

49:10, 49:11, 49:14,
49:19, 50:6, 50:13,
50:21, 52:16, 53:3, 53:6,
62:6
**rely** [2] - 62:5, 72:22
**relying** [3] - 83:3, 83:18,
89:14
**remaining** [1] - 22:2
**remand** [9] - 5:2, 5:24,
8:25, 44:3, 60:22, 61:10,
63:9, 93:5, 93:17
**remanding** [1] - 61:3
**remedies** [1] - 30:6
**remedy** [1] - 30:16
**removal** [6] - 8:24, 51:20,
65:9, 81:23, 81:25
**remove** [1] - 65:14
**removed** [2] - 51:19,
52:13
**rep** [1] - 27:4
**repaid** [1] - 29:4
**repaying** [1] - 28:21
**replead** [4] - 39:22, 43:9,
43:13
**replies** [1] - 45:4
**reply** [3] - 10:20, 10:21,
45:3
**Reporter** [2] - 94:5
**REPORTER** [2] - 1:25,
3:14
**representations** [3] -
7:20, 8:11, 83:13
**representatives** [1] -
83:12
**represented** [1] - 47:10
**representing** [1] - 51:9
**reps** [1] - 17:16
**request** [1] - 91:12
**requirement** [17] - 10:24,
18:8, 18:10, 21:3, 24:22,
26:5, 27:17, 31:1, 31:2,
37:18, 38:3, 38:11,
40:14, 40:25, 41:8, 42:4,
42:20
**requirements** [7] - 17:24,
22:20, 25:22, 26:13,
26:17, 31:21, 36:2
**requiring** [1] - 35:17
**reserving** [1] - 88:20
**residents** [1] - 69:7
**resolve** [1] - 91:14
**respect** [12] - 23:5,
23:13, 25:13, 26:12,

30:8, 30:20, 31:13, 32:2,
32:5, 32:25, 41:1, 41:2
**respectfully** [1] - 89:22
**response** [1] - 24:9
**restrict** [1] - 27:11
**result** [6] - 8:14, 11:18,
13:2, 21:25, 57:22,
62:19
**results** [1] - 34:16
**resurrect** [1] - 48:22
**return** [2] - 50:8, 53:15
**review** [2] - 9:12, 10:2
**reviewed** [1] - 7:23
**revolves** [1] - 61:4
**rid** [1] - 46:8
**ripe** [2] - 49:13, 49:20
**rise** [2] - 4:2, 92:7
**risk** [1] - 8:2
**risks** [3] - 7:3, 7:5, 7:14
**Risperdal** [2] - 72:9,
73:20
**Robert** [1] - 4:6
**ROBERT** [1] - 1:17
**Roberts** [1] - 77:5
**Rockville** [1] - 59:14
**role** [1] - 75:9
**room** [1] - 88:5
**roots** [2] - 55:21, 56:10
**rule** [3] - 9:20, 37:22,
65:17
**rules** [2] - 5:8, 5:12
**Ruling** [3] - 93:7, 93:14,
93:16
**ruling** [3] - 9:13, 88:21,
93:10
**rulings** [1] - 89:4
**Russoniello** [2] - 94:4,
94:20
**RUSSONIELLO** [2] -
1:24, 3:13

---

**S**

**safe** [5] - 17:25, 18:3,
18:13, 18:23
**safeguard** [1] - 14:22
**safety** [6] - 15:4, 15:20,
16:9, 32:11, 71:12,
71:13
**sales** [4] - 17:16, 27:4,
82:16, 83:12
**Salim** [3] - 4:6, 91:9,
93:23

**SALIM** [9] - 1:17, 4:6,
43:16, 88:22, 88:24,
91:10, 91:19, 91:22,
92:4
**SANDLER** [1] - 2:9
**Sandler** [1] - 4:23
**sanguine** [1] - 52:10
**savings** [1] - 36:4
**saw** [3] - 42:17, 45:19,
53:5
**scheduling** [1] - 91:12
**scheme** [7] - 28:17,
29:23, 56:3, 77:23,
86:11, 86:13, 90:19
**schemes** [3] - 56:1, 56:5,
79:25
**se** [2] - 78:8, 79:3
**searched** [1] - 29:21
**seat** [3] - 17:22, 19:4,
67:22
**seated** [1] - 4:5
**second** [5] - 14:22,
14:24, 34:4, 35:23,
85:22
**Secretary** [1] - 36:3
**Section** [3] - 31:25,
35:24, 42:12
**SECTION** [1] - 3:6
**section** [1] - 35:24
**Sections** [1] - 12:2
**securities** [1] - 54:8
**see** [10] - 24:25, 31:23,
32:1, 43:10, 46:2, 49:6,
55:5, 58:24, 71:12,
81:10
**seek** [2] - 44:24, 50:8
**seeking** [1] - 57:4
**seeks** [1] - 47:3
**seem** [1] - 90:21
**segregated** [2] - 66:7,
67:5
**self** [1] - 68:17
**self-funded** [1] - 68:17
**sell** [1] - 17:17
**send** [1] - 70:13
**sending** [1] - 57:7
**sense** [2] - 40:4, 59:24
**sensitive** [1] - 27:9
**sentence** [4] - 71:23,
73:20, 75:1, 81:16
**separate** [1] - 66:11
**separately** [1] - 54:25
**September** [1] - 92:3

**serve** [1] - 34:19
**serves** [1] - 68:2
**service** [1] - 79:11
**services** [2] - 40:20,
42:16
**set** [19] - 5:7, 20:23,
21:8, 21:9, 23:16, 26:10,
26:16, 29:23, 29:25,
30:16, 62:23, 68:12,
69:11, 79:25, 82:12,
91:13, 91:20, 91:24,
94:9
**sets** [1] - 76:4
**setting** [5] - 32:16, 33:2,
36:10, 91:15, 92:1
**shall** [1] - 66:25
**shot** [1] - 58:6
**show** [9] - 20:10, 63:8,
64:22, 75:11, 75:19,
83:2, 83:7, 85:13, 88:4
**showing** [1] - 83:4
**shown** [1] - 83:20
**shows** [1] - 81:17
**significant** [6] - 32:10,
34:3, 34:9, 35:10, 36:23,
53:7
**significantly** [3] - 38:22,
38:23, 39:5
**similar** [4] - 7:18, 41:24,
42:24, 87:5
**SIMON** [1] - 1:18
**simply** [6] - 14:16, 53:16,
57:9, 65:18, 75:13, 85:3
**single** [1] - 64:23
**situation** [7] - 38:18,
56:1, 59:6, 64:13, 78:2,
86:11, 91:2
**situations** [1] - 58:21
**six** [1] - 49:15
**skewed** [2] - 29:12,
34:16
**skip** [1] - 40:20
**slim** [1] - 77:7
**slope** [1] - 76:25
**sole** [1] - 79:9
**solely** [1] - 44:25
**sometime** [1] - 92:2
**somewhat** [1] - 6:5
**sorry** [1] - 42:14
**sort** [2] - 77:19, 85:21
**Southern** [1] - 61:2
**special** [1] - 66:25
**specific** [5] - 14:5, 32:6,

52:2, 56:15, 73:24
**specifically** [14] - 10:2, 11:23, 12:10, 21:8, 21:19, 24:23, 30:23, 35:13, 39:13, 41:20, 48:4, 54:3, 57:24, 61:14
**specificity** [1] - 51:24
**sponsor** [4] - 31:5, 42:2, 42:5, 42:14
**sponsors** [2] - 35:1, 42:19
**squarely** [1] - 55:12
**SQUIBB** [2] - 1:6, 1:10
**staff** [1] - 50:5
**stake** [1] - 47:2
**standard** [6] - 40:12, 45:13, 45:16, 71:13, 78:5, 78:15
**standards** [6] - 12:12, 65:9, 71:12, 76:17, 80:12, 87:19
**standing** [1] - 44:21
**start** [7] - 9:23, 10:8, 13:10, 19:1, 19:2, 23:2, 29:17
**State** [5] - 4:13, 52:22, 67:21, 76:3, 94:6
**STATE** [2] - 1:8, 1:13
**state** [82] - 4:13, 14:5, 20:14, 25:21, 26:10, 26:25, 27:11, 27:16, 29:23, 30:1, 32:17, 34:13, 34:25, 36:25, 37:12, 37:21, 44:11, 44:12, 44:22, 46:12, 46:16, 46:22, 51:15, 53:15, 54:10, 56:22, 56:23, 57:5, 57:6, 58:14, 58:25, 59:2, 59:20, 60:7, 62:7, 64:5, 64:9, 64:14, 64:17, 66:2, 66:4, 66:8, 66:11, 66:16, 66:18, 66:20, 66:23, 67:1, 67:7, 67:9, 67:17, 68:4, 68:9, 68:14, 68:15, 68:21, 69:8, 69:12, 69:24, 71:1, 72:17, 73:9, 73:23, 74:10, 75:9, 76:7, 76:16, 78:11, 78:22, 78:23, 79:18, 79:23, 81:13, 86:5, 86:14, 86:16, 86:20, 89:5, 90:3
**state's** [3] - 58:1, 61:7,

76:13
**state-related** [1] - 66:18
**statement** [3] - 20:16, 48:3, 73:24
**statements** [4] - 72:8, 73:19, 83:22, 88:8
**states** [14] - 13:22, 13:25, 23:19, 26:8, 26:14, 26:16, 34:18, 37:23, 38:7, 38:9, 39:12, 39:16, 62:4, 85:8
**STATES** [2] - 1:1, 1:13
**States** [2] - 62:2, 94:4
**status** [1] - 91:17
**statute** [26] - 22:19, 23:7, 23:17, 25:16, 25:25, 26:10, 26:16, 28:15, 31:18, 36:21, 40:17, 42:3, 42:10, 45:1, 55:23, 60:12, 60:13, 66:6, 72:19, 81:24, 82:23, 82:24, 85:13, 87:1, 87:2, 87:16
**statutes** [8] - 18:5, 19:2, 20:12, 35:4, 35:7, 87:5, 89:3, 90:18
**statutorily** [1] - 44:11
**statutory** [4] - 29:23, 44:23, 44:25, 69:15
**stay** [1] - 69:17
**stem** [1] - 50:17
**STENOGRAPHIC** [1] - 3:8
**stenographically** [1] - 94:8
**step** [2] - 14:17, 64:2
**Sterns** [7] - 54:7, 55:5, 55:7, 55:9, 55:18, 55:24, 58:5
**still** [14] - 24:13, 24:22, 25:4, 35:11, 37:15, 37:25, 38:10, 47:17, 49:21, 71:15, 74:24, 81:12, 89:6, 90:3
**stipulate** [2] - 47:21, 48:11
**stop** [6] - 14:24, 16:16, 28:2, 35:23, 38:25, 56:9
**strategically** [1] - 76:19
**STREET** [1] - 1:13
**stroke** [5] - 17:8, 17:10, 17:14, 23:15, 35:22
**strokes** [1] - 38:8

**studies** [3] - 7:20, 8:1, 38:24
**stuff** [1] - 85:14
**subchapter** [1] - 40:19
**subject** [2] - 77:16, 81:23
**submission** [2] - 20:11, 21:25
**submit** [8] - 19:14, 19:17, 29:13, 30:21, 37:9, 37:20, 51:22, 71:10
**submits** [3] - 19:9, 28:4, 28:5
**submitted** [4] - 19:10, 27:24, 70:25, 71:6
**submitting** [2] - 19:12, 37:8
**subparagraph** [1] - 36:1
**Subsection** [1] - 36:14
**substance** [3] - 13:9, 75:3, 85:1
**substantial** [1] - 47:2
**substantiative** [1] - 5:15
**substantive** [6] - 9:1, 44:7, 44:9, 44:13, 44:22, 45:18
**substitute** [1] - 30:15
**successful** [1] - 73:1
**sue** [1] - 69:8
**sued** [1] - 68:13
**sues** [1] - 68:12
**suffered** [1] - 35:22
**sufficient** [5] - 7:3, 7:4, 8:22, 22:14, 73:15
**suggested** [2] - 27:13, 81:22
**suggesting** [1] - 12:15
**suggestion** [4] - 5:2, 5:24, 8:25, 93:5
**suited** [1] - 30:18
**sum** [3] - 63:21, 75:3, 85:1
**summarize** [1] - 39:25
**summary** [3] - 51:5, 63:12, 65:11
**summer** [1] - 52:6
**superior** [9] - 7:16, 16:1, 16:4, 17:17, 17:18, 51:10, 80:5, 80:10
**superiority** [6] - 80:3, 80:4, 80:6, 80:13, 80:25, 84:22
**supplemental** [1] - 76:14
**support** [1] - 31:16

**supposed** [3] - 69:16, 69:17
**Supreme** [14] - 55:19, 56:8, 59:7, 62:2, 64:15, 71:24, 73:3, 74:16, 76:22, 77:3, 79:23, 82:22, 87:13, 90:2
**sur** [2] - 45:3, 45:4
**sur-replies** [1] - 45:4
**sur-reply** [1] - 45:3
**surprised** [2] - 40:3, 90:22
**survive** [1] - 65:10
**survived** [1] - 81:13
**survives** [1] - 65:4
**system** [5] - 31:5, 37:19, 44:16, 66:13, 66:15

---

**T**

---

**tack** [1] - 65:20
**tack-on** [1] - 65:20
**tail** [1] - 52:23
**Takeda** [1] - 21:6
**tam** [5] - 4:10, 6:4, 6:25, 7:17, 24:12
**target** [1] - 27:5
**targeting** [2] - 34:17, 51:14
**technical** [2] - 80:6, 80:14
**teeth** [1] - 52:9
**tense** [1] - 53:11
**term** [2] - 11:8, 15:19
**terminology** [1] - 23:6
**terms** [7] - 10:14, 10:16, 32:11, 33:7, 45:13, 45:16, 85:2
**terribly** [1] - 33:5
**test** [1] - 34:16
**testimony** [1] - 83:12
**THE** [159] - 1:1, 1:15, 3:6, 3:8, 4:2, 4:3, 4:15, 4:24, 5:21, 6:16, 6:20, 7:7, 7:23, 9:7, 9:9, 9:17, 9:23, 10:6, 10:12, 10:18, 11:6, 11:14, 12:2, 12:13, 14:2, 14:24, 15:7, 15:11, 15:17, 17:22, 19:1, 19:17, 19:22, 20:7, 20:20, 21:14, 21:17, 22:6, 22:16, 23:8, 24:9, 25:3, 25:8, 25:10, 25:12, 27:10, 28:3, 28:10,

28:17, 29:9, 31:4, 31:14, 31:21, 32:21, 34:1, 35:23, 36:11, 36:16, 38:14, 39:1, 39:14, 41:18, 41:25, 42:10, 43:8, 43:22, 44:1, 44:14, 45:2, 45:8, 45:19, 45:24, 46:7, 47:1, 47:15, 47:21, 48:1, 48:13, 49:24, 50:8, 50:10, 50:12, 50:23, 51:4, 52:4, 53:13, 54:1, 55:5, 55:8, 55:16, 56:19, 57:21, 58:4, 58:7, 60:10, 60:19, 60:23, 61:1, 61:8, 61:14, 61:18, 61:21, 61:24, 62:8, 62:25, 63:13, 64:21, 65:2, 65:13, 65:22, 66:19, 67:11, 67:18, 67:22, 68:20, 69:1, 69:21, 70:6, 70:11, 70:17, 70:24, 71:5, 72:1, 72:20, 73:7, 74:3, 75:6, 76:12, 78:19, 81:19, 82:2, 82:10, 82:14, 82:17, 82:25, 83:7, 83:10, 83:18, 84:1, 84:6, 84:9, 84:15, 85:17, 86:25, 87:10, 88:6, 88:12, 88:23, 89:8, 89:24, 90:5, 90:15, 90:21, 91:6, 91:16, 91:21, 91:25, 92:5, 92:7
**theirs** [1] - 42:5
**themselves** [4] - 19:3, 39:4, 57:1, 58:19
**theoretically** [2] - 49:9, 49:15
**theories** [1] - 6:7
**theory** [3] - 20:2, 20:3, 31:4
**therapeutic** [4] - 32:11, 34:3, 34:9, 36:23
**thereby** [1] - 38:8
**therefore** [7] - 8:18, 34:10, 47:17, 64:16, 74:23, 78:10, 87:6
**they've** [2] - 64:13, 71:6
**thinking** [1] - 48:18
**thinks** [1] - 49:18
**Third** [4] - 5:17, 45:15, 52:4, 68:11
**third** [2] - 85:22, 85:23
**thread** [1] - 64:6

**three** [2] - 16:13, 77:18
**throughout** [1] - 11:9
**thrust** [1] - 53:11
**tied** [2] - 53:23, 78:24
**timing** [1] - 54:23
**title** [1] - 79:9
**TITLE** [1] - 3:6
**TO** [2] - 3:6, 3:7
**today** [10] - 5:10, 11:21, 12:14, 13:12, 26:23, 43:19, 50:16, 52:3, 53:5, 88:20
**together** [5] - 36:12, 54:7, 54:19, 58:12, 91:23
**top** [1] - 26:4
**total** [1] - 77:11
**totality** [1] - 64:10
**totally** [2] - 74:1, 81:21
**touted** [1] - 16:1
**track** [1] - 91:6
**tracks** [1] - 91:3
**trade** [4] - 48:8, 62:22, 71:15, 88:10
**trained** [1] - 17:16
**transactions** [1] - 58:23
**TRANSCRIPT** [2] - 1:4, 3:7
**transcript** [1] - 94:7
**TRANSCRIPTION** [1] - 3:8
**transferee** [1] - 5:13
**transferor** [4] - 5:3, 5:15, 20:4, 93:8
**Treasurer** [1] - 67:21
**treasury** [1] - 53:18
**Treasury** [2] - 67:1, 67:21
**treat** [1] - 18:14
**treating** [3] - 14:18, 16:22, 24:24
**treatment** [4] - 21:24, 32:5, 32:12, 40:22
**TRENTON** [1] - 1:13
**tried** [1] - 25:21
**trier** [2] - 79:15, 80:16
**tries** [1] - 64:10
**true** [6] - 7:24, 20:2, 24:19, 70:16, 85:3, 94:7
**truth** [1] - 35:20
**try** [2] - 17:5, 46:1
**trying** [6] - 52:8, 55:19, 63:15, 69:1, 89:20,

91:13
**turn** [10] - 5:4, 9:1, 14:25, 15:17, 20:25, 39:23, 43:15, 63:4, 65:22, 67:24
**twice** [1] - 28:2
**twin** [1] - 58:13
**two** [11] - 7:6, 16:13, 16:15, 19:24, 32:17, 35:11, 58:17, 62:16, 85:20, 86:1, 86:20
**Twombly** [3] - 51:23, 52:5, 52:8
**TX** [1] - 1:20
**type** [3] - 57:19, 61:5, 61:15
**types** [5] - 7:6, 17:3, 17:4, 19:24, 55:4
**typically** [1] - 55:10

---

**U**

**U.S** [2] - 1:25, 3:14
**U.S.C** [1] - 41:19
**ultimately** [3] - 8:19, 46:13, 65:10
**unclear** [2] - 11:7, 38:25
**under** [48] - 5:11, 9:12, 10:25, 21:5, 29:23, 31:4, 35:4, 35:6, 36:20, 39:18, 40:8, 40:18, 41:11, 42:13, 42:16, 45:17, 51:23, 53:8, 53:24, 54:1, 59:3, 64:8, 68:11, 72:6, 72:10, 72:12, 73:21, 74:5, 74:7, 75:20, 76:2, 76:3, 78:8, 78:21, 78:23, 80:7, 80:11, 81:15, 83:1, 84:23, 84:25, 86:5, 87:19, 88:3, 88:9, 88:10, 89:18
**underlying** [3] - 48:7, 70:25, 71:14
**understated** [1] - 7:13
**understood** [1] - 16:3
**unfair** [5] - 48:8, 62:22, 72:12, 73:22, 88:10
**unfortunately** [1] - 77:9
**uniform** [1] - 89:6
**unique** [7] - 6:4, 85:7, 85:17, 85:19, 85:20, 86:1, 86:9
**UNITED** [2] - 1:1, 1:13
**United** [2] - 62:2, 94:4

**unlawful** [1] - 88:3
**unlawfully** [1] - 47:25
**unless** [12] - 21:8, 26:8, 26:10, 27:12, 31:4, 40:8, 40:9, 41:4, 41:12, 42:13, 49:3, 49:7
**unnecessary** [1] - 31:6
**unreasonable** [1] - 31:6
**untitled** [1] - 50:18
**up** [18] - 29:25, 30:16, 32:16, 33:2, 36:10, 45:3, 47:4, 55:2, 63:21, 68:12, 69:11, 75:9, 79:13, 80:23, 81:23, 85:24, 90:13, 92:1
**upheld** [1] - 90:2
**uphold** [1] - 90:25
**usage** [1] - 27:2
**usages** [3] - 25:14, 51:11, 51:13
**USC** [1] - 3:6
**USDJ** [1] - 1:15
**uses** [3] - 24:1, 24:8, 24:11
**utilized** [1] - 62:7

---

**V**

**various** [1] - 87:4
**vascular** [1] - 17:10
**vastly** [1] - 27:21
**vehicle** [1] - 70:2
**versus** [3] - 8:3, 21:10, 56:21
**viability** [2] - 61:7, 70:4
**viable** [4] - 53:24, 54:22, 55:1, 55:4
**view** [3] - 23:13, 24:6, 41:13
**Vincent** [2] - 94:4, 94:20
**VINCENT** [2] - 1:24, 3:13
**vindicate** [1] - 59:22
**violate** [1] - 73:25
**violated** [8] - 71:12, 72:17, 72:18, 73:14, 74:25, 75:2, 81:14
**violating** [1] - 38:2
**violation** [16] - 47:4, 64:23, 65:2, 73:17, 74:8, 80:20, 81:2, 81:17, 82:6, 82:8, 82:19, 83:4, 85:5, 85:6, 86:12, 86:20
**violations** [3] - 83:17, 84:20, 85:15

**VIRGINIA** [2] - 1:8, 1:21
**Virginia** [56] - 4:9, 4:13,
    4:14, 5:5, 43:15, 43:18,
    43:23, 44:16, 45:9,
    45:17, 45:18, 46:20,
    46:23, 51:8, 53:24,
    54:13, 55:19, 55:20,
    57:25, 58:12, 59:7, 61:3,
    64:14, 64:24, 66:1,
    68:19, 69:7, 69:8, 71:25,
    73:3, 74:11, 74:15, 75:2,
    76:3, 76:22, 80:11,
    80:16, 82:7, 82:21,
    82:24, 83:2, 84:24, 85:7,
    85:18, 86:2, 86:8, 86:16,
    87:13, 87:16, 87:20,
    87:23, 87:24, 88:3,
    90:19, 90:23, 92:3
**VISVADER** [2] - 2:9, 4:22
**Visvader** [1] - 4:22
**voluntary** [1] - 65:16

---

**W**

**wagging** [1] - 52:23
**WAICHMAN** [1] - 2:13
**warn** [3] - 78:5, 81:7,
    81:11
**warning** [6] - 74:12,
    74:19, 74:20, 76:21,
    78:17, 80:1
**warnings** [2] - 7:3, 7:4
**ways** [2] - 38:5, 58:17
**weaker** [1] - 87:22
**weight** [1] - 54:9
**weighty** [1] - 68:2
**West** [56] - 4:8, 4:12,
    4:14, 5:5, 43:15, 43:18,
    43:23, 44:16, 45:9,
    45:17, 45:18, 46:20,
    46:23, 51:8, 53:24,
    54:13, 55:19, 55:20,
    57:24, 58:12, 59:7, 61:3,
    64:14, 64:24, 66:1,
    68:19, 69:7, 69:8, 71:25,
    73:3, 74:10, 74:15, 75:2,
    76:3, 76:22, 80:11,
    80:16, 82:7, 82:21,
    82:24, 83:1, 84:24, 85:7,
    85:17, 86:1, 86:8, 86:16,
    87:13, 87:16, 87:19,
    87:23, 87:24, 88:3,
    90:19, 90:23, 92:3
**WEST** [2] - 1:8, 1:21

**Westlaw** [2] - 60:24,
    60:25
**whereas** [1] - 56:25
**White** [17] - 53:25, 54:2,
    54:3, 54:24, 55:18,
    56:11, 57:12, 59:25,
    62:10, 62:12, 62:17,
    62:23, 63:1, 64:5, 65:7,
    86:9
**whole** [4] - 28:18, 44:16,
    73:3, 85:4
**wiggle** [1] - 88:5
**Wilkins** [6] - 20:19, 24:5,
    30:5, 30:8, 30:14, 30:20
**willful** [2] - 47:4, 64:23
**willing** [2] - 49:7, 64:4
**win** [1] - 73:7
**wise** [1] - 26:23
**WOLFSON** [1] - 1:15
**word** [1] - 11:9
**words** [3] - 22:17, 40:20
**works** [1] - 66:15
**worried** [1] - 38:18
**worse** [3] - 16:13, 35:21,
    38:24
**written** [9] - 18:6, 32:14,
    38:2, 42:4, 42:11, 50:19,
    73:2, 87:2, 88:12
**wrote** [1] - 77:6
**WV** [1] - 1:19
**Wyeth** [1] - 78:22

---

**Y**

**year** [2] - 47:5, 51:3
**years** [1] - 55:9